UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENTAL ASSOCIATES, P.C., d/b/a
REDWOOD DENTAL GROUP,

      Plaintiff,

v.

AMERICAN DENTAL PARTNERS
OF MICHIGAN, LLC and AMERICAN
DENTAL PARTNERS, INC.,

      Defendants.

Civil Action No. _____
Hon. _____

---

| | |
|---|---|
| Ronald L. Cornell, Jr. (P46860) | Robert M. Jackson (P40723) |
| SEYBURN, KAHN, GINN, BESS & | Jason R. Abel (P70408) |
| SERLIN, P.C. | HONIGMAN MILLER SCHWARTZ |
| Attorneys for Plaintiff | AND COHN LLP |
| 200 Town Center, Suite 1500 | Attorneys for Defendants |
| Southfield, Michigan 48075 | 2290 First National Building |
| (248) 353-7620 | 660 Woodward Avenue |
| | Detroit, Michigan  48226 |
| | (313) 465-7430 |

---

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants remove to this Court the state-court action that was served on Defendants on or about March 25, 2011 and that was venued in the Wayne County, Michigan Circuit Court.  As required by 28 U.S.C. § 1446(a), attached are copies of all process, pleadings and orders served upon the Defendants in the removed case.  In support of this Notice of Removal, Defendants state:

      1.      Plaintiff filed its Complaint in the Wayne County, Michigan Circuit Court on March 17, 2011, and the Complaint was assigned Case No. 11-003213-CK.  The first date upon which Defendants were served with a copy of the Complaint in the removed case was March 25,

2011.  This Notice of Removal is being filed within 30 days of service, and, therefore, is timely filed under 28 U.S.C. § 1446(b).

2.     Venue of this removal is proper under 28 U.S.C. § 1441(a), because this Court is in the United States District Court for the district and division corresponding to the venue where the state-court action was filed.

3.     This is a civil action that falls within the Court's original jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) and is one that may be removed to this Court based on diversity of citizenship under 28 U.S.C. §§ 1441 and 1446 because:

(a)    As stated in the Complaint, ¶ 1, Plaintiff Dental Associates, P.C., d/b/a Redwood Dental Group, is a Michigan professional corporation with its registered office located in Warren, Michigan.  It therefore is a citizen of the State of Michigan at the time of removal and at the time this action was served.

(b)    As stated in the Complaint, ¶ 3, American Dental Partners, Inc. ("ADPI") is a publically-traded Delaware corporation with its headquarters located in Wakefield, Massachusetts.  ADPI's principal place of business is, in fact, in Massachusetts.  ADPI is, therefore, a citizen of Delaware and Massachusetts at the time of removal and at the time this action was served.  28 U.S.C. § 1332(c)(1) (stating that a corporation is a citizen of its state of incorporation and the state in which its principal place of business is located); *V & M Star, LP v. Centimark Corp.*, 596 F.3d 354, 355 (6th Cir. 2009).

(c)    As stated in the Complaint, ¶ 2, Defendant American Dental Partners of Michigan, LLC ("ADP of Michigan") is a Delaware limited liability company.  A limited liability company is a citizen of all of the states in which its members are

citizens.  *V & M Star, LP*, 596 F.3d at 356.  The sole member of ADP of Michigan is ADPI.  Therefore, ADP of Michigan is a citizen of Delaware and Massachusetts, and it was so at the time of removal and at the time this action was served.

(d)     The monetary value of the amount in controversy exceeds $75,000, exclusive of interests and costs, for three independently sufficient reasons.  First, "[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."  *Hunt v. Washington State Apple Adver. Comm'n*,  432 U.S. 333, 347 (1997).  Here, the Plaintiff seeks a declaration that it can terminate its agreement with ADP of Michigan.  The potential loss to the Plaintiff from enforcement of the agreement exceeds $75,000 because the Plaintiff will pay ADP of Michigan far in excess of $75,000 through the remaining life of the agreement if the Plaintiff does not succeed in this lawsuit in terminating its agreement.  (Affidavit of Breht T. Feigh "Feigh Aff." at  ¶¶ 3-5, attached as Exhibit A.)  *See Crestmark Bank v. Goldleaf Fin. Solutions, Inc.*, No. 07-12841, 2007 WL 2694174, at *9 (E.D. Mich. Sept. 11, 2007) ("The 'object of the litigation' is not the 'contract' itself, but the costs associated with its enforcement against the plaintiff to the plaintiff").  Moreover, where a constructive trust is sought, as in this case, the amount in controversy includes all money retained by the defendants.  *Rosen v. Chrysler Corp.*, 205 F.3d 918 (6th Cir. 2000).  The amount over which the Plaintiff seeks a constructive trust exceeds $75,000 in this case.  (Feigh Aff. at ¶¶ 6.)  Finally, the Plaintiff has sued for damages.  Plaintiff alleges in its Complaint that this case is similar to

another case in which the plaintiff recovered approximately $88 million in compensatory damages and over $40 million in punitive damages. (Complaint at ¶ 17.) Therefore, Plaintiff's own allegations illustrate that the amount in controversy exceeds $75,000.

4.    Thus, the state-court action may be removed to this Court in accordance with the provisions of 28 U.S.C. § 1441(a) because: (i) this action is a civil action pending within the jurisdiction of the United States District Court for the Eastern District of Michigan; (ii) this action is between citizens of different states; and (iii) the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.    All of the Defendants join in removal of this action.

6.    If any question arises as to the propriety of the removal of this action, Defendants request the opportunity to brief any disputed issues and to present oral argument in support of its position that this case is properly removable.

7.    Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of any of the Defendants' rights to deny the allegations contained in Plaintiff's Complaint, or of Defendants' rights to assert any defenses, including, without limitation: (1) lack of jurisdiction of the person, (2) improper venue, (3) insufficiency of process, (4) insufficiency of service of process, (5) improper joinder of claims and/or parties, (6) failure to state a claim, (7) failure to join an indispensable party, (8) that Plaintiff's claims must be arbitrated or (9) any other procedural or substantive defenses available under state or federal law.

8.    Pursuant to 28 U.S.C. § 1446(d), written notice of the removal of this action has been given simultaneously to Plaintiff's counsel, and the Notification of Filing Notice of Removal in Federal Court is simultaneously being filed with the Wayne County Circuit Court,

8990854.1

State of Michigan.  A copy of the filing with the Wayne County Circuit Court (without exhibit) is attached as Exhibit B.

**WHEREFORE**, Defendants request that further proceedings be conducted in this Court as provided by law.

Dated:  April 15, 2011

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By:  /s/ Jason R. Abel
     Robert M. Jackson (P40723)
Jason R. Abel (P70408)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Phone:  313-465-7430

and

MASLON EDELMAN BORMAN & BRAND, LLP
William Z. Pentelovitch (#85078)
Haley N. Schaffer (#0313099)
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Phone:  612-672-8200

5

8990854.1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 15, 2011, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to all ECF participants; and I hereby certify that I have mailed the foregoing papers by United States Postal Service to the following non-ECF participants:

Ronald L. Cornell, Jr. (P46860)
SEYBURN, KAHN, GINN, BESS & SERLIN, P.C.
Attorneys for Plaintiff
200 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 353-7620

By: /s/ Jason R. Abel
     Robert M. Jackson (P40723)
     Jason R. Abel (P70408)
     2290 First National Building
     660 Woodward Avenue
     Detroit, MI 48226
     Phone:  313-465-7430

8990854.1

# STATE COURT DOCUMENTS

| STATE OF MICHIGAN THIRD CIRCUIT COURT | | **SUMMONS AND RETURN OF SERVICE** | **CASE NO.** | 11-003213-CK |

| | |
|---|---|
| COURT ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT TELEPHONE NO. (313) 224- |

THIS CASE ASSIGNED TO JUDGE:   **Jeanne Stempien**        Bar Number: 31381

| PLAINTIFF | DEFENDANT |
|---|---|
| **DENTAL ASSOCIATES PC** | **VS AMERICAN DENTAL PARTNERS OF MICHIGAN LLC** |

PLAINTIFF'S ATTORNEY

**Cornell, Ronald L.
(P-46860)
2000 Town Ctr Ste 1500
Southfield, MI 48075-1148
(248)  353-7620**

| CASE FILING FEE | | JURY FEE | |
|---|---|---|---|
| **Paid** | | **Paid** | |
| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK | |
| **03/17/2011** | **06/16/2011** | **Latonya Smith** | |
| *This summons is invalid unless served on or before its expiration date. | | Cathy M. Garrett – Wayne County Clerk | |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

_____        _____
Date                           Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)    MC 01 (10/97)    **SUMMONS AND RETURN OF SERVICE**    MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)

RETURN COPY-FILE IN ROOM 201 C.C.B.

**For best results use a felt pen**

## RETURN OF SERVICE

Case No.

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing.  You must make and file your return with the court clerk.  If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

☐ **OFFICER CERTIFICATE**          OR          ☐ **AFFIDAVIT OF PROCESS SERVER**

I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party [MCR 2.104(A)(2)], and that:   (notary not required)

Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:   (notary required)

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
        List all documents served with the Summons and Complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s): _____

_____

☐ I have personally attempted to serve the summons and complaint, together with _____
                                                                            Attachment

_____ on _____
                                                Name

at _____ and have been unable to complete service because
   Address

the address was incorrect at the time of filing.

| Service fee | Miles traveled | Mileage fee | Total fee |
|---|---|---|---|
| $ |  | $ | $ |

Signature _____

Title _____

Subscribed and sworn to before me on _____ _____ County, Michigan.
                                        Date

My commission expires: _____   Signature: _____
                        Date                        Deputy court clerk/Notary public

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
                                          Day, date, time

on behalf of _____

Signature _____

| STATE OF MICHIGAN<br>THIRD CIRCUIT COURT<br> | SUMMONS AND<br>RETURN OF SERVICE | CASE NO.<br>11-003213-CK |
|---|---|---|

| COURT<br>ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT<br>TELEPHONE NO. (313) 224- |
|---|---|

THIS CASE ASSIGNED TO JUDGE: **Jeanne Stempien**   **Bar Number: 31381**

| PLAINTIFF | | DEFENDANT |
|---|---|---|
| **DENTAL ASSOCIATES PC** | VS | **AMERICAN DENTAL PARTNERS INC** |

PLAINTIFF'S ATTORNEY

**Cornell, Ronald L.**
**(P-46860)**
**2000 Town Ctr Ste 1500**
**Southfield, MI 48075-1148**
**(248)  353-7620**

| CASE FILING FEE | JURY FEE |
|---|---|
| **Paid** | **Paid** |
| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
| **03/17/2011** | **06/16/2011** | **Latonya Smith** |
| *This summons is invalid unless served on or before its expiration date. | | Cathy M. Garrett – Wayne County Clerk |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

_____   _____
Date                                       Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**

If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101   NC 01 (10/97)   **SUMMONS AND RETURN OF SERVICE**   MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
REV. (3-98)

RETURN COPY-FILE IN ROOM 201 C.C.B.

For best results use a felt pen

## RETURN OF SERVICE

Case No.

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party [MCR 2.104(A)(2)], and that: (notary not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notary required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s): _____

_____

☐ I have personally attempted to serve the summons and complaint, together with _____
                                                                          Attachment

_____ on _____
                                              Name

at _____ and have been unable to complete service because
    Address

the address was incorrect at the time of filing.

| Service fee | Miles traveled | Mileage fee | Total fee | Signature |
|---|---|---|---|---|
| $ | | $ | $ | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
                                          Date

My commission expires: _____  Signature: _____
                          Date                  Deputy court clerk/Notary public

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
                                              Day, date, time

                                    on behalf of _____

_____
Signature

JURY FEE PAID
MAR 17 2011

## STATE OF MICHIGAN

## WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

        Plaintiff,

                              Case No. 11-                CK

vs.                                    Hon. _____

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

        Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

2011 MAR 17 P 3: 55
CATHY M GARRETT
WAYNE COUNTY CLERK

## COMPLAINT

**THERE IS NO OTHER PENDING OR RESOLVED CIVIL ACTION ARISING OUT OF
THE SAME TRANSACTION OR OCCURRENCE AS ALLEGED IN THE COMPLAINT.**

    For its Complaint against Defendants American Dental Partners of Michigan, LLC and

American Dental Partners, Inc., Plaintiff Dental Associates, P.C., states and alleges as follows:

### PARTIES

    1.    Plaintiff Dental Associates, P.C. d/b/a Redwood Dental Group ("RDG") is a

Michigan professional corporation with its registered office located in Warren, Michigan. RDG

is owned by a number of dentists, each of whom is licensed to practice dentistry in the state of

Michigan. RDG, which employs approximately 20 licensed dentists and provides dental services

{00552197.DOC}

to the general public at six clinics located in the following Detroit-area communities: Madison Heights, Shelby Township, St. Clair Shores, Troy, Warren, and Westland.

     2.     Upon information and belief, Defendant American Dental Partners of Michigan, LLC ("ADP of Michigan") is a Delaware limited liability company with its registered office located in Bingham Farms, Michigan. The principal business of ADP of Michigan is providing administrative services to RDG in connection with the operation of RDG's dental clinics in the Detroit metropolitan area, including Wayne County.

     3.     Upon information and belief, ADP of Michigan is a wholly-owned subsidiary of defendant American Dental Partners, Inc. ("ADPI"). ADPI is a publicly traded Delaware corporation with its headquarters located in Wakefield, Massachusetts. ADPI, through ADP of Michigan and other wholly-owned subsidiaries, is in the business of providing administrative services to group dental practices throughout the United States.

     4.     In describing the business of ADP of Michigan and other ADPI subsidiaries, ADPI represents on its website and/or in filings with the Securities and Exchange Commission that it is the leading "business partner" to group dental practices like RDG. ADPI states that its model for affiliating with group dental practices centers around "a partnership in management" designed to insure sharing of operating governance and financial risk and reward with each dental practice and that the relationship that ADPI and its subsidiaries structure with affiliated dentists "has the critical elements of any business partnership." ADPI touts its resources that it deploys "to enhance the growth and success of our affiliated dental group practices."

     5.     As a publicly traded business corporation, ADPI, along with its subsidiaries, including ADP of Michigan, are focused heavily on financial performance through increasing revenue, controlling expenses, and meeting certain financial metrics in its affiliated dental

practices. They seek to maximize the financial return to ADPI's public shareholders and investors.

6.      Through overlapping officers and directors and as the parent company of ADPI of Michigan, ADPI, upon information and belief, controls the business activities of ADPI of Michigan and its other subsidiaries and affiliates. For example, although it is technically ADPI's subsidiaries that enter into contractual agreements with group dental practices, ADPI's Form 10-K filed with the SEC states that "we have entered into a service agreement with each affiliated practice "and that "[p]ursuant to the service agreement, we are responsible" for the various services to be provided to the dental practices. ADPI further states that under its contractual arrangements with dental groups, the affiliated dental practices "reimburse us" for certain expenses and "pay fees to us" for certain services. In short, with respect to their relationships with group dental practices, ADPI and its subsidiaries like ADP of Michigan make no operational distinctions between ADPI and the subsidiaries.

## JURISDICTION AND VENUE

7.      This dispute involves equitable claims and an amount in controversy in excess of $25,000, exclusive of costs, interest and attorneys' fees and is therefore within this Court's venue and jurisdiction.

## FACTUAL BACKGROUND

8.      RDG was formed in approximately 1980. At that time RDG had 4 dentists practicing in one location.

9.      Over the next several decades, RDG grew and expanded so that by the early 2000's, RDG employed approximately 17 dentists working at five locations. During this period RDG built a culture and reputation of placing the interests of patients ahead of profit motive or

{00552197.DOC}

other financial metrics. RDG accomplished this by providing high qualify dental care at well equipped and well furnished clinics, by assuring that licensed dentists were responsible for all decisions impacting dental care, and by placing great emphasis on maintaining strong doctor-patient relationships.

10.     In approximately 1999-2000, RDG was introduced to executives of ADPI. ADPI proposed to RDG that RDG enter into an affiliation agreement with ADPI whereby ADPI (or its subsidiary) would purchase certain assets of RDG and would provide administrative services to RDG in return for payment of fees.

11.     ADPI subsequently proposed that RDG and ADPI (or its subsidiary) enter into a Service Agreement that would describe the services to be provided by ADPI and the fees to be paid by RDG. ADPI indicated that the proposed Service Agreement was similar to one that ADPI (or its subsidiaries) had previously entered into with other dental groups, including Park Dental, a large (approximately 100 dentists) and very successful group dental practice located in the Minneapolis, Minnesota metropolitan area.

12.     In discussing a possible affiliation of RDG with ADPI, RDG expressed to ADPI that RDG and its doctors were not interested in a relationship with ADPI if it would mean a change in the long-standing culture of RDG or changes in the way doctors provided dental care, interacted with their patients, and operated the clinics. RDG was repeatedly assured by high level ADPI executives, including ADPI Chief Executive officer and Board Chairman Greg Serrao, that no such changes would occur. To the contrary ADPI and its executives assured RDG that entering into a Service Agreement with ADP of Michigan would serve RDG's interests, both from a professional and financial standpoint.

{00552197.DOC}                                             4

13.     Mr. Serrao told RDG and its doctors on multiple occasions that nothing about the way RDG and its doctors practiced dentistry and exercised control over dental care and patient issues would change.  What would change, according to Serrao, is that ADPI would provide the sufficient capital and resources to make RDG "the premier dental group in Michigan" and "the next Park Dental."  Serrao told RDG that RDG would become the Michigan "platform group" and that ADPI would invest the capital necessary to substantially grow the RDG practices through acquisitions of other dental practices or otherwise adding doctors and locations.

14.     To back up these commitments, Serrao encouraged RDG President Mark Bouchillon to meet with Dr. Greg Swenson.  Dr. Swenson was a member of the Board of Directors of ADPI and a senior executive of ADPI's affiliate in Minnesota (Park Dental). Dr. Bouchillon met in person with Dr. Swenson and spoke with him on the phone on other occasions.

15.     Dr. Swenson told Dr. Bouchillon that RDG would benefit financially and professionally from an affiliation with ADPI and that an affiliation would allow RDG to grow and open new state-of-the-art offices as Park Dental had done in Minnesota.  On the critical issue of doctor independence and avoiding changes in the RDG culture and dental practices, Dr. Swenson assured Dr. Bouchillon and RDG that such changes would not occur.  He said that under Park Dental's relationships with ADPI, the doctors continued to be completely autonomous and in charge of their practices, and the same would be true for RDG if it affiliated with ADPI.

16.     Prior to its affiliation with Park Dental, ADPI made similar commitments to the Park Dental doctor group, telling Park Dental that affiliation with ADPI would not result in

{00552197.DOC}                              5

changes in the culture of the practice, and that the doctor group would maintain autonomous

decision-making and control over dental care and doctor-patient relationships.

17.    ADPI (and its Minnesota subsidiary) did not honor those representations,

promises, and assurances to the Park Dental doctor group.  Ultimately, the Park Dental doctor

group sued ADPI and its Minnesota subsidiary and terminated its Service Agreement with the

ADPI subsidiary.  The conduct by ADPI and its subsidiary resulted in a December 2007 jury

verdict against ADPI and its Minnesota subsidiary for approximately $88 million in

compensatory damages and over $40 million in punitive damages.  Defendants have also failed

to honor their similar assurances and contractual obligations to RDG.

18.    Based upon the representations, promises and assurances by ADPI, on or about

May 1, 2003, RDG and ADP of Michigan entered into a Service Agreement, a copy of which is

attached hereto as Exhibit A and incorporated herein.

19.    Among the essential purposes of the affiliation of RDG with ADPI was for

Defendants to provide capital and other support so that RDG could grow its practices in

Michigan while the licensed doctors of RDG would remain autonomous in the operations of their

practices and would continue to make all decisions relating to the manner in which dental care is

provided.

20.    The representations, promises, and assurances of Defendants, including those

made by Greg Serrao and Dr. Greg Swenson, to induce RDG to enter into the Service Agreement

have not been honored.  Instead, Defendants have exercised greater and greater control over both

the financial expenditures and operational issues at the RDG dental practices and have interfered

with RDG's ability to make or direct decisions regarding dental care and their doctor-patient

relationships in the manner they believe is appropriate to fulfill their professional obligations to their patients and the state of Michigan, which licenses them to practice dentistry.

21.     Rather than maintaining the culture of RDG's practices, as promised, ADPI has aggressively sought to sublimate RDG's culture and to advance a culture of what Mr. Serrao calls "One ADPI," whereby all ADPI affiliates through the U.S. are part of a top-down, one-size-fits all culture focused first and foremost on meeting financial metrics to increase the bottom line and the return to ADPI's investors. This conduct violated not only the parties' agreement but also has allowed Defendants to exercise control over dental care in a manner that is directly contrary to the public policy that licensed dentists, and not non-professional business corporations, be responsible for decisions affecting dental care and doctor-patient relationships.

22.     Defendants have failed to provide capital necessary for significant growth of RDG's practices. Instead of honoring the commitment to make RDG the platform group in Michigan that would become the next Park Dental, Defendants have made the decision that they do not want to invest significant capital in Michigan. As a result, Defendants have not provided the capital and other assistance needed for meaningful growth of RDG's practices through acquisition or otherwise.

23.     Under RDG's Service Agreement with ADP of Michigan, RDG hired ADP of Michigan as its agent to perform certain services outlined in the Agreement. According to the express terms of the Service Agreement, it was the "sole intention" of the parties that the services to be provided to RDG by ADP of Michigan "are solely for the purpose of providing non-dental administrative services to [RDG]." (Exhibit A, § 9.1.)

24.     ADP of Michigan is the employer of the non-professional staff that provide administrative and business services to RDG. RDG employs all of the professional staff,

including the dentists as well as the dental hygienists and dental assistants that provide care to patients.

25.    The critical overarching principle governing the contractual relationship between ADP of Michigan and RDG is that RDG and its licensed dentists, and not ADP of Michigan (the non-professional business corporation hired to provide administrative services) is to be solely responsible for all decisions relating to dental care.

26.    For example, Section 2.5 of the Service Agreement provides that:

> The Parties acknowledge and agree that: (a) Service Company is not authorized or qualified to engage in any activity that may be construed or deemed to constitute the practice of dentistry, and (b) notwithstanding anything in this Agreement to the contrary: (i) Provider, through its dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants, shall be solely responsible for and shall have complete authority, responsibility, supervision, and control over the provision of all Dental Care and that all Dental Care shall be provided and performed exclusively by or under the supervision of dentists as such dentists, in their sole discretion, deem appropriate, consistent with applicable law; (ii) Service Company shall not have or exercise any control or supervision over the provision of Dental Care. . . .

27.    Similarly, Section 3.3 of the Service Agreement provides:

> Dental Decisions.  Notwithstanding the preceding section or any other provisions of this Agreement to the contrary, all Dental Decisions (defined below) will be made solely by the dentist members of the Policy Board; provided that non-dentist members of the Policy Board may participate in the analysis and discussion process.  For purposes of this Agreement, "Dental Decisions" shall mean decisions relating directly to: (a) types and levels of Dental Care to be provided; (b) recruitment of dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants for Provider, including the evaluation of the background, experience, qualification, specialties, and other credentials of such recruited individuals; (c) fee schedules for Provider's services, including without limitation Provider's usual and customary fee schedule; (d) to the extent required by applicable law, third party payor contracting; and (e) any other Dental Care related functions or decisions agreed upon by the Parties.

28.     In short, consistent with the discussions prior to entering into the Service Agreement, RDG and its dentists are to be solely responsible for all dental care related decisions and it is the responsibility of ADP of Minnesota as RDG's administrative service provider to implement those decisions.

29.     Despite this relationship of RDG as the principal and ADP of Michigan as the agent, Defendants have attempted to turn this relationship on its head, effectively making RDG and its doctors agents of ADPI and part of the "One ADPI" envisioned by ADPI CEO Greg Serrao.  Contrary to the terms of the Service Agreement and public policy, Defendants have not allowed RDG and its doctors to make all decisions affecting dental care at RDG's practices and have refused to implement directives from RDG with respect to dental care issues.  Defendants have exercised control over these issues through, among other things, their control over RDG's purse strings.

30.     Under the Service Agreement, ADP of Michigan was appointed as the "sole and exclusive agent" of RDG.  (Exhibit A, § 2.1.)  In addition, ADP of Michigan was granted an "exclusive special power of attorney" and was appointed RDG's "attorney-in-fact" with respect to the handling of RDG's bank account and funds and the use and distribution of revenues generated by RDG's dental practices.  (Exhibit A, § 4.12.)  In addition, ADP of Michigan was granted a "special power of attorney" and was appointed as RDG's attorney-in-fact with respect to matters involving patient billing, insurance reimbursement, collection of accounts receivable, depositing funds in RDG's bank account, and making payments of RDG's funds out of the bank account.  (Exhibit A, § 4.11.)  As such, ADP of Michigan has a fiduciary duty to RDG to act in RDG's best interests, to not utilize its authority to its own benefit to the detriment and/or without

{00552197.DOC}

9

the consent of RDG, and to deal fairly with RDG in all transactions between ADP of Michigan and RDG and in the use of RDG's funds.

31.     Despite the fact that ADP of Michigan is RDG's agent with fiduciary duties to RDG and the fact that the services to be provided by ADP of Michigan to RDG are supposed to be solely for the purpose of providing non-dental administrative services, ADP of Michigan and ADPI have exercised control over important aspects of RDG's dental practices in ways that affect the dental care provided by RDG, that are inconsistent with the Service Agreement and the role of ADP of Michigan as RDG's agent and fiduciary, and that are inconsistent with commitments made by Defendants prior to and after the execution and effective date of the Service Agreement.

32.     As a publicly-traded business corporation, with its shares trading on NASDAQ, ADPI (along with ADP of Michigan) is intensely focused on the financial performance and results.  Given this intense focus on financial results, Defendants have exercised control over expenditures by RDG in a manner that has affected the dental care provided by RDG and its doctors.  Examples of expenditures directed by RDG doctors in order for them to provide dental care in the manner they deem to be appropriate, but that Defendants refused to undertake, are: replacement of defective nitrous/oxygen systems; purchase of needed dental hand pieces, tools and other important clinical equipment; new lighting systems and other furnishings needed in a number of clinic operatories.  When requests for these and other necessities have been made by RDG doctors, the response from Defendants has generally been, in words or substance "we cannot spend the money or we will not meet our [budget] numbers."

33.     Defendants' focus on the financial bottom line has also resulted in the failure to maintain appropriate staffing levels at RDG clinics.  Hiring of appropriate staff and keeping

them motivated and satisfied in their job is critical to RDG's standards of professional quality as well as financial performance. RDG doctors have requested additional clinical assistants necessary to provide the dental care they believe to be necessary and appropriate. Due to Defendants' excessive focus on the financial results, Defendants have refused to provide for sufficient staffing of RDG's clinics. Defendants have also refused to provide for any staff raises for an extended period of time, thereby undermining staff morale and resulting in staff turnover.

34.    Defendants have taken other steps contrary to the directions of RDG. For example, RDG had always worked with its patients to provide them with needed care, even if the patients could not pay for the services or needed to be extended credit so they could pay a bill over time. RDG views this financial flexibility to be an important service because without it, some patients will simply not get dental care or will not see a dentist with the frequency necessary for appropriate care. ADPI as part of its bill collection efforts has implemented policies that take away this flexibility, that result in refusal of dental services to patients, and that result in threatening bill collection communications to patients.

35.    On or about November 15, 2010, RDG provided Defendants as its agent and fiduciary with written directions as to a number of necessary expenditures (many of which had been previously requested) and other actions needed for ADP of Michigan to comply with its obligations under the Service Agreement. A copy of that letter is attached hereto as Exhibit B and is incorporated herein. Defendants provided no response within 30 days and took no steps within that period to even begin implementing the directions it had received from RDG. Defendants' failure to respond and correct the problems is a breach of the Service Agreement.

36.    In a January 18, 2011 letter to representatives of ADP of Michigan and ADPI, RDG identified specific staffing needs for its practices and directed its agent to immediately take

{00552197.DOC}

11

steps to fill three positions.  A copy of that letter is attached hereto as Exhibit C and incorporated

herein.  Defendants have failed to take any timely or sufficient steps to implement this directive

from RDG.  Defendants' actions are a breach of the Service Agreement.

     37.     In its November 15, 2010 letter (Exhibit B), RDG addressed the issue of staff

raises, directing that "it is critical that staff receive raises of not less than 3% for 2011."  For

several months, Defendants took no steps to implement such staff compensation increases.

Then, after several months had passed, Defendants unilaterally implemented certain minimal

staff raises that had never been approved by RDG and directly contrary to what RDG had

directed.  Defendants' actions are a breach of the Service Agreement.

     38.     Moreover, under its "One ADPI Compensation Philosophy," ADPI has set a

financial metric that dental assistants cannot be paid more than a specific maximum hourly wage.

Because several of RDG's dental assistants have been working for RDG for many years, and are

valuable and critical team members in the dental care provided to patients, already are paid at or

above ADPI's unilateral metric, Defendants have dictated that these staff members (who are not

even employees of Defendants) will get no raises at all.

     39.     As RDG's agent fiduciary, ADP of Michigan collects all revenues generated by

RDG's practices and deposits the funds into a "Provider Account," a bank account in the name

of RDG.  Rather than leaving the funds in RDG's bank account so that the funds can be used to

pay RDG's expenses, including fees payable to ADP of Michigan under the Service Agreement,

ADP of Michigan instead "sweeps" the funds from the account on a daily or other periodic basis.

The funds are then transferred into one or more accounts used and/or controlled by ADPI, such

that Defendants have control over all of RDG's funds and control what payments are made from

RDG's funds.  By taking possession and control of RDG's funds, ADPI takes on the same fiduciary duty as the duty owed by ADP of Michigan to RDG.

40.     Through their sweep and control over the funds deposited into RDG's bank account, Defendants benefit because among other things, ADPI is able to reduce the amount by which it must draw on its own credit facility.  The same conduct harms RDG by depriving it of the investment income that could otherwise be earned on the funds.

41.     In its November 15, 2010 letter (Exhibit B), RDG directed that the "sweep" of its bank account be discontinued, and requested its agent to provide RDG with a monthly general ledger or comparable report of payments out of RDG's account and provide RDG with necessary paperwork to give officers of RDG signing authority for RDG's own account.  Defendants have ignored this direction and request, and failed to take any of the steps that RDG directed or requested that they take.  Defendants continue to sweep RDG's account and exercise complete control over RDG's funds.  Moreover, in exercising this unilateral control over RDG's account and funds, RDG has acted in a manner contrary to the best interests of RDG, contrary to the direction from RDG, and in a manner that interferes with RDG's ability to make or direct dental care decisions regarding dental care and their doctor-patient relationships in the manner they believe is appropriate.

42.     Under the Service Agreement, RDG is to maintain professional and comprehensive general liability insurance coverage covering RDG and its dentists.  Such insurance is to be obtained and maintained with commercial carriers or through self insurance by RDG.  Upon information and belief, ADPI and ADP of Michigan have in recent years arranged for professional liability coverage for RDG that results in payment to ADPI and/or ADPI's wholly owned captive insurance subsidiary, Edgewater Indemnity Company.  Upon information

{00552197.DOC}

13

and belief, ADPI and ADP of Michigan have not attempted to obtain or provide to RDG competitive bids or otherwise obtain the best insurance at the least cost, but rather have implemented an "insurance program" for RDG to provide financial benefit to ADPI and/or its affiliated insurance company.

43.    As a result of the conduct of Defendants, which has been part of the "One ADPI" philosophy they have attempted to force on RDG, ADP has breached its obligations to RDG and has interfered with RDG's ability to make or direct decisions regarding dental care or otherwise operate their practices and deal with their patients in the way they believe in their professional opinions to be appropriate.

44.    As a result of Defendants' actions and inactions, ADP of Michigan is in breach of the Service Agreement and in breach of their fiduciary duty to RDG, and RDG is entitled to terminate the Service Agreement. Notwithstanding these breaches, Defendants have refused to allow RDG to end the Service Agreement or move their dental practices to locations other than the clinics controlled by Defendants.

45.    Defendants' improper efforts to control the practice of dentistry, dental care, and doctor-patient relationships are also reflected by their improper insistence on enforcing non-compete agreements RDG has with its dentists. Employment agreements between RDG and its doctors prevent the doctors for a period of time from competing with RDG within a 10-mile radius of their current clinic locations. ADP of Michigan asserts that it is a third-party beneficiary of these non-compete agreements between RDG and its doctors, even though Defendants, as non-professional business corporations, are legally prohibited from engaging in the practice of dentistry and therefore as a matter of law cannot compete with a professional dental practice. Defendants have no cognizable interest that would justify them from enforcing

{00552197.DOC}

14

non-compete agreements against doctors, but nonetheless have indicated an intent that,

regardless of whether RDG enforces the non-competes, ADP of Michigan can enforce the non-

competes and thereby control the practice of dentistry in violation of law and public policy.

## COUNT I
## BREACH OF FIDUCIARY DUTY

46.     RDG incorporates by references paragraphs 1 through 45 above.

47.     As the result of its status and duties to RDG under the Service Agreement,

specifically including the power of attorney granted by RDG to ADP of Michigan and ADP of

Michigan's appointment as RDG's exclusive agent and attorney-in-fact, ADP of Michigan owes

a fiduciary duty to RDG.

48.     As a result of ADPI's control over ADP of Michigan and in light of the fact that

ADPI asserts control over RDG's funds once they are swept on a daily or other period basis from

RDG's bank account, ADPI owes a fiduciary duty to RDG.

49.     By their above described actions and omissions, ADP of Michigan and ADPI

have breached their fiduciary duty, including multiple actions and omissions by which

Defendants have failed to act in the best interests of RDG and have acted in the self interest of

ADP of Michigan and ADPI, and often in a manner that is contrary to the direction of RDG

and/or at the expense or to the detriment of RDG.

50.     RDG has been damaged as a direct and proximate result of the breaches of

fiduciary duty by ADP of Michigan and ADPI in an amount in excess of $25,000.

## COUNT II
## BREACH OF CONTRACT

51.     RDG incorporates by references paragraphs 1 through 50 above.

{00552197.DOC}

15

52.     By its above described actions and omissions, ADP of Michigan has materially breached its contractual obligations, specifically including the Service Agreement and the implied covenant of good faith and fair dealing.

53.     As a direct and proximate result of said breaches of contract, RDG has been damaged in an amount in excess of $25,000.

### COUNT III
### DECLARATORY AND/OR INJUNCTIVE RELIEF

54.     RDG incorporates by references paragraphs 1 through 53 above.

55.     Upon a judicial determination that ADP of Michigan has materially breached a fiduciary duty to RDG, RDG is entitled to terminate the Service Agreement. RDG is also entitled to terminate the Service Agreement due to ADP of Michigan's failure to comply with or perform material duties or obligations under the Service Agreement. RDG is and/or will be entitled to terminate the Service Agreement.

56.     ADP of Michigan, as lessee, controls all of the clinics utilized by RDG, and owns all of the assets, including all dental furniture and equipment and other furnishings, used in RDG's practices. ADP of Michigan also is the employer of many of the non-professional staff performing services for RDG.

57.     The Service Agreement does not provide a defined process or timetable to be followed to separate RDG and its practices from Defendants upon a termination of the Service Agreement. The Service Agreement does provide that upon termination by RDG under the relevant sections of the Service Agreement, RDG has an option to purchase assets and assume liabilities of ADP of Michigan, but the closing on this purchase may take up to 180 days from the notice of termination. If RDG does not exercise this option, the Agreement does not articulate how and when RDG will transition its current practice locations.

58.     Upon termination of the Service Agreement by RDG, if RDG does not exercise its purchase option, RDG will need time to locate and purchase (or rent) space for new clinics to design and build-out the spaces as needed for dental clinics, to purchase and install all equipment, materials and supplies needed to operate the practices, and to hire all needed personnel. Even if RDG does exercise the option, Defendants will continue to own and/or control the clinic locations and other assets, but the closing on the purchase of the assets may take up to 180 days.

59.     Because Defendants own the assets and control the clinic locations, this would allow Defendants to attempt to force RDG out of the existing clinics before RDG is prepared to begin operations at new clinics or has purchased the assets of the existing clinics. Without locations to serve its patients, the business of RDG would be destroyed or significantly impaired within a short period of time, and RDG's patients would be prevented from obtaining needed dental services from their RDG dentists and thereby irreparably harmed.

60.     Upon information and belief, ADPI and its Minnesota subsidiary used just such tactic of attempting to force the Park Dental doctors out of their clinics before they could establish new practice locations after the Park Dental doctor group in Minnesota notified ADPI of the termination of a similar Service Agreement. The Park Dental Doctor Group introduced evidence at trial of its lawsuit against ADPI (and its Minnesota subsidiary) that this and other conduct by defendant would destroy Park Dental's business and interfere with Park Dental's ability to serve its patients. At the conclusion of trial and based in large part due to such conduct, the jury entered a verdict against ADPI and its Minnesota subsidiary of approximately $88 million in compensatory damages and over $40 million in punitive damages. Given this

history, RDG reasonably believes that Defendants will employ a similar strategy upon any termination of the Service Agreement by RDG.

61.     It would be a violation of Defendants' contractual obligations, including the implied covenant of good faith and fair dealing, and their fiduciary duty to RDG to engage in such conduct upon the termination of the Service Agreement by RDG.

62.     To avoid the potential for massive irreparable harm to RDG and its patients and in light of the absence of any provision in the Service Agreement for implementation of a responsible and well-defined process following termination of the Service Agreement, the Court should oversee and direct the transition process through entry of appropriate injunctive and/or declaratory relief.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT AND/OR PROSPECTIVE ECONOMIC ADVANTAGE

63.     RDG incorporates by references paragraphs 1 through 62 above.

64.     RDG has contractual relationships with its patients and prospective patients that requires RDG and its doctors to provide dental care in the manner they believe to be appropriate and in the best interests of the patients without interference or limitation by Defendants or other non-dentists.

65.     RDG has relationships with its employees, including dental assistants and hygienists who are critical team members in the care provided to patients and for whom RDG directed staff raises of at least 3% for 2011.

66.     RDG has a relationship with the State of Michigan, which licenses RDG's dentists, that expressly and/or impliedly requires RDG and its doctors to provide dental care in

the manner they believe to be appropriate and in the best interests of its patients without interferences, or limitations by Defendants or other non-dentists.

67.     Defendants have knowledge of said contracts, relationships, and prospective relationships and/or business expectancy.

68.     Defendants have intentionally and without justification interfered with and/or caused the breach of said contracts, relationships, and/or relationships and/or business expectancy.

69.     As a result, RDG has incurred and will continue to incur substantial damages in an amount to be determined at trial.

**COUNT V**
**UNJUST ENRICHMENT**

70.     RDG incorporates by references paragraphs 1 through 69 above.

71.     As a result of Defendants' above-referenced conduct, Defendants' have received a benefit from RDG.

72.     It would be inequitable to allow Defendants to retain that benefit.

73.     As a result, RDG is entitled to an award against Defendants in an amount to be determined at trial.

**COUNT VI**
**CONSTRUCTIVE TRUST AND ACCOUNTING**

74.     RDG incorporates by references paragraphs 1 through 73 above.

75.     RDG is entitled to a constructive trust with respect to any and all funds swept from its bank account and/or otherwise owned by RDG that Defendants have caused to be improperly paid to or retained by or for the benefit of Defendants or any affiliates of Defendants.

{00552197.DOC}

76.     RDG is entitled to a detailed audit and accounting with respect to any and all revenues generated by RDG and the payment of said funds to or for the benefit of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, RDG prays that the Court enter relief, including the following:

1.     Award damages in favor of RDG and against Defendants, in an amount in excess of $25,000;

2.     Entry of such declaratory and/or injunctive relief as requested herein, including but not limited to imposing a reasonable transition that will allow RDG to end its relationship with Defendants and establish clinics without jeopardizing RDG's patient's ability to obtain continuity of care for their medical needs;

3.     Order a constructive trust and accounting as requested in Count VI;

4.     Award RDG its costs, disbursements, and attorneys' fees herein; and

5.     Entry of such other equitable and just relief as the Court finds appropriate.

Respectfully submitted:

Seyburn, Kahn, Ginn, Bess & Serlin, P.C.

By: _____
     Ronald L. Cornell, Jr. (P46860)
     Attorneys for Plaintiff
     2000 Town Center-Ste. 1500
     Southfield, MI  48075 (248) 353-7620

and

**Anthony Ostlund Baer & Louwagie P.A.**
     Joseph W. Anthony, #2872
     Randy G. Gullickson, #185607
Co-Counsel for Plaintiff
3600 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402  (612) 349-6969

Dated: March 17, 2011

{00552197.DOC}

20

SERVICE AGREEMENT

BETWEEN

REDWOOD DENTAL GROUP, P.C.
and
REDWOOD DENTAL GROUP – STERLING HEIGHTS, P.L.L.C.

and

AMERICAN DENTAL PARTNERS OF MICHIGAN, LLC

Effective Date:  May 1, 2003

**EXHIBIT A**

# TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS.................................................................................1
ARTICLE II        APPOINTMENT AND AUTHORITY OF SERVICE COMPANY...............1
    2.1    Appointment ......................................................................1
    2.2    Authority ...........................................................................1
    2.3    Patient Referrals..................................................................2
    2.4    Internal Management of Provider ..........................................2
    2.5    Practice of Dentistry ...........................................................2
ARTICLE III      POLICY BOARD .................................................................2
    3.1    Formation and Operation of Policy Board...............................2
    3.2    Responsibilities of the Policy Board.......................................3
    3.3    Dental Decisions ................................................................5
ARTICLE IV      RESPONSIBILITIES OF SERVICE COMPANY...........................5
    4.1    Clinics................................................................................5
    4.2    Equipment ..........................................................................6
    4.3    Laboratory Services ............................................................6
    4.4    Supplies.............................................................................6
    4.5    Capital Investment ..............................................................6
    4.6    Support Services .................................................................7
    4.7    Quality Assurance, Risk Management, and Utilization Review.............7
    4.8    Licenses and Permits...........................................................7
    4.9    Personnel...........................................................................7
    4.10   Contract Negotiations .........................................................7
    4.11   Billing and Collection..........................................................8
    4.12   Provider Account ...............................................................9
    4.13   Financial Matters ..............................................................10
    4.14   Reports and Records .........................................................11
    4.15   Recruitment of Provider Dentists.........................................11
    4.16   Service Company's Insurance...............................................11
    4.17   License of Name and Marks ................................................12
    4.18   No Warranty.....................................................................12

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE V      RESPONSIBILITIES OF PROVIDER ........................................................ 12

     5.1    Organization and Operations ........................................................... 12

     5.2    Provider Personnel ........................................................................... 13

     5.3    Professional Standards .................................................................... 14

     5.4    Dental Care ....................................................................................... 14

     5.5    Peer Review and Quality Assurance ............................................. 14

     5.6    Provider's Insurance ....................................................................... 15

     5.7    Noncompetition ............................................................................... 16

     5.8    Use of Name ..................................................................................... 17

ARTICLE VI      CONFIDENTIALITY ...................................................................... 17

     6.1    Confidential and Proprietary Information .................................... 17

     6.2    Use of Practice Statistics ................................................................ 17

ARTICLE VII      FINANCIAL ARRANGEMENTS .................................................. 18

     7.1    Clinic Expense Reimbursement ..................................................... 18

     7.2    Repayment of Advances ................................................................. 18

     7.3    Service Fee ......................................................................................... 18

     7.4    Reasonable Value ............................................................................. 18

     7.5    Payment ............................................................................................. 18

     7.6    Accounts Receivable ....................................................................... 19

ARTICLE VIII      TERM AND TERMINATION ...................................................... 19

     8.1    Initial and Renewal Term ............................................................... 19

     8.2    Termination ...................................................................................... 19

     8.3    Effects of Termination .................................................................... 21

     8.4    Purchase Obligation ....................................................................... 22

     8.5    Closing of Purchase ........................................................................ 23

ARTICLE IX      GENERAL ...................................................................................... 23

     9.1    Administrative Services Only ......................................................... 23

     9.2    Relationship of Parties ................................................................... 23

     9.3    Notices .............................................................................................. 24

     9.4    Execution of Documents ................................................................ 25

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 9.5 | Governing Law | 25 |
| 9.6 | Severability | 25 |
| 9.7 | Setoff | 25 |
| 9.8 | Remedies | 25 |
| 9.9 | Non-waiver | 25 |
| 9.10 | Indemnification | 26 |
| 9.11 | No Third Party Benefit | 26 |
| 9.12 | Captions | 26 |
| 9.13 | Genders and Numbers | 26 |
| 9.14 | Complete Agreement | 26 |
| 9.15 | Counterparts | 26 |
| 9.16 | Assignment | 26 |
| 9.17 | Successors | 27 |
| 9.18 | Force Majeure | 27 |

Exhibit A, Definitions...........................................................................A-1

Exhibit B, Form of Management Level Dentist Employment and Non-Competition Agreement...........................................................B-1

Exhibit C, Form of Non-Management Level Dentist Employment and Non-Competition Agreement...........................................................C-1

## SERVICE AGREEMENT

This agreement (this "Agreement") is made effective May 1, 2003, between Redwood Dental Group, P.C., a Michigan professional corporation ("RDG"), Redwood Dental Group – Sterling Heights, P.L.L.C., a Michigan professional limited liability company ("RDG-Sterling Heights"), and American Dental Partners of Michigan, LLC, a Delaware limited liability company ("Service Company"). RDG and RDG-Sterling Heights are referred to herein collectively as "Provider."

### Background Information

A.     Provider operates as a dental practice providing dental services to the general public in and around the Warren, St. Clair Shores, Madison Heights, Shelby Township, Troy, and Sterling Heights, Michigan areas through individual dentists who are licensed to practice dentistry in the State of Michigan and who are employed or otherwise retained by Provider.

B.     Service Company is engaged in the business of providing assets, personnel, and services to dental practices, other than such services as are directly related to the provision of dental care or the practice of dentistry. Service Company's services are intended to permit the dentists in such practices to focus their efforts primarily on rendering quality dental care.

C.     Provider desires to focus its energies, expertise and time on the practice of dentistry and on the delivery of dental services to patients. To accomplish this goal, Provider desires to engage Service Company to provide such services as are necessary and appropriate for the day-to-day administration of the non-dental aspects of Provider's dental practice, and Service Company desires to provide such services to Provider, all upon the terms and subject to the conditions set forth in this Agreement.

### Statement of Agreement

Service Company and Provider (the "Parties") hereby acknowledge the accuracy of the foregoing Background Information and agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement but not otherwise defined herein shall have the respective meanings given those terms in the attached Exhibit A.

## ARTICLE II
## APPOINTMENT AND AUTHORITY OF SERVICE COMPANY

2.1     Appointment.    Provider hereby appoints Service Company as its sole and exclusive agent for the performance of the Services, and Service Company hereby accepts such appointment, subject at all times to the provisions of this Agreement.

1

2.2    Authority.  Service Company shall have all power, authority, and responsibility reasonably necessary to provide the Services and carry out Service Company's other obligations under this Agreement, subject to the authority of the Policy Board as provided in Article III of this Agreement.  Without limiting the foregoing, Service Company shall have the authority to provide the Services in any reasonable manner Service Company deems appropriate to meet the day-to-day requirements of the business functions of Provider.  Subject to Article III of this Agreement, Service Company is also expressly authorized to negotiate and execute on behalf of Provider contracts that do not relate to the provision of Dental Care or the employment of licensed professional personnel or unlicensed dental assistants.  Provider shall give Service Company 30 days prior written notice of Provider's intent to execute any agreement obligating Provider to perform Dental Care or otherwise creating a binding legal obligation on Provider.

2.3    Patient Referrals.  The Parties agree that the benefits to Provider hereunder do not require, are not payment for, and are not in any way contingent upon the referral, admission, treatment, or any other arrangement for the provision of any item or service offered by Service Company to patients of Provider in any facility, laboratory, or dental care operation controlled, managed, or operated by Service Company.

2.4    Internal Management of Provider.  Matters involving the tax planning, investment planning, and internal management, control, or finances of Provider, including without limitation the compensation of dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants employed by Provider, shall remain the sole and exclusive responsibility of Provider and its shareholders.

2.5    Practice of Dentistry.  The Parties acknowledge and agree that: (a) Service Company is not authorized or qualified to engage in any activity that may be construed or deemed to constitute the practice of dentistry; and (b) notwithstanding anything in this Agreement to the contrary: (i) Provider, through its dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants, shall be solely responsible for and shall have complete authority, responsibility, supervision, and control over the provision of all Dental Care and that all Dental Care shall be provided and performed exclusively by or under the supervision of dentists as such dentists, in their sole discretion, deem appropriate, consistent with applicable law; (ii) Service Company shall not have or exercise any control or supervision over the provision of Dental Care; and (iii) to the extent any act or service required of Service Company under this Agreement is reasonably likely to be construed by a court of competent jurisdiction or by any applicable governmental agency to constitute the practice of dentistry, the requirement to perform that act or service by Service Company shall be deemed waived and unenforceable.  For purposes of this Agreement and as the context permits, the term "dentist" shall be deemed to include those individuals licensed by the Michigan State Board of Dentistry to practice general dentistry or a dental care specialty such as orthodontics, endodontics, periodontics, prosthodontics, pediatric dentistry, oral surgery, public health dentistry, and oral pathology.

# ARTICLE III
# POLICY BOARD

3.1    Formation and Operation of Policy Board.  The Parties hereby establish a policy board (the "Policy Board") which shall be responsible for developing and implementing

2

management and administrative policies for the overall operation of Clinics, subject to §3.3, below. The Policy Board shall consist of six members, of which three members shall be designated by Service Company, in its sole discretion, and three members shall be designated by Provider, in its sole discretion; provided that, unless otherwise agreed by the Parties, the Policy Board members designated by Provider shall be licensed dentists employed by Provider. Each Party shall have the right to designate, remove, and replace its Policy Board designees at any time and from time to time upon notice to the other Party.

Any decision made by a Party's Policy Board representative shall be binding on that Party. Except as may otherwise be expressly provided in this Agreement or any rules, bylaws, or regulations adopted by the Policy Board, the act of a majority of the members of the Policy Board shall be the act of the Policy Board. The Policy Board's decisions may be evidenced by either minutes of a Policy Board meeting or written action taken by the Policy Board members making the decision; provided that no written action signed by less than all of the Policy Board members shall be effective unless notice of such action is given to each Policy Board member who is not signing such action at least two business days prior to the effective date of such action. The decisions, resolutions, actions or recommendations of the Policy Board shall be implemented by Service Company or Provider, as appropriate.

The Policy Board shall hold regular meetings at such places and at such times (not less often than quarterly) as the Policy Board may determine from time to time. Special Policy Board meetings may be called by either Party or any two Policy Board members; provided that notice of any meeting which is not a regularly scheduled meeting shall be given to all Policy Board members at least five business days prior to the meeting, unless such notice is waived by the Policy Board members. Policy Board meetings may be held through the use of telecommunications equipment so long as all members can hear each other clearly.

If the Policy Board is deadlocked as to any matter requiring Policy Board approval, or in the absence of Provider Consent with respect to any matter requiring Provider Consent hereunder, the "status quo" shall continue with respect to such matter until such Policy Board approval or Provider Consent, as applicable, is obtained.

3.2     Responsibilities of the Policy Board. The Policy Board shall have the following duties, responsibilities, and authority (subject to Section 3.3, below):

(a)     Capital Improvements and Expansion. Any renovation and expansion plans and capital equipment expenditures with respect to Clinics shall be reviewed and approved by the Policy Board and shall be based upon economic feasibility, dentist support, productivity, and then-current market conditions.

(b)     Annual Budgets. All annual capital and operating budgets prepared in accordance with §4.13(a) by Service Company (in consultation with Provider) shall be subject to the review, comment, and approval of the Policy Board. Notwithstanding the foregoing sentence, such budgets shall be subject to the review, comment, and approval of Parent. The Policy Board shall, upon approving any budget pursuant to this section, deliver a copy of such approved budget to the Chief Financial Officer of Parent for Parent's approval.

3

(c) Marketing and Advertising. All advertising and other marketing of the dental services performed at any Clinic shall be subject to the prior review and approval of the Policy Board.

(d) Patient Fees; Collection Policies. Subject to §3.3, as a part of the annual operating budget, in consultation with Provider and Service Company, the Policy Board shall review and make recommendations concerning the fee schedules and collection policies for all dental and ancillary services rendered by Provider. Approval of the fee schedules shall be a Dental Decision.

(e) Provider and Payor Relationships. Subject to §3.3, decisions regarding the establishment or maintenance of contractual relationships between Provider and outside or institutional dental care providers and third-party payors shall be subject to the review and recommendations of the Policy Board. Subject to §3.3, all discounted fee practices and schedules, including individual provider or specialty discount arrangements, preferred provider organization discounts and capitated fee arrangements, shall be subject to the review and recommendations of the Policy Board. Where there is no clear methodology for the allocation of capitated fees among Provider's Dental Care Professionals, the Policy Board shall recommend the methodology intended to result in the equitable and appropriate allocation of all related fees consistent with the type and utilization of Dental Care covered under the capitation arrangement.

(f) Strategic and Operational Planning. The Policy Board shall review and approve the long-term strategic and short-term operational goals, objectives and plans developed by Service Company.

(g) Capital Expenditures. The Policy Board shall determine the priority of major capital expenditures.

(h) Personnel Planning. The Policy Board shall review and approve Provider and support personnel manpower plans developed by Service Company. The Policy Board shall review and approve any variations to the restrictive covenants in the dentists' employment or other agreements.

(i) Grievance Referrals. The Policy Board shall consider and make recommendations to the Parties regarding grievances pertaining to matters not specifically addressed in this Agreement as referred to it by key Provider or Service Company management and supervisory personnel.

(j) Patient Concerns and Claims. The Policy Board shall review, approve and monitor a patient claims tracking, monitoring and recovery procedure which shall provide, without limitation, for (i) the timely and appropriate resolution of all claims and related patient and Provider reimbursement decisions, and (ii) the distribution of a summary report setting forth the status and proposed actions with respect to each such claim to Provider and Service Company on a regular basis. Any Dental Care related patient concern or claims reimbursement decision shall be a Dental Decision.

(k) Environmental Health and Safety. The Policy Board shall review, approve and monitor environmental and workplace health and safety guidelines, the goal of which is to

4

achieve compliance with current national, state and local laws and regulations regarding environmental and workplace health and safety.

(l)  Emergency Care Services.  The Policy Board shall review, approve and periodically make suggestions for improving (i) the organization and delivery of emergency Dental Care by Provider, and (ii) the process and guidelines for ensuring an appropriate response by Provider to dental and in-Clinic medical emergencies as they may occur from time to time.

(m)  Financial Review.  The Policy Board shall review and monitor the financial performance of Provider with respect to the attainment of its budgeted goals.

(n)  Provider Acquisitions.  The Policy Board shall have the authority to approve or disapprove any merger or combination with or acquisition of any dental practice by Provider.

(o)  Other.  The Policy Board shall have such other duties, responsibilities, and authority as may be set forth in this Agreement or agreed upon by the Parties from time to time.

3.3  Dental Decisions.  Notwithstanding the preceding section or any other provisions of this Agreement to the contrary, all Dental Decisions (defined below) will be made solely by the dentist members of the Policy Board; provided that non-dentist members of the Policy Board may participate in the analysis and discussion process.  For purposes of this Agreement, "Dental Decisions" shall mean decisions relating directly to: (a) types and levels of Dental Care to be provided; (b) recruitment of dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants for Provider, including the evaluation of the background, experience, qualifications, specialties, and other credentials of such recruited individuals; (c) fee schedules for Provider's services, including without limitation Provider's usual and customary fee schedule; (d) to the extent required by applicable law, third party payor contracting; and (e) any other Dental Care related functions or decisions agreed upon by the Parties.

## ARTICLE IV
## RESPONSIBILITIES OF SERVICE COMPANY

During the Term, Service Company shall provide all such Services as are necessary and appropriate for the day-to-day administration of the business aspects of Provider's operations, including without limitation those services set forth in this Article, provided that all such services shall be subject to the applicable Budget.

4.1  Clinics

(a)  Service Company shall lease, acquire or otherwise procure Clinics at such locations as are approved by the Policy Board, taking into consideration the professional concerns of Provider.  The expenses associated with any such leasing, acquisition, or procurement shall be Clinic Expenses.  Any Clinic procured by Service Company for use by Provider shall be procured at commercially reasonable rates.  Any move from a present Provider practice location shall be made only after Service Company has received Provider Consent.

(b)     In the event Provider is the lessee of a Clinic under a lease with an unrelated and nonaffiliated lessor, Service Company may require Provider to assign such lease to Service Company upon receipt of consent from the lessor. Provider shall exercise all reasonable efforts to assist in obtaining the lessor's consent to the assignment. Any expenses incurred in the assignment shall be Clinic Expenses.

(c)     Service Company shall be responsible for the repair and maintenance of each Clinic, in a manner consistent with Service Company's responsibilities under the terms of any lease or other use arrangement relating to that Clinic, the costs and expenses of which shall be a Clinic Expense; provided that the costs and expenses of any repairs or maintenance necessitated by the negligence or willful misconduct of dentists, dental hygienists, or dental assistants employed or otherwise retained by Provider shall be a Provider Expense, but one that is ignored for purposes of calculating the Calculated Margin and that therefore must be paid out of the Provider Retained Earnings.

4.2     Equipment

(a)     Service Company shall provide all non-dental equipment, fixtures, office supplies, furniture and furnishings deemed reasonably necessary by Service Company for the operation of each Clinic and reasonably necessary for the provision of Dental Care.

(b)     Service Company shall provide, finance, or cause to be provided or financed such dental related equipment as is reasonably required by Provider. Subject to economic feasibility as set forth in the budgets approved pursuant to this Agreement, Provider shall have final authority in all dental equipment selections. Service Company may, however, advise Provider on the relationship between its dental equipment decisions and the overall administrative and financial operations of the Clinics. Except for Special Dental Supplies, all dental and non-dental equipment acquired for the use of Provider shall be owned by Service Company.

(c)     Service Company shall be responsible for repairing, maintaining, and keeping in reasonably good condition (ordinary wear and tear excepted), and replacing (as necessary), all equipment provided by Service Company under this Agreement, ordinary wear and tear excepted, the cost and expense of which shall be a Clinic Expense; provided that the costs and expenses of any repairs, maintenance and replacement necessitated by the negligence or willful misconduct of dentists, dental hygienists, or dental assistants employed or otherwise retained by Provider shall be a Provider Expense, but one that is ignored for purposes of calculating the Calculated Margin under the Service Agreement and that therefore must be paid out of the Provider Retained Earnings.

4.3     Laboratory Services. Unless otherwise prohibited by federal or state law, Service Company shall arrange for laboratory services (consistent with the requirements of applicable law), including without limitation dental appliance laboratory service, pathology laboratory service, medical laboratory service, and such other laboratory services as are reasonably necessary and appropriate for the operation of each Clinic and the provision of Dental Care therein.

6

4.4     Supplies. Service Company shall order, procure, purchase, own, and provide to Provider a reasonable inventory of Ordinary Dental Supplies and office supplies as are reasonably necessary and appropriate for the operation of each Clinic and the provision of Dental Care therein. Unless otherwise prohibited by federal or state law, Service Company shall also order, procure, purchase and provide on behalf of and as agent for Provider all reasonable Special Dental Supplies required by Provider to provide Dental Care, the cost of which shall be a Clinic Expense. Service Company shall ensure that each Clinic is at all times adequately stocked with all such supplies. The ultimate oversight, supervision and ownership of (a) all office and Ordinary Dental Supplies is and shall remain the sole responsibility of Service Company, and (b) all Special Dental Supplies is and shall remain the sole responsibility of Provider.

4.5     Capital Investment. Access to all needed working capital and capital expenditures approved by the Policy Board will be provided by Service Company. Service Company shall determine the source of capital to be invested, which may include (a) inter-company borrowings from Parent (provided that the terms of any such inter-company borrowing shall be no less favorable to the borrower than could reasonably be obtained from an independent third-party financial institution), and (b) borrowings, leases, or other financing methods through independent third-party financial institutions.

4.6     Support Services. Service Company shall provide or arrange for all printing, stationery, forms, postage, duplication, facsimile, photocopying, and data transmission and processing services, information services (including providing a computer system for clinic functions, billing, communications, and management), and other support services as are reasonably necessary and appropriate for the operation of each Clinic and the provision of Dental Care therein.

4.7     Quality Assurance, Risk Management, and Utilization Review. Service Company shall assist Provider in Provider's establishment and implementation of procedures to ensure the consistency, quality, appropriateness, and necessity of Dental Care provided by Provider, and shall provide administrative support for Provider's overall quality assurance, risk management, and utilization review programs. Service Company shall have the authority to monitor Provider's level of conformance with such procedures and to report its findings to Provider.

4.8     Licenses and Permits. Although Provider shall be solely responsible for obtaining and maintaining all federal, state, and local licenses and regulatory permits required for or in connection with the operation of Provider and in connection with the operation of all dental equipment located in each Clinic, Service Company shall assist Provider with the implementation of a plan designed to ensure that all such licenses and permits are obtained and shall provide reasonable assistance to Provider in obtaining the same. Service Company also shall maintain all licenses and permits required for all equipment (existing and future) located at each Clinic.

4.9     Personnel. Except as provided in §5.2(d) of this Agreement and subject to §3.3: (a) Service Company shall employ or otherwise retain and shall be responsible for recruiting, hiring, and terminating all management, administrative, supervisory, clerical, secretarial, bookkeeping, accounting, payroll, laboratory technicians and personnel, and other personnel (other than dentists, dental hygienists, and other licensed dental personnel and unlicensed dental

7

assistants) as Service Company deems necessary and appropriate for Service Company's performance of its duties and obligations under this Agreement; and (b) the selection, training and supervision of all such personnel to be employed by Service Company shall be the responsibility of Service Company. Consistent with reasonably prudent personnel management policies, Service Company shall seek and consider the advice, input, and requests of Provider in regard to personnel matters. Service Company shall have sole responsibility for determining the salaries and fringe benefits of such non-professional personnel and for withholding all appropriate amounts for income taxes, unemployment insurance, social security, workers' compensation, and any other withholding required by applicable law.

    4.10   Contract Negotiations.  Service Company shall advise Provider with respect to and negotiate, either directly or on Provider's behalf, as appropriate, such contractual arrangements with third parties as are reasonably necessary and appropriate for Provider's provision of Dental Care, including without limitation negotiated price agreements with third party payors, alternative delivery systems, or other purchasers of group dental care services; provided that no contract or arrangement regarding the provision of Dental Care shall be entered into without Provider Consent.

    4.11   Billing and Collection.  On behalf of and for the account of Provider, Service Company shall establish and maintain credit and billing and collection policies and procedures, and shall exercise reasonable efforts to bill and collect in a timely manner (and to the extent permitted by applicable law) all professional and other fees for all billable Dental Care provided by Dental Care Professionals.   Service Company shall advise and consult with Provider regarding the fees for Dental Care provided by Provider (including any related discounting policy), it being understood, however, that Provider shall establish the fees (subject to §3.2(d), above) to be charged for Dental Care and that Service Company shall have no authority whatsoever with respect to the establishment of such fees.  In connection with the billing and collection services to be provided hereunder, Provider hereby grants to Service Company, to the extent permitted by applicable law, throughout the Term (and thereafter as provided in §8.3), an exclusive special power of attorney and appoints Service Company, to the extent permitted by applicable law, as Provider's exclusive true and lawful agent and attorney-in-fact, and Service Company hereby accepts such special power of attorney and appointment, for the following purposes:

    (a)   To bill Provider's patients, in Provider's name and on Provider's behalf, for all billable Dental Care provided by or on behalf of Provider to patients.

    (b)   To bill, in Provider's name and on Provider's behalf, all claims for reimbursement or indemnification from insurance companies and plans, all state or federally funded dental benefit plans, and all other third party payors or fiscal intermediaries for all covered billable Dental Care provided by or on behalf of Provider to patients.

    (c)   To collect and receive, in Provider's name and on Provider's behalf, all accounts receivable generated by such billings and claims for reimbursement, to administer such accounts including, but not limited to, extending the time of payment of any such accounts for cash, credit or otherwise; discharging or releasing the obligors of any such accounts; suing, assigning or selling at a discount such accounts to collection agencies; or taking other measures

8

to require the payment of any such accounts; provided, however, that extraordinary collection measures, such as filing lawsuits, discharging or releasing obligors, or assigning or selling accounts at a discount to collection agencies shall not be undertaken without Provider Consent.

(d)     To deposit all amounts collected into the Provider Account which shall be and at all times remain in Provider's name. Provider shall transfer and deliver to Service Company all funds received by Provider from patients or third party payors for Dental Care. Upon receipt by Service Company of any funds from patients or third party payors or from Provider for Dental Care pursuant to this Agreement, Service Company shall promptly deposit the same into the Provider Account.

(e)     To take possession of, endorse in the name of Provider, and deposit into the Provider Account any notes, checks, money orders, insurance payments, and any other instruments received in payment of accounts receivable for Dental Care.

(f)     To sign checks, drafts, bank notes or other instruments on behalf of Provider, and to make withdrawals from the Provider Account for payments specified in this Agreement and as requested from time to time by Provider.

Upon request of Service Company, Provider shall execute and deliver to the financial institution at which the Provider Account is maintained such additional documents or instruments as Service Company may reasonably request to evidence or effect the special power of attorney granted to Service Company by Provider pursuant to this section and §4.12. The special power of attorney granted herein is coupled with an interest and shall be irrevocable except with Service Company's written consent. The irrevocable power of attorney shall expire when this Agreement has been terminated, all accounts receivable purchased by Service Company pursuant to §7.6, if any, have been collected, and all amounts due to Service Company as described in Article VII have been paid.

4.12    Provider Account

(a)     Power of Attorney. Service Company shall have access to the Provider Account solely for the purposes stated herein and shall use all funds on deposit therein in accordance with the terms of this Agreement. Provider hereby grants to Service Company an exclusive special power of attorney and appoints Service Company as Provider's true and lawful agent and attorney-in-fact, throughout the Term (and thereafter as provided in §8.3), and Service Company hereby accepts such special power of attorney and appointment, to make withdrawals from the Provider Account for: (i) payments described in this Agreement; and (ii) such other purposes as Service Company deems appropriate (subject to the first and last sentences of this Section 4.12(a)); provided that to the extent that the aggregate funds withdrawn by Service Company from the Provider Account pursuant to this section (the "Aggregate Withdrawals") exceed the aggregate amounts paid or payable to Service Company under this Agreement (the "Aggregate Payments"), then such excess shall be deemed to be held by Service Company as agent for Provider. Notwithstanding this exclusive special power of attorney, Provider may, upon reasonable advance notice to Service Company, request that Service Company draw checks on the Provider Account for Provider Expenses and such other amounts as may be due to Provider under this Agreement, subject to Sections 4.12(b) and 7.7 of this Agreement.

9

Disbursements shall be related to and in such amount so as to ensure that disbursements made without prior Provider Consent are consistent with the expenditures authorized by the Budget.

(b)     Priority of Payments.  Payments described in this Agreement to be made from funds in the Provider Account shall be applied (to the extent available) in the following order of priority:

(i)     Reimbursement of Clinic Expenses to Service Company pursuant to §7.1;

(ii)    Repayment of advances made by Service Company to Provider pursuant to §7.2;

(iii)   Payment of the Service Fee to Service Company pursuant to §7.3(a);

(iv)    Payment of Provider Expenses; and

(v)     Distribution of the Provider Retained Earnings (as defined in Section 7.7, below), or portions thereof, subject to Section 7.7, below.

(c)     Further Assurances.  Promptly upon request by Service Company, Provider shall execute a separate power of attorney in form reasonably satisfactory to Service Company for the purpose of further confirming or evidencing the rights granted to Service Company under §§4.11 and 4.12.

4.13    Financial Matters

(a)     Annual Budget.  At least 30 days prior to the commencement of each calendar year, Service Company, in consultation with Provider, shall prepare and deliver to the Policy Board for its approval a proposed Budget, setting forth an estimate of Provider's revenue and expenses for the upcoming calendar year (including without limitation the Service Fee associated with the services provided by Service Company hereunder).

In the event that a proposed Budget is not approved by either the Policy Board or Parent (pursuant to §3.2(b)), Service Company, in consultation with Provider, shall promptly revise such Budget, taking into consideration the comments of the Policy Board or Parent, as applicable, and shall deliver such revised Budget to the Policy Board for approval. In the event that a proposed Budget has not been approved by both the Policy Board and Parent by the beginning of the calendar year, the Budget for the prior year shall be deemed to be adopted as the Budget for the current year until a new Budget has been approved by both the Policy Board and Parent.

Notwithstanding any provisions of this Agreement to the contrary, for purposes of all calculations related to the Service Fee for any period the amount of Provider Expense used in such calculations for that period shall be determined by applying the methodology for compensating dentists and paying other budgeted Provider Expenses contained in the then-

10

applicable Budget (e.g., if the Budget requires a dentist to be paid a base salary, that salary shall be used for purposes of such calculations, and if the Budget requires that a dentist be paid formula-based compensation, that formula shall be used for purposes of such calculations); provided that the Parties shall exercise reasonable efforts to adjust the Budget from time to time as necessary to reflect changes in Provider's staff of dentists and/or compensation and/or other budgeted Provider Expenses (it being understood that neither Party shall be obligated to agree to Budget adjustments deemed by such Party to be unreasonable under the then-relevant circumstances).

(b)     Accounting and Financial Records. Service Company shall establish and administer accounting policies and procedures, internal controls, and systems for the development, preparation and safekeeping of administrative or financial records and books of account relating to the business and financial affairs of Provider, all of which shall be prepared and maintained in accordance with GAAP. Service Company shall prepare and deliver to Provider, within 45 days after the end of each of the first three calendar quarters during each year and within 90 days after the end of each calendar year, a balance sheet and an income statement reflecting the financial status of Provider in regard to the provision of Dental Care as of the end of each such calendar quarter and each such calendar year, as applicable, all of which shall be prepared in accordance with GAAP. In addition, Service Company shall prepare or assist in the preparation of any other financial statements or records as Provider may reasonably request.

(c)     Review of Expenditures. One of Provider's representatives to the Policy Board shall review all expenditures related to the operation of Provider, but such representative shall not have the power to prohibit or invalidate any expenditure.

(d)     Tax Matters

(i)     General. Service Company shall prepare or arrange for the preparation of all tax returns and reports of Provider required by applicable law, which returns and reports shall be prepared by an accountant reasonably acceptable to Provider.

(ii)     Sales and Use Taxes. Service Company and Provider acknowledge and agree that to the extent that any of the services to be provided by Service Company hereunder may be subject to any state sales and use taxes, Service Company may have a legal obligation to collect such taxes from Provider and to remit the same to the appropriate tax collection authorities. Provider agrees to pay any and all applicable state sales, use, gross receipts, and other similar taxes and charges (other than taxes on Service Company's net income) with respect to any amount paid to Service Company hereunder and that such amounts shall be a Clinic Expense.

4.14     Reports and Records

(a)     Dental Records. Service Company shall establish, monitor and maintain procedures and policies for the timely creation, preparation, filing and retrieval of all dental records generated by Provider in connection with Provider's provision of Dental Care; and, subject to applicable law, shall ensure that dental records are promptly available to dentists and any other appropriate persons. All such dental records shall be retained and maintained in

11

accordance with all applicable state and federal laws relating to the confidentiality and retention thereof. All dental records shall be and remain the property of Provider.

(b)      Other Reports and Records.   Service Company shall timely create, prepare, and file such additional reports and records as are reasonably necessary and appropriate for Provider's provision of Dental Care and shall analyze and interpret such reports and records upon the reasonable request of Provider.

4.15    Recruitment of Provider Dentists.   Upon Provider's request, Service Company shall perform all services reasonably necessary and appropriate in connection with the recruitment of dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants. Service Company shall provide Provider with model agreements to document Provider's employment, retention or other service arrangements with such individuals. However, it shall be and remain the sole and complete responsibility of Provider to interview, select, contract with (subject to §5.2, below), supervise, control and terminate all dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants and other clinical staff performing Dental Care or other professional services, and Service Company shall have no authority whatsoever with respect to such activities.

4.16    Service Company's Insurance.   Throughout the Term, Service Company shall, as a Clinic Expense, obtain and maintain with commercial carriers, or through self-insurance, or some combination thereof: (a) appropriate worker's compensation coverage for the employees of Service Company provided pursuant to this Agreement; and (b) professional, casualty and comprehensive general liability insurance covering Service Company, Service Company's personnel, and all of Service Company's equipment in such amounts and on such terms and conditions as Service Company deems appropriate. Service Company shall cause Provider to be named as an additional insured on Service Company's property and casualty insurance policies. Upon the request of Provider, Service Company shall provide Provider with a certificate evidencing such insurance coverage. Service Company may also carry, at Service Company's option and as a Clinic Expense, key person life and disability insurance on any shareholder or dentist employee of Provider in amounts determined to be reasonable and sufficient by Service Company. Service Company shall be the owner and beneficiary of any such insurance.

4.17    License of Name and Marks.   Service Company hereby grants to Provider, for the Term, a non-exclusive royalty-free license to use the names "Redwood Dental Group," "All Dental Services," and all related marks and logos owned by Service Company for the purpose of fulfilling its obligations hereunder, including without limitation providing Dental Care to its patients.

4.18    No Warranty.   Provider acknowledges that Service Company has not made and will not make any representations or warranties, express or implied, regarding Service Company's services under this Agreement or the results of those services, including without limitation any representations or warranties that the Services will result in any particular amount or level of dental practice or income to Provider.

4.19    Organization and Operations.   As a continuing condition of Provider's obligations under this Agreement, Service Company shall at all times during the Term: (a) be and remain

12

legally organized and operated to provide the Services in a manner consistent with all state and federal laws; and (b) operate and maintain a business of providing the Services in compliance with all applicable federal, state, and local laws, rules, regulations, ordinances, and orders. Notwithstanding the foregoing, in the event of a Regulatory Change (as defined in Section 8.2(d), below), any determination that Service Company is in breach of either condition set forth in this Section 4.19 as a result of such Regulatory Change shall be subject to and made in accordance with the provisions of Section 8.2(d), below.

## ARTICLE V
## RESPONSIBILITIES OF PROVIDER

5.1    Organization and Operations.  As a continuing condition of Service Company's obligations under this Agreement, Provider shall at all times during the Term: (a) be and remain legally organized and operated to provide Dental Care in a manner consistent with all state and federal laws; (b) operate and maintain within the Practice Territory a full time practice of dentistry providing Dental Care in compliance with all applicable federal, state, and local laws, rules, regulations, ordinances, and orders; (c) maintain and use its best efforts to enforce its articles or certificate of incorporation (or other instrument of organization), bylaws, shareholder agreements, and other organizational documents (hereafter in this §5.1 simply "organizational documents") in the respective forms provided to Service Company prior to execution of this Agreement; (d) have at least three executive officers at the level of vice president or above who are also dentist employees of Provider; (e) maintain and use its best efforts to enforce the written employment agreements and independent contractor agreements described in §5.2(a), below; and (f) not, without Service Company Consent, (i) amend any of its employment agreements or organizational documents in any material respect or waive any material rights thereunder, or (ii) engage in any transaction constituting a merger, consolidation, reorganization, sale or purchase of assets outside of the ordinary course of business, liquidation, or dissolution.  Provider hereby acknowledges that Service Company would not have entered into this Agreement but for Provider's covenant to maintain such organizational documents and employment agreements, and Provider shall pay to Service Company, in addition to the amounts set forth in Article VII, any damages, compensation, payment, or settlement amounts received by Provider from a dentist who receives consideration from Service Company or Parent as an inducement to become affiliated with Service Company through his employment by Provider and who thereafter terminates his employment agreement without cause or whose employment agreement is terminated by Provider for cause.  Provider and Service Company acknowledge and agree that, as to those dentists who are the equity owners of Provider as of the date of this Agreement (the "Owners") and who are receiving promissory notes issued by Parent in connection with the Asset Purchase Agreement dated the same date as this Agreement (the "Purchase Agreement"), Service Company shall have the right to, and shall, avail itself of the setoff provisions set forth in Section 4.6 of the Purchase Agreement before seeking payment in cash pursuant to the preceding sentence.

5.2    Provider Personnel

(a)    Dentist Personnel.  Provider shall retain, as a Provider Expense and not as a Clinic Expense, that number of dentists during the Term which are necessary and appropriate, in Provider's sole discretion, to provide Dental Care to reasonably meet the demand therefor.

13

Provider shall cause each dentist retained by Provider to hold and maintain a valid and unrestricted license to practice dentistry in the State of Michigan, including without limitation any licenses required for the provision of any specialty dental services, together with all necessary or appropriate board or other certifications. Throughout the Term, Provider shall enter into and maintain a written employment agreement substantially in the form of Exhibit C for all dentists now and hereafter employed by Provider; provided that Provider shall, throughout the Term, enter into and maintain a written employment agreement substantially in the form of Exhibit B with each dentist of Provider who now or hereafter is either a shareholder or an executive officer (at a level of vice president or above) of, or Policy Board member designated by, Provider. Throughout the Term, Provider shall enter into and maintain a written agreement with each independent contractor retained by Provider, which agreements shall contain confidentiality provisions substantially similar to those contained in the employment agreement in the form of Exhibit C. Provider shall be responsible for paying the compensation and benefits, as applicable, for all dentists and any other dentist personnel or other contracted or affiliated dentists, and for withholding all sums for income tax, unemployment insurance, social security, or any other withholding required by applicable law. Service Company may, on behalf of Provider, administer the compensation and benefits with respect to such individuals in accordance with the written agreement between Provider and each dentist. Service Company shall neither control nor direct any dentist in the performance of Dental Care for patients. Provider shall provide to Service Company evidence of such licensing, certifications, and other credentials of the dentists retained by Provider as Service Company may request from time to time.

In addition, Provider shall retain, as a Clinic Expense for which Provider is financially liable, that number of dental hygienists and other licensed dental personnel and unlicensed dental assistants during the Term which are necessary and appropriate, in Provider's sole discretion, to provide Dental Care to reasonably meet the demand therefor. Provider shall cause each dental hygienist and other individual retained by Provider who is required by applicable law to be licensed to hold and maintain a valid and unrestricted license to perform the activities which such dental hygienist or such other individual may perform under Michigan law. Provider shall be responsible for paying the compensation and benefits, as applicable, for all such personnel and for withholding all sums for income tax, unemployment insurance, social security, or any other withholding required by applicable law. Service Company may, on behalf of Provider, administer the compensation and benefits with respect to such individuals in accordance with the written agreement between Provider and each such individual. Service Company shall neither control nor direct any such individual in the performance of Dental Care for patients. Provider shall provide to Service Company evidence of such licensing, certifications, and other credentials of such personnel retained by Provider as Service Company may request from time to time.

(b)     Provider and Patient Scheduling.  Provider shall, with the reasonable assistance of Service Company: (i) develop a set of Provider and patient scheduling guidelines and a corresponding scheduling system; and (ii) support Service Company in the implementation of such guidelines and effective operation of such system.

(c)     Paid Hours Reporting.  Provider shall support the development and effective operation by Service Company of a system to monitor and report hours of dental service provided.

14

(d)   Non-Dentist Dental Care Personnel.  Notwithstanding any other provision of this Agreement to the contrary, all non-dentist personnel who provide Dental Care, including without limitation dental hygienists, dental assistants and other clinical staff (whether licensed or unlicensed), and other licensed or certified personnel, shall be under such control, supervision and direction of Provider and the dentists retained by Provider in the performance of or in connection with Dental Care for patients as is required under applicable state law and regulations.

5.3   Professional Standards.   As a continuing condition of Service Company's obligations hereunder, each dentist retained by Provider to provide Dental Care must: (a) have and maintain a valid and unrestricted license to practice dentistry in the State of Michigan; and (b) comply with, be controlled and governed by, and otherwise provide Dental Care in accordance with applicable federal, state, and municipal laws, rules, regulations, ordinances and orders, and the ethics and standard of care of the dental profession.  All specialty Dental Care shall be provided by a dentist who is either board certified or board eligible in that specialty or by another dentist licensed to provide such specialty Dental Care operating under the general supervision of a dentist who is either board certified or board eligible in that specialty. As an additional condition to Service Company's obligations hereunder, each dental hygienist retained by Provider, or other employee of Provider required to have a license to perform that employee's services, must (i) have and maintain a valid and unrestricted license to perform his or her duties in the State of Michigan, and (ii) comply with and be controlled and governed by all applicable federal, state, and local laws, rules, regulations, ordinances, and orders.

5.4   Dental Care.  Provider shall ensure that dentists, dental hygienists, other licensed dental personnel, and non-dentist dental care personnel (including unlicensed dental assistants and other clinical staff) are available in sufficient numbers as are necessary or appropriate to provide Dental Care to reasonably meet the demand for such Dental Care.  In the event that dentists employed by, or shareholders of, Provider are not available to provide Dental Care coverage, Provider shall engage and retain dentists on a temporary coverage basis, which dentists shall meet or exceed the qualifications required for Provider's Dental Care Professionals under this Agreement.  All costs and expenses associated with the retention of such temporary coverage shall be Provider Expenses.  With the assistance of the Service Company, Provider and the dentists shall be responsible for scheduling dentist and non-dentist dental care personnel coverage of all dental procedures.  Provider shall cause all dentists to exert their best efforts to develop and promote Provider in such a manner as to ensure Provider is able to serve the diverse needs of the community.  Provider shall organize and maintain a high quality, cost-effective process for ensuring that patients will have timely access to emergency Dental Care on a 24-hour per day, seven day per week basis.

5.5   Peer Review and Quality Assurance.  Provider shall conduct its peer review and quality assurance activities in a manner that is consistent with maintaining the confidentiality of the related processes, actions, and documentation.

(a)   Provider shall designate a committee of dentists to function as a dental peer review committee to review credentials of potential dentist recruits, periodically review the credentials of Provider's existing dentists, determine the practice privileges of the dentists retained by Provider, perform quality assurance, utilization review, and Provider profiling

15

functions, and otherwise resolve dental competency issues. The dental peer review committee shall function pursuant to formal written policies and procedures established by Provider upon consultation with assistance of Service Company.

(b)     Provider also shall adopt a quality assurance program to monitor and evaluate the quality and cost-effectiveness of the Dental Care provided by Provider's dentists and by non-dentist personnel providing Dental Care under the supervision of Provider's dentists. Upon request of Provider, Service Company shall provide administrative assistance to Provider in performing its quality assurance activities. All costs and expenses incurred in connection with this §5.5(b) shall be deemed Clinic Expenses.

(c)     Provider shall cooperate fully with Service Company in an effort to achieve and maintain full accreditation status for Provider. For purposes of facilitating accreditation and other related processes and without limiting Provider's responsibilities under the preceding sentence, Provider shall develop and maintain a philosophy of practice and a set of practice guidelines which are reasonably acceptable to the Policy Board. Provider shall cause all personnel retained by it to abide by such philosophy and guidelines at all times.

(d)     Provider shall, at the direction of the Policy Board, support the development, maintenance, and operation of a patient concerns and claims recording, reporting, review, resolution, and tracking process which is reasonably acceptable to the Policy Board. Provider shall cause all personnel retained by it to comply fully with such process at all times.

(e)     Provider shall, with the assistance of Service Company, develop a set of quality standards and utilization, process monitoring, and reporting guidelines. Provider shall cause all personnel retained by it to comply with such standards and guidelines.

5.6     Provider's Insurance.     Provider shall obtain and maintain with commercial carriers reasonably acceptable to Service Company or through self insurance or some combination thereof (reasonably acceptable to Service Company) appropriate workers' compensation coverage for Provider's employed personnel (which, with respect to dental hygienists, dental assistants (whether licensed or unlicensed), and other non-dentist licensed dental personnel employed by Provider, shall be a Clinic Expense, and which, with respect to all other employees of Provider, including without limitation dentists, shall be a Provider Expense) and professional liability and comprehensive general liability insurance covering Provider and each of the dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants Provider retains to provide Dental Care (which, including any applicable deductibles, shall be a Clinic Expense). All costs, expenses, and liabilities incurred by Provider or Service Company in excess of the limits of such policies shall be a Provider Expense. Provider shall actively support the participation of all dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants retained by Provider in training and continuing education programs in order to reduce the risk of exposure to and the related cost of obtaining and maintaining such coverage. The comprehensive general liability coverage and professional liability coverage shall be in such minimum amounts and with such deductibles as Service Company may establish from time to time. In addition, Provider shall cause each dentist retained by Provider as an independent contractor to obtain comparable professional and comprehensive general liability insurance coverage. All such insurance policies (including those

16

described in the preceding sentence) shall name Service Company as an additional insured and provide for at least 30 days advance written notice to Provider and Service Company from the insurer with respect to any alteration of coverage, cancellation, or proposed cancellation for any reason. Provider shall cause to be issued to Service Company by such insurer or insurers a certificate reflecting such coverage. Upon the termination of this Agreement for any reason, Provider shall continue to carry professional liability insurance in the amounts specified in this section for 10 years after termination, or, if Provider dissolves or ceases to practice dentistry, Provider shall obtain and maintain as a Provider Expense "tail" professional liability coverage in the amounts specified in this section for an extended reporting period of 10 years; provided that if such professional liability insurance is provided under an "occurrence" policy and not a "claims made" policy, such "tail" coverage shall not be required. Provider shall be responsible for paying all premiums for such "tail" insurance coverage. In no event shall the professional liability insurance carrier be replaced or changed without Service Company Consent. Service Company shall provide reasonable assistance to Provider to obtain such coverage.

5.7     Noncompetition.     Provider acknowledges that Service Company will incur substantial costs in providing the equipment, support services, personnel, and other items and services that are the subject matter of this Agreement and that in the process of providing services under this Agreement, Provider will learn or have access to financial and other Confidential Information of Service Company to which Provider would not otherwise be exposed. Provider also recognizes that the services to be provided by Service Company will be feasible only if Provider operates an active practice to which the dentists associated with Provider devote their full time and attention. Accordingly, Provider further agrees as follows:

(a)     During the Term, except for its obligations under this Agreement, Provider shall not establish, operate, or provide Dental Care at any dental office, clinic or other dental care facility anywhere within the Practice Territory nor have any ownership interest, direct or indirect, in any entity, or participate in any joint venture, which operates any such office, clinic or facility; and

(b)     Except as specifically approved by Service Company in writing, during the Term and for a period of five years immediately following the date this Agreement is terminated for any reason, Provider shall not directly or indirectly own (excluding ownership of less than five percent (5%) of the equity of any publicly traded entity), manage, operate, control, lend funds to, lend its name to, maintain any interest in, or otherwise enter into, engage in, or promote or assist (financially or otherwise) any entity, business, or enterprise which (i) provides, distributes, or promotes any type of management or administrative services or products to third parties in competition with Service Company in the Practice Territory, or (ii) offers any type of service or product to third parties substantially similar to those offered by Service Company to Provider in the Practice Territory. Notwithstanding the above restriction, nothing herein shall prohibit Provider or any of its shareholders from providing management and administrative services to its or their own dental practices after the termination of this Agreement, and nothing herein shall prohibit Provider or its shareholders from contracting with a third party manager to provide administrative or management services for its or their dental practices after termination of this Agreement as long as such relationship complies with the provisions of this section. Service Company acknowledges and agrees that the covenants set forth in this Section 5.7

17

constitute obligations of Provider as a corporate entity and not the personal obligations of Provider's equity owners or employees.

5.8     Use of Name.  At all times during the Term, Provider shall, unless otherwise directed by the Policy Board pursuant to §3.2(c), operate its dental practice under the name "Redwood Dental Group," including without limitation using all related marks and logos as are licensed to Provider pursuant to §4.17, above, and filing an assumed or fictitious name application with all appropriate governmental agencies; provided that Provider shall, immediately upon the expiration of the Term, abstain from using such name, marks and logos and shall take such steps as are necessary to terminate such applications and Provider's rights thereunder, except to the extent otherwise provided in Article VIII, below.

## ARTICLE VI
## CONFIDENTIALITY

6.1     Confidential and Proprietary Information.  Neither Party shall, in any manner or at any time, directly or indirectly, disclose any of the Confidential Information of the other Party to any person, firm, association, organization, or entity, or use, or permit or assist any person, firm, association, organization, or entity to use, any such Confidential Information, excepting only: (a) disclosures (i) required by law, as reasonably determined by the disclosing Party or its legal counsel, or (ii) made on a confidential basis to the disclosing Party's shareholders, directors, officers, employees (limited to those who need to know such Confidential Information), and legal, accounting, and other professional advisors (collectively, the "Permitted Recipients"); or (b) use of such Confidential Information by Permitted Recipients in connection with this Agreement; provided that each Party shall (i) make its Permitted Recipients aware of the requirements of this Agreement, (ii) take reasonable steps to prohibit disclosure of such Confidential Information by any Permitted Recipient to any other person or entity except another Permitted Recipient, including without limitation taking such steps as that Party customarily takes to protect its own Confidential Information, and (iii) be responsible and liable for any disclosure or use of such Confidential Information by any of its Permitted Recipients, except disclosures or uses permitted by this Agreement.

6.2     Use of Practice Statistics.  Notwithstanding §6.1, above, but subject to the restrictions of this section and applicable law, Service Company or its affiliates may: (a) share with other professional corporations, associations, dental practices, or dental care delivery entities, or their representatives, the practice statistics and other information relating to the operation of Provider's dental practice, including utilization review data, quality assurance data, revenue and cost data, outcomes data, or other practice data or information, provided that such information shall only be disclosed to (i) affiliates of Service Company, (ii) other dental groups with whom Service Company or any of its affiliates has a management or service relationship, (iii) managed care dental benefit providers and other third party payors for the purpose of obtaining or maintaining third party payor contracts, (iv) financial analysts and underwriters, (v) employers and employee benefit associations, (vi) quality assurance and accrediting organizations, or (vii) financial institutions; and (b) disclose all practice-related information necessary or desirable in connection with any public or private offering of any security of Service Company or any of its affiliates.  In addition, subject to the restrictions of this section and applicable law (including without limitation federal and state law and regulation relating to

18

confidentiality), Service Company or its affiliates may disclose practice-related information and data in connection with any survey, presentation, published material, study, or research project which Service Company deems appropriate for the purpose of gaining insight into existing and changing patterns in the organization and delivery of Dental Care and related issues. In no event will any such data disclose or divulge the identity of any patient or, to the extent reasonably practicable, any dentist.

## ARTICLE VII
## FINANCIAL ARRANGEMENTS

7.1    Clinic Expense Reimbursement.  Service Company shall be reimbursed for the amount of all Clinic Expenses incurred by Service Company.

7.2    Repayment of Advances.  Service Company shall be reimbursed for any and all amounts advanced to Provider by Service Company pursuant to the terms and conditions of this Agreement.

(a)    Service Fee.  Provider and Service Company acknowledge and agree that the compensation set forth in this Article is being paid by Provider to Service Company in consideration of the substantial commitment being made by Service Company hereunder and that such fee is fair and reasonable in all respects in consideration of (i) the services performed by Service Company hereunder, and (ii) the capital being made available by Service Company. Service Company shall be paid by Provider an annual Service Fee (determined on a calendar year basis) equal to 85.0% of the Calculated Margin, which shall be calculated and payable monthly.

7.3    Reasonable Value.  Payment of the Service Fee is not intended to be and shall not be interpreted or applied as permitting Service Company to share in Provider's fee for Dental Care or any other services, but is the Parties' negotiated agreement as to the reasonable fair market value of the equipment, contract analysis and support, other support services, purchasing, personnel, office space, management, administration, strategic management, and other items and services furnished by Service Company pursuant to this Agreement, considering the nature and volume of the services required and the risks assumed by Service Company.  Provider and Service Company acknowledge that: (a) Service Company's administrative expertise will contribute great value to Provider's performance; (b) Service Company will incur substantial costs and business risks in arranging for Provider's use of each Clinic and in providing the equipment, support services, personnel, marketing, office space, management, administration, and other items and services that are the subject matter of this Agreement; and (c) certain of such costs and expenses can vary to a considerable degree according to the extent of Provider's business and services.  It is the intent of the Parties that the Service Fee reasonably compensate Service Company for the value to Provider of Service Company's administrative expertise, given the considerable business risk to Service Company in providing the items and services that are the subject of this Agreement.

7.4    Payment.  The amounts to be paid to Service Company under this Article shall be calculated by Service Company on the accrual basis of accounting and paid monthly.  To facilitate the payments due to Service Company under this Article, Provider hereby expressly

authorizes Service Company to make withdrawals of such amounts from the Provider Account during the Term in accordance with §4.12(b), and after termination as provided in §8.3.

    7.5    <u>Accounts Receivable</u>.  To assure that Provider receives the entire amount of professional fees for its services and to assist Provider in maintaining reasonable cash flow for the payment of Clinic Expenses, Service Company may, during the Term, purchase, with recourse to Provider for the amount of the purchase, the accounts receivable of Provider arising during the previous month, except for any receivables due to Provider from Medicaid or any other governmental health care reimbursement program which Service Company is not permitted to receive under applicable law (the "Restricted Receivables"), by transferring the amount set forth below into the Provider Account.  The consideration for the purchase shall be an amount equal to the Adjusted Gross Revenue recorded each month, less the Adjusted Gross Revenue related to Restricted Receivables.  Service Company shall be entitled to offset Clinic Expense reimbursement plus all fees and advances due to Service Company under this Article against the amount payable for such accounts receivable.  Although it is the intention of the Parties that Service Company purchase and thereby become the owner of the accounts receivable of Provider, in the event such purchase shall be ineffective or prohibited for any reason, Provider hereby grants to Service Company a security interest in the accounts receivable, to the extent permitted by applicable law, and Provider shall cooperate with Service Company and execute all documents which may be reasonably requested by Service Company in connection with such security interest.  All collections in respect of such accounts receivable purchased by Service Company shall be received by Provider as the agent of Service Company and shall be endorsed to Service Company and deposited in a bank account at a bank designated by Service Company.  To the extent Provider comes into possession of any payments in respect of such accounts receivable, Provider shall direct such payments to Service Company for deposit in bank accounts designated by Service Company.

    7.6    <u>Provider Retained Earnings</u>.  The Parties acknowledge and agree that an annual amount (determined on a calendar year basis) equal to 15.0% of the Calculated Margin shall be retained by Provider (such amount, the "Provider Retained Earnings") and shall be calculated monthly and payable in arrears based on Provider's average days sales outstanding.

[Remainder of page intentionally left blank.]

**ARTICLE VIII**
**TERM AND TERMINATION**

8.1   <u>Initial and Renewal Term</u>.  The Term of this Agreement shall be for an initial period of 40 years beginning on the date of this Agreement, and shall renew automatically for successive five-year periods thereafter unless and until either Party gives notice to the other Party at least 120 days prior to the expiration of the then-current term of its intent to terminate this Agreement at the end of the then-current term or unless otherwise terminated as provided in §8.2 of this Agreement.

8.2   <u>Termination</u>

(a)   <u>Termination By Service Company</u>.  Service Company may terminate this Agreement immediately upon notice to Provider upon the occurrence of any one of the following events:

(i)   The dissolution of Provider;

(ii)   Provider admits in writing its inability to pay generally its debts as they become due or makes an assignment for the benefit of creditors;

(iii)   A receiver, trustee, liquidator, or conservator is appointed for Provider or to take possession of all or substantially all of Provider's property or a petition for insolvency, dissolution, liquidation, or reorganization, or order for relief in which Provider is named as debtor, is filed by, against, or with respect to Provider pursuant to any federal or state statute, regulation, or law for the protection of debtors, and, with respect to any such appointment or filing, Provider fails to secure a stay or discharge thereof within 45 days after such appointment or filing;

(iv)   Provider fails to pay when due any payment to be made by Provider under this Agreement, which failure continues for 10 days after notice is given by Service Company to Provider thereof, provided that such failure is not directly attributable to Service Company's failure to apply available funds in the Provider Account according to §4.12(b); or

(v)   Provider fails to comply with or perform any of its other material duties or obligations under this Agreement, which failure continues for 30 days after notice is given by Service Company to Provider thereof, or if because of the nature of such failure it cannot reasonably be corrected within such 30 day period, failure by Provider to commence such correction promptly following its receipt of notice from Service Company and thereafter to expeditiously and continuously prosecute the correction to completion.

(b)   <u>Termination By Provider</u>.  Provider may terminate this Agreement immediately upon notice to Service Company upon the occurrence of any of the following events:

21

(i)     A receiver, trustee, liquidator, or conservator is appointed for Service Company or to take possession of all or substantially all of Service Company's property or a petition for insolvency, dissolution, liquidation, or reorganization, or order for relief in which Service Company is named as debtor, is filed by, against, or with respect to Service Company pursuant to any federal or state statute, regulation, or law for the protection of debtors, and, with respect to any such appointment or filing, Service Company fails to secure a stay or discharge thereof within 45 days after such appointment or filing;

(ii)     Service Company fails to comply with or perform any of its material duties or obligations under this Agreement, which failure continues for 30 days after notice is given by Provider to Service Company thereof, or if because of the nature of such failure it cannot reasonably be corrected within such 30 day period, failure by Service Company to commence such correction promptly following its receipt of notice from Provider and thereafter to expeditiously and continuously prosecute the correction to completion; or

(iii)     A court of competent jurisdiction makes a final determination that Service Company has materially breached a fiduciary duty owed to Provider.

Notwithstanding the foregoing, any termination by Provider under this section shall require the affirmative vote of three-fourths of the then-outstanding shares of Provider entitled to vote on such a matter.

(c)     <u>Termination by Agreement</u>.  Provider and Service Company may mutually agree to terminate this Agreement at any time, such agreement to be in writing and signed by both Parties.

(d)     <u>Legislative, Regulatory or Administrative Change</u>.  If (a) there is (i) any change in any federal, state, or local statute, law, regulation, legislation, rule, policy, or general instruction, or a change in any third party reimbursement system, or (ii) any ruling, judgment, decree, or interpretation by any court, agency, or other governing body having jurisdiction over either Party (in any such case, for purposes of this clause (d), a "Regulatory Matter"), and (b) such Regulatory Matter materially and adversely affects, or is reasonably likely to affect, the manner in which either Party is to perform or be compensated for its services under this Agreement or which shall make this Agreement unlawful, the Parties shall immediately use their best efforts to enter into a new service arrangement or basis for compensation for the services furnished pursuant to this Agreement that complies with such Regulatory Matter and approximates as closely as possible the economic position of the Parties prior to such Regulatory Matter.

If the Parties are unable to reach a new agreement within a reasonable period of time following the date upon which it becomes reasonably certain that such Regulatory Matter will arise, then either Party may submit the issue to arbitration which shall be binding on the Parties and subject to the then-applicable Commercial Arbitration Rules of the American Arbitration Association. In any such arbitration, the arbitrators shall consist of a panel of three arbitrators, which shall act by majority vote and which shall consist of one arbitrator selected by the Party on one side of the issue subject to the arbitration, one arbitrator selected by the Party on the other side of the issue, and a third arbitrator selected by the two arbitrators so selected, who

22

shall be either a certified public accountant or an attorney at law licensed to practice in the State of Michigan and who shall act as chairman of the arbitration panel; provided that if the Party on one side of the issue selects its arbitrator for the panel and the other Party fails so to select its arbitrator within 10 business days after being requested by the first Party to do so, then the sole arbitrator shall be the arbitrator selected by the first Party.

All costs and expenses of arbitration shall be borne by the Parties as determined by the arbitrator or arbitration panel, except that the fees of any arbitrator on an arbitration panel who is selected individually by a Party shall be borne separately by the Party appointing him; provided that if one Party fails to select an arbitrator for a panel, and the sole arbitrator is the arbitrator selected by the other Party, then the fees of that arbitrator shall be borne by the Parties as determined by that arbitrator.

8.3    Effects of Termination.  Upon termination of this Agreement as herein provided, neither Party shall have any further obligations under this Agreement, except for: (a) obligations accruing prior to the date of termination, including without limitation payment of the amounts set forth in Article VII relating to services provided prior to the termination of this Agreement; (b) obligations set forth in this Agreement that expressly extend beyond the Term, including without limitation indemnities and noncompetition provisions, which provisions shall survive the expiration or termination of this Agreement; (c) the obligations of each Party set forth in Article VI; and (d) the obligation of Provider described in §8.4. Provider specifically acknowledges and agrees that Service Company shall continue to collect and receive on behalf of Provider all cash collections from accounts receivable in existence at the time this Agreement is terminated (which have not otherwise been purchased by Service Company pursuant to §7.6), and that all such cash collections shall be disbursed in accordance with §4.12(b), it being understood that such cash collections will represent, in part, compensation to Service Company for Services already rendered and compensation on accounts receivable purchased by Service Company, if any. Upon the closing of a purchase option or purchase obligation transaction pursuant to Sections 8.4 and 8.5, below, Service Company's rights to collect and receive cash collections with respect to Provider's accounts receivable pursuant to the foregoing sentence shall terminate immediately and automatically. Upon the expiration or termination of this Agreement for any reason or cause whatsoever, Service Company shall surrender to Provider all books and records pertaining to Provider's dental practice; provided that Service Company may retain copies of such documents to the extent reasonably necessary for Service Company to complete its post-termination obligations and activities under this Agreement.

8.4    Purchase Option; Purchase Obligation.  Upon termination of this Agreement by Provider pursuant to Section 8.2(b)(ii) or (iii), Provider may, at its option, or upon termination of this Agreement for any other reason, Provider shall, at Service Company's option (subject to any consent rights of Parent's senior creditor):

(a)    Purchase from Service Company at book value the intangible assets, deferred charges, goodwill, and all other amounts on the books of the Service Company relating to this Agreement or the items or services provided by Service Company pursuant to this Agreement, including without limitation the amount, if any, for the covenants described in §5.7, above, as adjusted through the last day of the month most recently ended prior to the date of such termination in accordance with GAAP to reflect amortization or depreciation of all such

23

amounts; provided that any such asset shall be deemed to be fully amortized or depreciated on the earlier to occur of (i) the actual date upon which it becomes fully amortized or depreciated, or (ii) the 25th anniversary of its acquisition by Service Company;

(b)     Purchase from Service Company any real estate owned by Service Company and used as a Clinic at the greater of the appraised fair market value thereof or the then book value thereof;

(c)     Purchase, at the greater of the appraised fair market value or the then book value, all improvements, additions, or leasehold improvements that have been made by Service Company at any Clinic and that relate to the performance of Service Company's obligations under this Agreement;

(d)     Assume all debt, and all contracts, payables, and leases that are obligations of Service Company and that relate to the performance of Service Company's obligations under this Agreement or the properties leased or subleased by Service Company in connection with its obligations under this Agreement; and

(e)     Purchase from Service Company, at the greater of the appraised fair market value or the then book value, all of the equipment then being supplied by Service Company pursuant to Service Company's obligations under this Agreement, and all other assets, including inventory and supplies, tangibles and intangibles, set forth on the books of Service Company as adjusted through the last day of the month most recently ended prior to the date of such termination in accordance with GAAP to reflect operations of each Clinic, depreciation, amortization, and other adjustments of assets shown on the books of the Service Company.

For purposes of subsection (b), above, the appraised value shall be determined by an appraiser mutually agreed upon by the Parties. In the event the Parties are unable to agree upon an appraiser within 10 days following the date upon which either Party requests the other Party to agree to an appraiser, then each Party shall appoint an appraiser, who shall in turn select a third appraiser who shall serve as the appraiser hereunder. In the event either Party fails to select an appraiser within 15 days of the selection of an appraiser by the other Party, the appraiser selected by the other Party shall serve as the appraiser hereunder. The determination of the appraised value of the assets identified in subsection (b), above, by the appraiser selected hereunder shall be binding on both Parties.

Service Company acknowledges and agrees that the rights and obligations of Provider set forth in this Section 8.4 constitute obligations of Provider as a corporate entity and not the personal obligations of Provider's equity owners or employees. If Provider exercises its option to purchase as set forth in this Section 8.4, it shall be Service Company's responsibility to obtain any consent or approval from Parent's senior creditor which is required in connection with such purchase.

8.5     Closing of Purchase.  If Provider purchases assets pursuant to §8.4, Provider shall pay cash for the purchased assets; provided that the amount of the purchase price allocable to an asset shall be reduced by the amount of debt and liabilities of Service Company, if any, relating directly to that asset which are assumed by Provider in connection with such purchase. Any asset

24

which is purchased by Provider pursuant to §8.4 and with respect to which the purchase price reduction described in the preceding sentence does not apply shall be transferred to Provider free and clear of all liens and encumbrances at closing. Provider and any dentist associated with Provider shall execute such documents as may be required for Provider to assume the liabilities set forth in §8.4(d) and to remove Service Company from any liability with respect to such purchased asset and with respect to any property leased or subleased by Service Company. The closing date for the purchase shall be determined by the Parties but shall in no event occur later than 180 days from the date of the notice of termination. Provider shall be released from the covenants described in §5.7, above, upon the successful consummation of such closing.

## ARTICLE IX
## GENERAL

9.1    <u>Administrative Services Only</u>.  Nothing in this Agreement is intended or shall be construed to allow Service Company to exercise control or direction over the manner or method by which Provider and its dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants, or other personnel supervised by Provider or its dentists, perform Dental Care or other professional dental care services. The rendition of all Dental Care shall be the sole responsibility of Provider and its dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants under appropriate supervision, and Service Company shall not interfere in any manner or to any extent therewith.  Nothing contained in this Agreement shall be construed to permit Service Company to engage in the practice of dentistry, it being the sole intention of the Parties hereto that the services to be rendered to Provider by Service Company are solely for the purpose of providing non-dental administrative services to Provider so as to enable Provider to devote its full time and energies to the professional conduct of its dental practice and provision of Dental Care to its patients and not to administration or practice management.

9.2    <u>Relationship of Parties</u>.  The relationship of the Parties is and shall be that of independent contractors, and nothing in this Agreement is intended, and nothing shall be construed, to create an employer/employee, partnership, or joint venture relationship between the Parties, or to allow either to exercise control or direction over the manner or method by which the other performs the services that are the subject matter of this Agreement; provided always that the services to be provided hereunder shall be furnished in a manner consistent with the standards governing such services and the provisions of this Agreement.

9.3    <u>Notices</u>.  All notices and other communications under this Agreement to any Party shall be in writing and shall be deemed given when delivered personally, telecopied (which is confirmed) to that Party at the telecopy number for that Party set forth below, mailed by certified mail (return receipt requested) to that Party at the address for that Party set forth below (or at such other address for such Party as such Party shall have specified in notice to the other Party), or delivered to Federal Express, UPS, or any similar express delivery service for delivery to that Party at that address:

(a)    If to Service Company:

American Dental Partners of Michigan, LLC
c/o American Dental Partners, Inc.
201 Edgewater Drive, Suite 285
Wakefield, Massachusetts 01880-1249
Attention:    Gregory A. Serao, President
             and Chief Executive Officer
Telecopy No.: (781) 224-4216

with a copy to:

Baker & Hostetler, LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
Attention:    Gary A. Wadman, Esq.
Telecopy No.: (614) 462-2616

(b)    If to Provider:

Redwood Dental Group, P.C.
13403 13 Mile Road
Warren, Michigan 48093
Attention:    Murray L. Yoffee, D.D.S., President
Telecopy No.: (586) 979-0652

with a copy to:

Seyburn, Kahn, Ginn, Bess & Serlin, P.C.
2000 Town Center, Suite 1500
Southfield, Michigan  48075-1195
Attention:  Bruce Kahn, Esq.
Telecopy No.: (248) 353-3727

Any Party may change the address to which notices and other communications are to be given by giving the other Party notice of such change.

9.4    Execution of Documents.  Each Party shall execute, acknowledge or verify, and deliver any and all documents, and take any and all other actions, which from time to time may be reasonably requested by the other Party to carry out the purposes and intent of this Agreement.

9.5    Governing Law.  All questions concerning the validity, intention, or meaning of this Agreement or relating to the rights and obligations of the Parties with respect to performance under this Agreement shall be construed and resolved under the laws of Michigan without reference to conflict of law principles.

26

9.6     Severability.  The intention of the Parties is to comply fully with all applicable laws and public policies, and this Agreement shall be construed consistently with all laws and public policies to the extent possible. If and to the extent that any court of competent jurisdiction determines that it is impossible to construe any provision of this Agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this Agreement, which shall remain in full force and effect. With respect to any provision in this Agreement finally determined by such a court to be invalid or unenforceable, such court shall have jurisdiction to reform this Agreement (consistent with the intent of the Parties) to the extent necessary to make such provision valid and enforceable, and, as reformed, such provision shall be binding on the Parties.

9.7     Setoff.  Notwithstanding any provision of this Agreement to the contrary, Service Company shall have the right from time to time to setoff any amounts owed by Service Company to Provider against any amounts owed by Provider to Service Company.

9.8     Remedies.  All rights and remedies of each Party under this Agreement are cumulative and in addition to all other rights and remedies which may be available to that Party from time to time, whether under any other agreement, at law, or in equity.

Each Party hereby acknowledges that:  (a) the provisions of §§5.7 and 6.1 of this Agreement are fundamental for the protection of the other Party's legitimate business interests; (b) such provisions are reasonable and appropriate in all respects; and (c) in the event it violates any such provisions, the other Party would suffer irreparable harm and its remedies at law would be inadequate. Accordingly, in the event either Party violates or attempts to violate any such provisions, the other Party shall be entitled to a temporary restraining order, temporary and permanent injunctions, specific performance, and other equitable relief without any showing of irreparable harm or damage or the posting of any bond, in addition to any other rights or remedies which may then be available to the other Party.

9.9     Non-waiver.  No failure by any Party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other Party shall affect, or constitute a waiver of, the first Party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the Parties at variance with any provision of this Agreement affect or constitute a waiver of, any Party's right to demand strict compliance with all provisions of this Agreement.

9.10     Indemnification.  Each Party (the "Indemnifying Party") shall indemnify and hold harmless the other Party and its shareholders, directors, officers, employees, agents, representatives, and affiliates (the "Indemnified Parties") from and against any and all losses, liabilities, damages, demands, claims, suits, actions, judgments, assessments, costs and expenses, including without limitation interest, penalties, attorneys' fees, any and all expenses incurred in investigating, preparing, or defending against any litigation, commenced or threatened, or any claim whatsoever, and any and all amounts paid in settlement of any claim or litigation (collectively, "Damages"), asserted against, imposed upon, or incurred or suffered by the Indemnified Parties, directly or indirectly, as a result of or arising from:  (i) any failure of any

27

representation or warranty of the Indemnifying Party in this Agreement to be accurate and complete in all material respects when made; or (ii) any failure by the Indemnifying Party to perform and observe fully all obligations and conditions to be performed or observed by the Indemnifying Party under this Agreement. In addition, Provider shall indemnify Service Company and its shareholders, directors, officers, employees, agents, representatives, and affiliates from and against any and all Damages asserted against, imposed upon, or incurred or suffered by any of them, directly or indirectly, as a result of or arising from the acts or omissions of Provider or its employees, contractors, or other agents or representatives.

9.11   No Third Party Benefit. This Agreement is intended for the exclusive benefit of the Parties and their respective successors and assigns, and nothing contained in this Agreement shall be construed as creating any rights or benefits in or to any third party.

9.12   Captions. The captions of the various sections of this Agreement are not part of the context of this Agreement, are only labels to assist in locating and reading those sections, and shall be ignored in construing this Agreement.

9.13   Genders and Numbers. When permitted by the context, each pronoun used in this Agreement includes the same pronoun in other genders or numbers and each noun used in this Agreement includes the same noun in other numbers.

9.14   Complete Agreement. This document (including its exhibits and all other documents referred to herein, all of which are hereby incorporated herein by reference) contains the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior or contemporaneous discussions, negotiations, representations, or agreements relating to the subject matter of this Agreement. No changes to this Agreement shall be made or be binding upon any Party unless made in writing and signed by each Party to this Agreement.

9.15   Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement.

9.16   Assignment. Provider may not assign this Agreement without the prior written consent of Service Company, which consent may be withheld for any reason. The sale, transfer, pledge, or assignment of any of the shares of Provider held by any shareholder of Provider, the issuance by Provider of voting shares to any other person, or any combination of such transactions within any period of two years, such that the shareholders in Provider at the beginning of that two-year period fail to maintain a majority of the voting interest in Provider, shall be deemed an attempted assignment by Provider, and shall be null and void unless consented to in writing by Service Company prior to any such transfer or issuance. Any breach of this provision, whether or not void or voidable, shall constitute a material breach of this Agreement, and in the event of such breach, Service Company may terminate this Agreement upon 24 hours notice to Provider. Service Company shall have the right to (i) assign its rights and obligations hereunder to any third party and (ii) collaterally assign its interest in this Agreement and its right to collect the amounts set forth in Article VII hereunder to any financial institution or other third party without the consent of Provider.

9.17   Successors.  Subject to §9.16, above, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the successors and assigns of each Party.

9.18   Force Majeure.  Neither Party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed to result, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either Party's employees, or any other similar cause beyond the reasonable control of either Party unless such delay or failure in performance is expressly addressed elsewhere in this Agreement.

[Remainder of page intentionally left blank.]

29

PROVIDER:                                SERVICE COMPANY:

REDWOOD DENTAL GROUP, P.C.               AMERICAN DENTAL PARTNERS OF
                                         MICHIGAN, LLC

By: _____           By:_____
    Murray L. Yoffee, D.D.S., President      Gregory A. Serrao, President

REDWOOD DENTAL GROUP – STERLING
HEIGHTS, P.L.L.C.

By:  REDWOOD DENTAL GROUP, P.C., its Manager

    By: _____
        Murray L. Yoffee, D.D.S., President

30

PROVIDER:

REDWOOD DENTAL GROUP, P.C.

By:_____
    Murray L. Yoffee, D.D.S., President

REDWOOD DENTAL GROUP – STERLING
HEIGHTS, P.L.L.C.

By:  REDWOOD DENTAL GROUP, P.C., its Manager

    By:_____
        Murray L. Yoffee, D.D.S., President

SERVICE COMPANY:

AMERICAN DENTAL PARTNERS OF
MICHIGAN, LLC

By:_____
    Gregory A. Serrao, President

30

Exhibit A

DEFINITIONS

Adjusted Gross Revenue. The term "Adjusted Gross Revenue" shall mean Gross Revenue less Adjustments.

Adjustments. The term "Adjustments" shall mean all adjustments on the accrual basis for (a) third party payor contractual allowances, adjustments, discounts, and professional courtesies, (b) uncollectible accounts and related expenses, and (c) other activities that do not result in collectible charges (provided that Adjustments for any period beginning on or after the effective date of this Agreement shall exclude adjustments which relate to (i) Dental Care that was rendered prior to the effective date of this Agreement, (ii) Capitation Revenue that was recorded prior to the effective date of this Agreement, or (iii) any other revenue recorded prior to the effective date of this Agreement).

Ancillary Revenue. The term "Ancillary Revenue" shall mean all other revenue actually recorded each month that is not Professional Service Revenue.

Budget. The term "Budget" shall mean an operating budget and capital expenditure budget for each calendar year as prepared by Service Company, in consultation with Provider, and approved by each of the Policy Board and Parent.

Calculated Margin. The term "Calculated Margin" shall mean, for any period, the actual Adjusted Gross Revenue for that period, less the sum of (a) the actual Clinic Expense for that period and (b) the actual Provider Expense for that period.

Capitation Revenue. The term "Capitation Revenue" shall mean all revenue recorded under GAAP from managed care organizations or third party payors where such revenue is recorded periodically on a per member basis for the partial or total dental needs of an enrolled patient.

Clinic. The term "Clinic" shall mean any of the facilities, including satellite facilities, that Service Company owns, leases or otherwise procures and provides for the use of Provider for the provision of Dental Care.

Clinic Expense. The term "Clinic Expense" shall mean any operating or nonoperating expense incurred by Service Company or Parent in the provision of services to Provider and any expense incurred by Provider which is expressly identified in this Agreement as a Clinic Expense, including without limitation any expense described in this definition for which Provider is required by applicable law to be financially liable. Clinic Expense shall not include any state or federal income tax of Provider, any expense related to any Dental Assets or the maintenance or protection of the same, or any other expense reasonably designated by Service Company as a Provider Expense. Clinic Expense shall not include amortization of goodwill or non-operating intangible assets (such as noncompete covenants and this Agreement) arising as a result of the transactions contemplated by the Asset Purchase Agreement between Provider, Service Company, Parent, and the other parties named therein being executed concurrently with

A-1

the execution of this Agreement, but shall include amortization of operating intangible assets obtained in that transaction. Without limiting the foregoing, Clinic Expense shall include:

(a)     The salaries, benefits, and other direct costs of all employees of Provider or Service Company at a Clinic, but not the salaries, benefits, or other direct costs of the dentists;

(b)     The direct cost of any employee or consultant that provides services at or in connection with a Clinic for improved Clinic performance, such as management, billing and collections, business office consultation, accounting and legal services rendered specifically for such Clinic, but only when such services are coordinated by Service Company;

(c)     Reasonable recruitment costs and out-of-pocket expenses of Service Company or Provider associated with the recruitment of additional dentists, dental hygienists, or other licensed dental personnel or unlicensed dental assistants for Provider;

(d)     Dental malpractice liability insurance expenses for dentists, dental hygienists, or dental assistants, Service Company employees, and non-dentist employees; workers' compensation premiums for Service Company employees at each Clinic; and comprehensive general liability insurance expenses covering each Clinic and employees of Provider and Service Company at each Clinic;

(e)     The cost of laboratory services;

(f)     The cost of dental supplies (including but not limited to products, substances, items, or dental devices), and office supplies;

(g)     The expense of using, leasing, or otherwise procuring Clinics and related equipment, including utilities, depreciation, and repairs and maintenance, provided that such expense shall not include the cost of acquiring goodwill, noncompete covenants, or other intangible assets in connection with such procurement;

(h)     Personal property and intangible taxes assessed against Service Company's assets which are provided or otherwise employed by Service Company for the benefit of Provider;

(i)     The reasonable travel expenses (except for the corporate staff of Service Company and Parent) associated with attending meetings, conferences, or seminars to benefit Provider;

(j)     Other expenses incurred by Service Company or Parent in carrying out its obligations under this Agreement in accordance with the policies and budgets established by the Policy Board, including without limitation the write-off of any tangible or intangible assets on the balance sheet of Service Company or any portion thereof other than costs incurred in connection with the execution of this Agreement and the issuance by Parent of stock options to Provider or its dentists;

(k)     Any tax assessed against Service Company (other than income taxes) in connection with the services provided by Service Company hereunder; and

A-2

(l)     Any other cost or expense designated as a Clinic Expense pursuant to this Agreement.

Confidential Information.   The term "Confidential Information" shall mean, with respect to a Party, all trade secrets, proprietary data, and other information (whether written or oral) of a confidential nature relating directly or indirectly to that Party or its business, including without limitation all business management, marketing, and economic studies and methods, patient lists, proprietary forms, marketing data, fee schedules, customer lists, financial, tax, accounting, and other information regarding business operations or structure, business plans, ideas, concepts, policies, and procedures, and any other information which that Party is obligated to treat as confidential pursuant to any law, agreement, or course of dealing by which that Party is bound, whether or not such Confidential Information is disclosed or otherwise made available pursuant to this Agreement. Confidential Information shall also include the terms and provisions of this Agreement and any transactions or documents executed by the Parties pursuant to this Agreement. Confidential Information shall not include any information which (a) is or becomes known or available to the public and did not become so known through the breach of this Agreement by either Party, (b) has been lawfully acquired from a third party without any breach of any confidentiality restriction, or (c) is already in the possession of the receiving Party at the time it was disclosed to the receiving Party by the disclosing Party.

Dental Assets.   The term "Dental Assets" shall mean the following assets of Provider:

(a)     All of Provider's rights, title and interest in, to or under, or possession of, all drugs, pharmaceuticals, products, substances, items or devices whose purchase, possession, maintenance, administration, prescription or security requires the authorization or order of a Dental Care Professional or requires a permit, registration, certification or any other governmental authorization held by a Dental Care Professional as specified under any federal or state law, or both;

(b)     All of Provider's rights, title and interest in and to records of identity, diagnosis, evaluation or treatment of patients;

(c)     All of Provider's rights, title and interest in, to or under insurance policies covering or relating to dental malpractice;

(d)     The name of Provider;

(e)     All franchises, licenses, permits, certificates, approvals and other governmental authorizations necessary or desirable to own and operate any of the other Dental Assets;

(f)     All of Provider's rights, title and interest in, to or under any contract or agreement that requires performance by a licensed dental care provider under federal or applicable state law.

Dental Care.   The term "Dental Care" shall mean such intra-oral diagnostic and therapeutic procedures, operations, and services as are included under the definition of the "practice of dentistry" under the laws and regulations of the state in which such procedures,

A-3

operations, and services are performed and which are provided by Provider to its patients through Provider's dentists, dental hygienists, dental assistants, and other professional dental care personnel operating under the supervision of Provider's dentists, including but not limited to the practice of general dentistry, endodontics, periodontics, orthodontics, prosthodontics, pediatric dental care, and oral surgery, and all dental care associated with any of the foregoing.

Dental Care Professional. The term "Dental Care Professional" shall mean any individual holding a current, unrestricted license issued by the appropriate dental licensing board in the state in which the Dental Care Professional renders Dental Care, which permits such individual to provide Dental Care, including without limitation dentists (as that term is defined in §2.5) and denturists, dental hygienists, and dental assistants.

GAAP. The term "GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board and the Securities and Exchange Commission or in such other statements by such other entity or other practices and procedures as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of the determination. All financial definitions in this exhibit are intended to be construed in accordance with GAAP, whether or not expressly so stated.

Gross Revenue. The term "Gross Revenue" shall mean the sum of all Professional Service Revenue and Ancillary Revenue before Adjustments.

Ordinary Dental Supplies. The term "Ordinary Dental Supplies" shall mean all products, substances, items, or devices which (a) are necessary or appropriate for Provider's provision of Dental Care, and (b) are not Special Dental Supplies.

Parent. The term "Parent" shall mean American Dental Partners, Inc., a Delaware corporation.

Practice Territory. The term "Practice Territory" shall mean the geographic area within which Provider provides Dental Care, which geographic area shall include all of the following territories: (a) with respect to each Clinic which offers general dentistry services only, the geographic area within a radius of 30 miles of such Clinic, and (b) with respect to each Clinic which offers specialty dental services, the geographic area within a radius of 50 miles of such Clinic.

Professional Service Revenue. The term "Professional Service Revenue" shall mean the sum of all (a) professional fees actually recorded each month on an accrual basis under GAAP as a result of the Dental Care rendered by the Dental Care Professionals retained by Provider, and (b) Capitation Revenue.

Provider Account. The term "Provider Account" shall mean the bank account of Provider established by Provider promptly following the execution of this Agreement at a financial institution reasonably acceptable to Service Company, which account shall be administered by Service Company according to §§4.11 and 4.12 of this Agreement.

A-4

Provider Consent.  The term "Provider Consent" shall mean the consent granted by a majority of Provider's representatives who serve on the Policy Board. When any provision of this Agreement requires Provider Consent, Provider Consent shall not be unreasonably withheld and shall be binding on Provider.

Provider Expense.  The term "Provider Expense" shall mean any expense (other than an expense for which Provider is required by applicable law to be financially liable and which is expressly identified in this Agreement as a Clinic Expense) incurred by the Service Company or Provider and for which Provider, and not the Service Company, is financially liable.  Provider Expense shall include dentist (as defined in Section 2.5) salaries, benefits (which includes workers' compensation coverage), and other direct costs related to the dentists employed or otherwise retained by Provider for the provision of its Dental Care (including professional dues, subscriptions, continuing dental education expenses, and travel costs for continuing dental education or other business travel, but excluding business travel requested by Service Company, which shall be a Clinic Expense), together with any expense related to any Dental Assets or the maintenance or protection of the same and any other cost or expense designated as a Provider Expense in or pursuant to this Agreement.  In the event Provider incurs any consulting, accounting, legal or other similar fee without Service Company's approval of such engagement through Service Company, any fee or expense so incurred shall be a Provider Expense, but one that is ignored for purposes of calculating the Calculated Margin and that therefore must be paid out of the Provider Retained Earnings.  Any Provider Expense which is not within the then-applicable Budget or the parameters described in the third paragraph of Section 4.13(a) and is not approved by either the Policy Board or the Service Company shall be ignored for purposes of calculating the Calculated Margin and therefore shall be paid out of the Provider Retained Earnings.

Provider Overhead Expense.  The term "Provider Overhead Expense" shall mean salaries, benefits, and other direct costs of personnel performing the functions which are being performed as of the date of this Agreement by: Joe Kyle; Colleen Hathaway; Carol Rossi; Leo Monfette; Brenda Murphy; Liz Kaminski; and Pat Kensicki.  Notwithstanding any other provision of this Agreement to the contrary (including without limitation any part of the definition of Clinic Expense or the definition of Service Company Expense), Provider Overhead Expense shall constitute either a Clinic Expense or a Service Company Expense, and the determination as to whether Provider Overhead Expense shall constitute a Clinic Expense or a Service Company Expense hereunder shall be determined as follows:

(a)  If the Service Company's operating earnings from the affiliation with Provider contemplated hereby (calculated as described in Section 1.4(c) of the Purchase Agreement) for the 12-month period beginning on the date of this Agreement, treating the Provider Overhead Expense for such period as a Service Company Expense, is less than $1,125,000, then the Provider Overhead Expense shall constitute a Clinic Expense under this Agreement for all periods (including such 12-month period beginning on the date of this Agreement).

(b)  If the Service Company's operating earnings from the affiliation with Provider contemplated hereby (calculated as described in Section 1.4(c) of the Purchase Agreement) for the 12-month period beginning on the date of this Agreement, treating the

A-5

Provider Overhead Expense for such period as a Service Company Expense, is equal to or greater than $1,125,000, then the Provider Overhead Expense shall constitute a Service Company Expense under this Agreement for all periods (including such 12-month period beginning on the date of this Agreement).

(c)     During the 12-month period beginning on the date of this Agreement, the Provider Overhead Expense shall be treated as a Clinic Expense for purposes of the monthly calculation and payment of the Service Fee and the Provider Retained Earnings; provided that (i) the Policy Board shall track the financial performance of the Provider and Service Company on a quarterly basis during such 12-month period for the purpose of anticipating, to the extent reasonably practicable, whether Provider Overhead Expense will remain a Clinic Expense or be converted to Service Company Expense; and (ii) on the basis of such tracking and anticipation, the Policy Board shall have the authority to make periodic reconciliations of the Service Fee and the Provider Retained Earnings amounts, with any final reconciliation to made as of a date not later than August 1, 2004.

(d)     Notwithstanding the foregoing, even if Provider Overhead Expense constitutes a Clinic Expense, Service Company shall have the right to record Provider Overhead Expense as a Service Company Expense for purposes of tracking Service Company's financial performance.

Provider Retained Earnings.  The term "Provider Retained Earnings" shall have the meaning given to it in Section 7.7.

Purchase Agreement.  The term "Purchase Agreement" shall have the meaning given to it in Section 5.1.

Representatives.  The term "Representatives' shall mean a Party's officers, directors, employees, and other agents or representatives, and attorneys, accountants, and other professional advisors.

Service Company Consent.  The term "Service Company Consent" shall mean the consent granted by a majority of Service Company's representatives who serve on the Policy Board. When any provision of this Agreement requires Service Company Consent, Service Company Consent shall not be unreasonably withheld and shall be binding on Service Company.

Service Company Expense.  The term "Service Company Expense" shall mean an expense or cost incurred by Service Company or Parent and for which Service Company or Parent, and not Provider, is financially liable. Without limiting the generality of the foregoing, Service Company Expense shall specifically include:

(a)     The costs of Service Company's and Parent's corporate personnel and the travel costs of such corporate personnel;

(b)     General overhead costs of Service Company or Parent that neither directly benefit Provider nor are otherwise incurred by Service Company or Parent in providing services pursuant to this Agreement, such as (by way of illustration and not limitation) rent expense for Parent's corporate headquarters; and

       (c)     Amortization of goodwill or non-operating intangible assets (such as noncompete covenants and this Agreement) arising as a result of the of the transactions contemplated by the Asset Purchase Agreement between Provider, Service Company, Parent, and the other parties named therein being executed concurrently with the execution of this Agreement.

Service Company Expense shall specifically exclude any expense incurred by Service Company or Parent that directly benefits Provider or is otherwise incurred by Service Company or Parent in providing services pursuant to this Agreement.

Service Fee. The term "Service Fee" shall mean the fee payable to Service Company by Provider as described in §7.3.

Services. The term "Services" shall mean the business, administrative, and management services to be provided for Provider by Service Company as set forth in this Agreement, including without limitation the provision of equipment, supplies, support services, non-dentist personnel, office space, financial recordkeeping and reporting, billing and collection and other business office services. Services shall not include the provision of Dental Care to patients of the Provider or the supervision or control of persons while they are providing Dental Care to patients.

Special Dental Supplies. The term "Special Dental Supplies" shall mean all products, substances, items or devices, the purchase, possession, maintenance, administration, prescription or security of which requires the authorization or order of a Dental Care Professional or requires a permit, registration, certification or other governmental authorization held by a Dental Care Professional as specified under any federal or state law (or both).

Term. The term "Term" shall mean the initial term and any renewal periods of this Agreement as described in §8.1, subject to termination pursuant to §8.2.

Exhibit B

FORM OF MANAGEMENT LEVEL DENTIST
EMPLOYMENT AND NON-COMPETITION AGREEMENT

This agreement (this "Agreement") is made _____, between _____, a Michigan professional corporation (the "Company"), and _____ an individual licensed to practice dentistry in the State of Michigan (the "Dentist"), who hereby agree as follows:

1.    Employment.  Upon the terms and subject to the conditions described in this Agreement, the Company hereby employs the Dentist and the Dentist hereby accepts employment with the Company.

2.    Term.  The Dentist's employment with the Company pursuant to this Agreement shall begin on _____ (the "Commencement Date") and shall end on the fifth anniversary of the Commencement Date (the "Initial Term"), unless sooner terminated pursuant to Section 10 of this Agreement.  The term of this Agreement shall renew automatically for successive one-year periods after the Initial Term (the "Renewal Terms"), unless and until terminated pursuant to Section 10 of this Agreement.  When permitted by the context, any reference in this Agreement to the "term of this Agreement" shall include the Initial Term and all Renewal Terms, if any.

3.    Services.  The Dentist shall perform such professional dental care services and related services or duties (collectively, the "Services") as may be assigned to the Dentist from time to time by the Company and shall devote his best efforts and full business and professional time, attention, energy, loyalty, and skill to the rendering of the Services on behalf of the Company, to the business affairs of the Company, and to the advancement of the Company's interests.

Any undertaking by the Dentist to perform professional dental services for third parties shall be made by the Dentist as agent for the Company.  The Dentist shall not perform dental services similar to those required to be provided hereunder for any other person, firm, corporation or other entity (hereinafter, simply "person"), as an employee or independent contractor of such person, without the prior written consent of the Company.  The Dentist shall not enter into any personal service contract, oral or written, under which any person other than the Company has the right to designate the employee of the Company who is to perform the services required thereby.  The Dentist shall not enter into any contract whatsoever on behalf of the Company, except as expressly authorized by the Company.

Subject to the terms and conditions of this Agreement, the Dentist shall be subject to the supervision and direction of the Company as to all matters relating to the performance of the Services, including without limitation: (a) work schedules and standards; (b) vacation schedules; (c) procedures and standards for billing; (d) determination of requirements for office space and necessary nonprofessional staff; (e) determination of requirements for gowns, instruments, equipment, and facilities; and (f) supervision of accounts, financial records, and confidential

B-1

records of patients.  The Dentist shall comply with the general standards and policies of the Company in every respect.

4.      Fees.  All fees or other compensation resulting from or received by the Company or the Dentist as payment for the Dentist's practice of dentistry or performance of professional dental services or related services shall accrue and inure to the benefit of the Company and shall be the exclusive property of the Company.   The Dentist shall be entitled only to the compensation provided for in this Agreement or as otherwise agreed upon by the Company and the Dentist (the "Parties") from time to time.

5.      Compensation.  As compensation for the Services the Company shall pay the Dentist base compensation ("Base Compensation") equal to 30% of all monies collected by or on behalf of the Company in respect of Services performed by the Dentist during the term of this Agreement (excluding fees collected for hygiene services), net of credit card fees and third-party collection fees ("Collections"), subject to the following conditions:

(a)      Monthly Draw and Reconciliation.  Because of the time lag between when Services are rendered and when Collections are actually received by the Company, for the first six months of the Initial Term (the "Draw Period"), the Company may pay the Dentist the Base Compensation in the form of a monthly draw of $_____ per month against future Collections (the "Monthly Draw").  During the period of six consecutive calendar months following the end of the Draw Period (the "Reconciliation Period"), in order for the Monthly Draw to be reconciled with the Base Compensation actually earned by the Dentist (on the basis of Collections actually received by the Company) with respect to Services rendered during the Draw Period, the amount actually paid to the Dentist as Base Compensation in satisfaction of the Company's obligations under this Section 5 shall be adjusted to reflect either (i) an increase over the Monthly Draw if the Base Compensation actually earned by the Dentist for Services rendered during the Draw Period exceeds the aggregate amount of Monthly Draws actually paid to the Dentist, or (ii) a decrease from the Monthly Draw if the Base Compensation actually earned by the Dentist for Services rendered during the Draw Period is less than the aggregate amount of Monthly Draws actually paid to the Dentist. Any such adjustments shall be spread over the Reconciliation Period in as nearly equal amounts as possible, and, subject to the reconciliation process described in this Section 5(a), from and after the first day of the Reconciliation Period, the Company shall have no obligation to pay the Dentist on any basis other than the amount of Collections actually received by the Company. *[Note: Section 5(a) should be n/a, and therefore deleted, if Dentist has been employed by the Company and compensated on a straight collections basis for at least six months prior to entering into this Agreement.]*

(b)      Collections Run-Off.  In recognition of the fact that, if the Dentist's employment by the Company terminates, Collections with respect to Services rendered by the Dentist prior to such termination may continue to be received by the Company following such termination, such post-termination Collections and related Base Compensation and Monthly Draw reconciliation for the Dentist shall be handled as follows:

B-2

(i)    In the event that the Dentist's employment with the Company terminates for any reason during the Probationary Period (as defined in Section 10, below), or in the event that the Dentist terminates the Dentist's employment with the Company other than as permitted hereby, or in the event that the Company terminates the Dentist's employment with the Company at any time for Cause (as defined below), the Company shall have no obligation to pay the Dentist with respect to any Collections received by the Company following the effective date of such termination or to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of any Collections received by the Company following the effective date of such termination.

(ii)    In the event that the Dentist's employment with the Company terminates for any reason other than the reasons set forth in the preceding paragraph (i), the Company shall continue to pay the Dentist the Base Compensation with respect to Collections received by the Company through the 90th day following the effective date of such termination (and, if applicable, to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of Collections received by the Company through the 90th day following the effective date of such termination), but the Company shall have no obligation to pay the Dentist with respect to any Collections received by the Company after the 90th day following the effective date of such termination or to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of any Collections received by the Company after the 90th day following the effective date of such termination.

Payment of the Base Compensation and any other compensation to the Dentist hereunder shall be subject to all applicable tax withholding requirements to which the Company is subject. Additionally, the Base Compensation may be adjusted from time to time by the Company after reviewing the contribution made by the Dentist to the operations of the Company, but the Company shall not be obligated to make any such adjustments. In addition to the Base Compensation, the Company may, in its sole discretion, pay bonuses or other additional compensation to the Dentist in such amounts and at such times as the Company shall determine, in its sole discretion.

6.    Insurance. The Company shall carry or cause to be provided professional liability insurance providing coverage for both Parties, with such limits as may from time to time be determined by the Company, provided that the Dentist is and continues to be insurable by the Company's professional liability insurer.

If professional liability insurance is purchased which provides individual coverage for the Dentist on a "claims made" basis or in the form of a "reporting endorsement", then after termination of the Dentist's employment the Company shall have no obligation to continue such insurance coverage unless the Dentist's employment is terminated by reason of death or permanent disability. If the Company is required by any insurer to pay premiums for a "reporting endorsement" upon termination of the Dentist's employment for any reason other than death or permanent disability, the Dentist shall reimburse the Company for the amount of such

premiums promptly following the Company's request.  Such  obligation may be offset against any amounts owed by the Company to the Dentist.

7.     Professional Expenses.  The Company shall reimburse the Dentist for reasonable professional expenses and other reasonable business expenses incurred by the Dentist from time to time in connection with his employment by the Company, including without limitation reasonable expenses for continuing education, attendance at professional seminars and conferences, and membership in appropriate professional organizations; provided that the Dentist shall comply with all related policies and procedures of the Company in effect from time to time, including without limitation reasonable reporting and recordkeeping requirements and procedures for prior approval of such types of expenses as may be designated by the Company.

8.     Licenses.  The Dentist shall at all times be qualified, professionally competent, and duly licensed to practice dentistry in Michigan.  The Dentist shall perform the Services in accordance with the customary rules of ethics and conduct of the American Dental Association and the Michigan State Board of Dentistry and in accordance with such practices as may be established by the Company from time to time.  The Dentist also shall cooperate fully with the Company in connection with credentialing, quality assurance reviews, and similar processes or procedures implemented or maintained by the Company, including without limitation providing the Company access to such information as the Company may reasonably request.

9.     Confidentiality; Non-competition.  The Dentist shall not, directly or indirectly, at any time (whether during the term of this Agreement or thereafter), disclose any Confidential Information (as defined below) to any person (other than the Dentist's legal counsel and professional advisors, the Company, or the Affiliated Companies, as defined below), or use, or assist any person (other than the Dentist's legal counsel and professional advisors, the Company, or the Affiliated Companies) to use, any Confidential Information, excepting only disclosures required by applicable law.

Upon termination of his employment with the Company (for any reason) the Dentist shall promptly deliver to the Company all documents and other materials containing any Confidential Information which are in his possession or under his control.

During the Restricted Period (defined below), the Dentist shall not, directly or indirectly (whether individually or as a shareholder or other owner, partner, member, director, officer, employee, independent contractor, creditor or agent of any person), other than for the Company:

(a)     Engage in the practice of dentistry or otherwise perform professional dental services or related services anywhere in the Restricted Territory (defined below);

(b)     Induce or encourage any employee, officer, director, agent, supplier, independent contractor, or patient of the Company to terminate its relationship with the Company, or otherwise interfere or attempt to interfere in any way with any of the Company's relationships with its employees, officers, directors, agents, suppliers, independent contractors, patients, or others;

B-4

       (c)     Employ or engage any person other than himself who, at any time within the one-year period immediately preceding such employment or engagement, was an employee, officer, or director of the Company; or

       (d)     Make any statement (oral or written) which disparages the reputation of the Company. For purposes of this Agreement, a statement which "disparages the reputation of the Company" means any disparaging or derogatory statement or comment which would give rise to a claim or cause of action in Michigan for libel or slander (or both).

       For purposes of this Agreement: (i) "Confidential Information" shall mean all trade secrets, proprietary data, and other confidential information of the Company and the Affiliated Companies, including without limitation financial information, information relating to business operations, services, promotional practices, quality assurance programs, prepaid dental programs, and relationships with suppliers, employees, independent contractors, patients or others, and any information which the Company or any Affiliated Company is obligated to treat as confidential pursuant to any course of dealing or any agreement to which it is a party or otherwise bound, provided that Confidential Information shall not include any information which is generally available to the public (which shall include the Dentist's knowledge about the dental industry in general) and did not become so as a result of any breach of this Agreement by the Dentist; (ii) "Affiliated Companies" shall mean American Dental Partners of Michigan, LLC, a Delaware limited liability company with which the Company has a long-term service agreement (the "Service Company"), American Dental Partners, Inc., a Delaware corporation of which the Service Company is a wholly owned subsidiary ("ADP"), and all other subsidiaries of ADP; (iii) the "Restricted Period" shall mean the period beginning on the Commencement Date and ending on the later of the fifth anniversary of the Commencement Date or the second anniversary of the date of termination of the Dentist's employment with the Company (for any reason); and (iv) the "Restricted Territory" shall mean the geographic area within a radius of 10 miles from any offices or facilities operated or otherwise utilized by the Company at which the Dentist has been regularly scheduled to see patients or has seen patients on a regular basis at any time during the two-year period immediately preceding the termination of the Dentist's employment with the Company.

       The Dentist acknowledges that: (A) the provisions of this section are fundamental and essential for the protection of the Company's and the Affiliated Companies' legitimate business and proprietary interests, and the Affiliated Companies are intended third party beneficiaries of such provisions (to the extent such provisions relate to the Affiliated Companies); (B) such provisions are reasonable and appropriate in all respects; and (C) in the event of any violation by the Dentist of any of such provisions, the Company and, if applicable, the Affiliated Companies, would suffer irreparable harm and their remedies at law would be inadequate. In the event of any violation or attempted violation of such provisions by the Dentist, the Company and the Affiliated Companies, or any of them, as the case may be, shall be entitled to a temporary restraining order, temporary and permanent injunctions, specific performance, and other equitable relief, without any showing of irreparable harm or damage or the posting of any bond, in addition to any other rights or remedies which may then be available to them.

10.   Termination; Liquidated Damages.   The Dentist's employment with the Company: (a) shall terminate automatically upon the death of the Dentist; (b) may be terminated by the Dentist at any time upon not less than 90 days prior written notice to the Company; (c) may be terminated by the Company, without any further obligation on the part of the Company, (i) immediately upon notice to the Dentist at any time during the first 120 days of the Initial Term (the "Probationary Period") with or without Cause (defined below), (ii) following the Probationary Period, at any time upon not less than 90 days prior written notice to the Dentist, or (iii) immediately upon notice to the Dentist at any time for Cause (defined below) or if the Dentist is then under a Long-Term Disability (defined below). If the Company terminates the Dentist's employment pursuant to the preceding clause (c)(ii), then the Company may, in its sole discretion, treat such termination as being effective on the first day after the written notice required under that clause by paying the Dentist an amount equal to three months average Base Compensation earned by him under Section 5 of this Agreement (the "Severance Payment"), such average to be based on the prior six-month period (or if the Dentist has been employed by the Company less than six months, then the period of the Dentist's employment). The intent of the Severance Payment shall be to compensate the Dentist for the 90-day period during which the Dentist otherwise would have continued to perform Services and generate Collections. The Severance Payment, in and of itself, shall have no effect on, and, at the Company's option, may be calculated without regard to, the Company's obligations described in Section 5(b)(ii), above.

The Company and the Dentist acknowledge and agree that, upon the termination by the Dentist of the Dentist's employment with the Company during the Initial Term or any Renewal Term, if any, other than because of the Dentist's death or Long-Term Disability, without the Dentist having given the notice required pursuant to Section 10(b), above (an "Early Termination"), the actual losses suffered by the Company will be difficult to ascertain, and that the liquidated damages set forth in this paragraph have been agreed upon by the Parties after good faith efforts as a reasonable estimate of such losses and not as a penalty. The Company and the Dentist acknowledge that the Company would not have entered into this Agreement but for this liquidated damages covenant. Therefore, in the event of an Early Termination, the Dentist shall pay to the Company liquidated damages in an amount equal to the result obtained when the Dentist's average monthly Base Compensation earned by him under Section 5 of this Agreement, such average to be based on the six-month period immediately preceding the Early Termination, is multiplied by the number of months, including partial months, by which the notice period required pursuant to Section 10(b), above, exceeds the actual period of prior written notice of termination given by the Dentist to the Company.

For purposes of this Agreement:

(A)   "Cause" shall mean any one or more of the following:

(1)   The revocation or suspension of the Dentist's license to practice dentistry in the State of Michigan;

(2)   The expulsion, suspension or disciplining of the Dentist as the final action of any professional, scientific, or similar organization having a primary purpose related to the practice of dentistry (a "Dental Organization");

B-6

(3)    The resignation of the Dentist from any Dental Organization while under threat of disciplinary action;

(4)    Any act constituting (i) a felony under the laws of the United States, the laws of any state, or any other applicable law, (ii)    fraud, embezzlement, misappropriation of assets, willful misfeasance or dishonesty, (iii) or other conduct which in any way materially and adversely affects the reputation, goodwill or business of the Company;

(5)    The inability of the Company to obtain or maintain professional liability insurance covering the Dentist at rates comparable to those at which it is able to insure other professional employees;

(6)    The failure of the Dentist to perform and observe all material obligations and conditions to be performed and observed by the Dentist under this Agreement or to perform the Services in accordance with the policies, programs, procedures and directions established from time to time by the Company or in a demonstrable spirit of cooperation and teamwork which accurately reflects the Company's work ethic and group practice philosophy (any such event, a "Performance Failure"), and to correct such Performance Failure promptly following notice from the Company to do so; or

(7)    Having corrected a Performance Failure, the occurrence of any subsequent Performance Failure.

(B)    "Long-Term Disability" shall mean that, because of physical or mental incapacity, it is more likely than not that the Dentist will be unable, within 180 days after such incapacity commenced, to engage actively in performing services and other business activities of the type which are substantially the same as the Services the Dentist was performing prior to such incapacity, with or without reasonable accommodation. In the event of any disagreement about whether or when the Dentist is under a Long-Term Disability, the question shall be determined: (1) by a physician selected by agreement between the Parties if such a physician is selected within the 10 days after either Party requests the other to so agree, or, if not, (2) by two physicians, the first of whom shall be selected by the Dentist and the second of whom shall be selected by the Company or, if the Dentist fails to make a selection within 10 days after being requested to do so by the Company, the second physician shall be selected by the first physician, and (3) if the two physicians fail to agree, by a third physician selected by the first two physicians. The Dentist shall submit to all reasonable examinations requested by any such physicians.

11.    Records and Files.    In the event of the termination of employment of the Dentist, possession of all records and files, including without limitation all patient records and files, shall be retained by the Company. However, if any patient requests a copy of that patient's records, the Company shall provide a copy of such records to the patient free of charge.

B-7

12.   Capacity.  The Dentist represents and warrants to the Company that he has the capacity and right to enter into this Agreement and perform all of his obligations under this Agreement without any restriction.

13.   Remedies.  Subject to the right of the Company and the Affiliated Companies to exercise the remedies described in the last paragraph of Section 10 of this Agreement in any court having jurisdiction, all disagreements and controversies arising with respect to this Agreement, or with respect to its application to circumstances not clearly set forth in this Agreement, shall be settled by binding arbitration to be held, and the award made, in the Detroit, Michigan, metropolitan area pursuant to the then-applicable Commercial Arbitration Rules of the American Arbitration Association. In any such arbitration, the arbitrators shall consist of a panel of three arbitrators, which shall act by majority vote and which shall consist of one arbitrator selected by the Party on one side of the issue subject to the arbitration, one arbitrator selected by the Party on the other side of the issue, and a third arbitrator selected by the two arbitrators so selected, who shall be either a certified public accountant or an attorney at law licensed to practice in the State of Michigan and who shall act as chairman of the arbitration panel; provided that if the Party on one side of the issue selects its arbitrator for the panel and the other Party fails so to select its arbitrator within 10 business days after being requested by the first Party to do so, then the sole arbitrator shall be the arbitrator selected by the first Party. A decision in any such arbitration shall apply both to the particular question submitted and to all similar questions arising thereafter and shall be binding and conclusive upon both Parties and shall be enforceable in any court having jurisdiction over the Party to be charged.

All costs and expenses of arbitration shall be borne by the Parties as determined by the arbitrator or arbitration panel, except that the fees and expenses of any arbitrator on an arbitration panel who is selected individually by a Party shall be borne separately by the Party appointing the arbitrator; provided that if one Party fails to select an arbitrator for a panel, and the sole arbitrator is the arbitrator selected by the other Party, then the fees of that arbitrator shall be borne by the Parties as determined by that arbitrator.

All rights and remedies of each Party under this Agreement are cumulative and in addition to all other rights and remedies which may be available to that Party from time to time, whether under any other agreement, at law, or in equity.

14.   Survival.  The termination of the Dentist's employment by the Company (for any reason) shall not relieve the Parties of any of their respective obligations to each other existing at, arising as a result of, or relating to acts or omissions occurring prior to, such termination. Without limiting the generality of the preceding sentence, in no event shall the termination of such employment modify or affect any obligations of the Dentist or rights of the Company or the Affiliated Companies under Sections 5, 6, 9, or 10 of this Agreement, all of which shall survive the termination of such employment.

15.   Notices.  All notices and other communications under this Agreement to either Party shall be in writing and shall be deemed given when (a) delivered personally to that Party, (b) telecopied (which is confirmed) to that Party at the telecopy number for that Party set forth at the end of this Agreement, (c) mailed by certified mail (return receipt requested) to that Party at the address for that Party set forth at the end of this Agreement, or (d) delivered to Federal

Express, UPS, or any similar express delivery service for delivery the next business day to that Party at that address. Either Party may change its address or telecopy number for notices under this Agreement by giving the other Party notice of such change.

16.   Severability. The intention of the Parties is to comply fully with all rules, laws, and public policies to the extent possible. If and to the extent that any court of competent jurisdiction is unable to so construe any provision of this Agreement and holds that provision to be invalid, such invalidity shall not affect the remaining provisions of this Agreement, which shall remain in full force and effect. With respect to any provision in this Agreement finally determined by such a court to be invalid or unenforceable, such court shall have jurisdiction to reform this Agreement to the extent necessary to make such provision valid and enforceable, and, as reformed, such provision shall be binding on the parties.

17.   Non-Waiver. No failure by either Party to insist upon strict compliance with any term of this Agreement, to exercise any option, to enforce any right, or to seek any remedy upon any default of the other Party shall affect, or constitute a waiver of, the other Party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default. No custom or practice of the Parties at variance with any provision of this Agreement shall affect or constitute a waiver of, either Party's right to demand strict compliance with all provisions of this Agreement.

18.   Complete Agreement. This Agreement contains the entire agreement between the Parties and supersedes all other agreements and understandings between the Parties with respect to the subject matter of this Agreement. This Agreement shall be of no force or effect unless and until executed and delivered by both the Dentist and a duly authorized representative of the Company. No alterations, additions, or other changes to this Agreement shall be made or be binding unless made in writing and signed by both Parties.

19.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

20.   Captions. The captions of the various sections of this Agreement are not part of the context of this Agreement, are only guides to assist in locating those sections, and shall be ignored in construing this Agreement.

21.   Genders and Numbers. Where permitted by the context, each pronoun used in this Agreement includes the same pronoun in other genders and numbers, and each noun used in this Agreement includes the same noun in other numbers.

22.   Successors. This Agreement shall be personal to the Dentist and no rights or obligations of the Dentist under this Agreement may be assigned or delegated by the Dentist to any person. Any assignment or attempted assignment by the Dentist in violation of the preceding sentence shall be null and void. Subject to the foregoing, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the heirs, personal representatives, successors, and assigns of each Party.

DENTIST:                          COMPANY:

                                  [_____]


_____         By:_____
[NAME OF DENTIST]                 Its:_____

Address:                          Address:

_____         _____
Telecopy No.: (___) ____-____     Telecopy No.: (___) ____-_____

B-10

Exhibit C

FORM OF NON-MANAGEMENT LEVEL DENTIST
EMPLOYMENT AND NON-COMPETITION AGREEMENT

This agreement (this "Agreement") is made _____, between _____, a _____ professional corporation (the "Company"), and _____ an individual licensed to practice dentistry in the State of Michigan (the "Dentist"), who hereby agree as follows:

1.    Employment.  Upon the terms and subject to the conditions described in this Agreement, the Company hereby employs the Dentist and the Dentist hereby accepts employment with the Company.

2.    Term.  The Dentist's employment with the Company pursuant to this Agreement shall begin on _____ (the "Commencement Date") and shall end on the _____ anniversary of the Commencement Date (the "Initial Term"), unless sooner terminated pursuant to Section 10 of this Agreement.  The term of this Agreement shall renew automatically for successive one-year periods after the Initial Term (the "Renewal Terms"), unless and until terminated pursuant to Section 10 of this Agreement.  When permitted by the context, any reference in this Agreement to the "term of this Agreement" shall include the Initial Term and all Renewal Terms, if any.

3.    Services.  The Dentist shall perform such professional dental care services and related services or duties (collectively, the "Services") as may be assigned to the Dentist from time to time by the Company and shall devote his best efforts and full business and professional time, attention, energy, loyalty, and skill to the rendering of the Services on behalf of the Company, to the business affairs of the Company, and to the advancement of the Company's interests.

Any undertaking by the Dentist to perform professional dental services for third parties shall be made by the Dentist as agent for the Company.  The Dentist shall not perform dental services similar to those required to be provided hereunder for any other person, firm, corporation or other entity (hereinafter, simply "person"), as an employee or independent contractor of such person, without the prior written consent of the Company.  The Dentist shall not enter into any personal service contract, oral or written, under which any person other than the Company has the right to designate the employee of the Company who is to perform the services required thereby.  The Dentist shall not enter into any contract whatsoever on behalf of the Company, except as expressly authorized by the Company.

Subject to the terms and conditions of this Agreement, the Dentist shall be subject to the supervision and direction of the Company as to all matters relating to the performance of the Services, including without limitation: (a) work schedules and standards; (b) vacation schedules; (c) procedures and standards for billing; (d) determination of requirements for office space and necessary nonprofessional staff; (e) determination of requirements for gowns, instruments, equipment, and facilities; and (f) supervision of accounts, financial records, and confidential

C-1

records of patients. The Dentist shall comply with the general standards and policies of the Company in every respect.

4.    Fees. All fees or other compensation resulting from or received by the Company or the Dentist as payment for the Dentist's practice of dentistry or performance of professional dental services or related services shall accrue and inure to the benefit of the Company and shall be the exclusive property of the Company. The Dentist shall be entitled only to the compensation provided for in this Agreement or as otherwise agreed upon by the Company and the Dentist (the "Parties") from time to time.

5.    Compensation. As compensation for the Services the Company shall pay the Dentist base compensation ("Base Compensation") equal to 30% of all monies collected by or on behalf of the Company in respect of Services performed by the Dentist during the term of this Agreement (excluding fees collected for hygiene services), net of credit card fees and third-party collection fees ("Collections"), subject to the following conditions:

(a)    Monthly Draw and Reconciliation. Because of the time lag between when Services are rendered and when Collections are actually received by the Company, for the first six months of the Initial Term (the "Draw Period"), the Company may pay the Dentist the Base Compensation in the form of a monthly draw of $_____ per month against future Collections (the "Monthly Draw"). During the period of six consecutive calendar months following the end of the Draw Period (the "Reconciliation Period"), in order for the Monthly Draw to be reconciled with the Base Compensation actually earned by the Dentist (on the basis of Collections actually received by the Company) with respect to Services rendered during the Draw Period, the amount actually paid to the Dentist as Base Compensation in satisfaction of the Company's obligations under this Section 5 shall be adjusted to reflect either (i) an increase over the Monthly Draw if the Base Compensation actually earned by the Dentist for Services rendered during the Draw Period exceeds the aggregate amount of Monthly Draws actually paid to the Dentist, or (ii) a decrease from the Monthly Draw if the Base Compensation actually earned by the Dentist for Services rendered during the Draw Period is less than the aggregate amount of Monthly Draws actually paid to the Dentist. Any such adjustments shall be spread over the Reconciliation Period in as nearly equal amounts as possible, and, subject to the reconciliation process described in this Section 5(a), from and after the first day of the Reconciliation Period, the Company shall have no obligation to pay the Dentist on any basis other than the amount of Collections actually received by the Company. [Note: Section 5(a) should be n/a, and therefore deleted, if Dentist has been employed by the Company and compensated on a straight collections basis for at least six months prior to entering into this Agreement.]

(b)    Collections Run-Off. In recognition of the fact that, if the Dentist's employment by the Company terminates, Collections with respect to Services rendered by the Dentist prior to such termination may continue to be received by the Company following such termination, such post-termination Collections and related Base Compensation and Monthly Draw reconciliation for the Dentist shall be handled as follows:

(i)     In the event that the Dentist's employment with the Company terminates for any reason during the Probationary Period (as defined in Section 10, below), or in the event that the Dentist terminates the Dentist's employment with the Company other than as permitted hereby, or in the event that the Company terminates the Dentist's employment with the Company at any time for Cause (as defined below), the Company shall have no obligation to pay the Dentist with respect to any Collections received by the Company following the effective date of such termination or to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of any Collections received by the Company following the effective date of such termination.

(ii)     In the event that the Dentist's employment with the Company terminates for any reason other than the reasons set forth in the preceding paragraph (i), the Company shall continue to pay the Dentist the Base Compensation with respect to Collections received by the Company through the 90th day following the effective date of such termination (and, if applicable, to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of Collections received by the Company through the 90th day following the effective date of such termination), but the Company shall have no obligation to pay the Dentist with respect to any Collections received by the Company after the 90th day following the effective date of such termination or to reconcile Base Compensation actually earned against previously paid Monthly Draws on account of any Collections received by the Company after the 90th day following the effective date of such termination.

Payment of the Base Compensation and any other compensation to the Dentist hereunder shall be subject to all applicable tax withholding requirements to which the Company is subject. Additionally, the Base Compensation may be adjusted from time to time by the Company after reviewing the contribution made by the Dentist to the operations of the Company, but the Company shall not be obligated to make any such adjustments. In addition to the Base Compensation, the Company may, in its sole discretion, pay bonuses or other additional compensation to the Dentist in such amounts and at such times as the Company shall determine, in its sole discretion.

6.     Insurance. The Company shall carry or cause to be provided professional liability insurance providing coverage for both Parties, with such limits as may from time to time be determined by the Company, provided that the Dentist is and continues to be insurable by the Company's professional liability insurer.

If professional liability insurance is purchased which provides individual coverage for the Dentist on a "claims made" basis or in the form of a "reporting endorsement", then after termination of the Dentist's employment the Company shall have no obligation to continue such insurance coverage unless the Dentist's employment is terminated by reason of death or permanent disability. If the Company is required by any insurer to pay premiums for a "reporting endorsement" upon termination of the Dentist's employment for any reason other than death or permanent disability, the Dentist shall reimburse the Company for the amount of such

premiums promptly following the Company's request. Such obligation may be offset against any amounts owed by the Company to the Dentist.

7.    Professional Expenses. The Company shall reimburse the Dentist for reasonable professional expenses and other reasonable business expenses incurred by the Dentist from time to time in connection with his employment by the Company, including without limitation reasonable expenses for continuing education, attendance at professional seminars and conferences, and membership in appropriate professional organizations; provided that the Dentist shall comply with all related policies and procedures of the Company in effect from time to time, including without limitation reasonable reporting and recordkeeping requirements and procedures for prior approval of such types of expenses as may be designated by the Company.

8.    Licenses. The Dentist shall at all times be qualified, professionally competent, and duly licensed to practice dentistry in Michigan. The Dentist shall perform the Services in accordance with the customary rules of ethics and conduct of the American Dental Association and the Michigan State Board of Dentistry and in accordance with such practices as may be established by the Company from time to time. The Dentist also shall cooperate fully with the Company in connection with credentialing, quality assurance reviews, and similar processes or procedures implemented or maintained by the Company, including without limitation providing the Company access to such information as the Company may reasonably request.

9.    Confidentiality; Non-competition. The Dentist shall not, directly or indirectly, at any time (whether during the term of this Agreement or thereafter), disclose any Confidential Information (as defined below) to any person (other than the Dentist's legal counsel and professional advisors, the Company, or the Affiliated Companies, as defined below), or use, or assist any person (other than the Dentist's legal counsel and professional advisors, the Company, or the Affiliated Companies) to use, any Confidential Information, excepting only disclosures required by applicable law.

Upon termination of his employment with the Company (for any reason) the Dentist shall promptly deliver to the Company all documents and other materials containing any Confidential Information which are in his possession or under his control.

During the Restricted Period (defined below), the Dentist shall not, directly or indirectly (whether individually or as a shareholder or other owner, partner, member, director, officer, employee, independent contractor, creditor or agent of any person), other than for the Company:

(a)    Engage in the practice of dentistry or otherwise perform professional dental services or related services anywhere in the Restricted Territory (defined below);

(b)    Induce or encourage any employee, officer, director, agent, supplier, independent contractor, or patient of the Company to terminate its relationship with the Company, or otherwise interfere or attempt to interfere in any way with any of the Company's relationships with its employees, officers, directors, agents, suppliers, independent contractors, patients, or others;

C-4

(c)     Employ or engage any person other than himself who, at any time within the one-year period immediately preceding such employment or engagement, was an employee, officer, or director of the Company; or

(d)     Make any statement (oral or written) which disparages the reputation of the Company.  For purposes of this Agreement, a statement which "disparages the reputation of the Company" means any disparaging or derogatory statement or comment which would give rise to a claim or cause of action in Michigan for libel or slander (or both).

For purposes of this Agreement:  (i) "Confidential Information" shall mean all trade secrets, proprietary data, and other confidential information of the Company and the Affiliated Companies, including without limitation financial information, information relating to business operations, services, promotional practices, quality assurance programs, prepaid dental programs, and relationships with suppliers, employees, independent contractors, patients or others, and any information which the Company or any Affiliated Company is obligated to treat as confidential pursuant to any course of dealing or any agreement to which it is a party or otherwise bound, provided that Confidential Information shall not include any information which is generally available to the public (which shall include the Dentist's knowledge about the dental industry in general) and did not become so as a result of any breach of this Agreement by the Dentist; (ii) "Affiliated Companies" shall mean American Dental Partners of Michigan, LLC, a Delaware limited liability company with which the Company has a long-term service agreement (the "Service Company"), American Dental Partners, Inc., a Delaware corporation of which the Service Company is a wholly owned subsidiary ("ADP"), and all other subsidiaries of ADP; (iii) the "Restricted Period" shall mean the period beginning on the Commencement Date and ending on the later of the _____ anniversary of the Commencement Date or the first anniversary of the date of termination of the Dentist's employment with the Company (for any reason); and (iv) the "Restricted Territory" shall mean the geographic area within a radius of 10 miles from any offices or facilities operated or otherwise utilized by the Company at which the Dentist has been regularly scheduled to see patients or has seen patients on a regular basis at any time during the two-year period immediately preceding the termination of the Dentist's employment with the Company.

The Dentist acknowledges that:  (A) the provisions of this section are fundamental and essential for the protection of the Company's and the Affiliated Companies' legitimate business and proprietary interests, and the Affiliated Companies are intended third party beneficiaries of such provisions (to the extent such provisions relate to the Affiliated Companies); (B) such provisions are reasonable and appropriate in all respects; and (C) in the event of any violation by the Dentist of any of such provisions, the Company and, if applicable, the Affiliated Companies, would suffer irreparable harm and their remedies at law would be inadequate.  In the event of any violation or attempted violation of such provisions by the Dentist, the Company and the Affiliated Companies, or any of them, as the case may be, shall be entitled to a temporary restraining order, temporary and permanent injunctions, specific performance, and other equitable relief, without any showing of irreparable harm or damage or the posting of any bond, in addition to any other rights or remedies which may then be available to them.

10.    Termination; Liquidated Damages.    The Dentist's employment with the Company: (a) shall terminate automatically upon the death of the Dentist; (b) may be terminated by the Dentist at any time upon not less than 90 days prior written notice to the Company; (c) may be terminated by the Company, without any further obligation on the part of the Company, (i) immediately upon notice to the Dentist at any time during the first 120 days of the Initial Term (the "Probationary Period") with or without Cause (defined below), (ii) following the Probationary Period, at any time upon not less than 90 days prior written notice to the Dentist, or (iii) immediately upon notice to the Dentist at any time for Cause (defined below) or if the Dentist is then under a Long-Term Disability (defined below).  If the Company terminates the Dentist's employment pursuant to the preceding clause (c)(ii), then the Company may, in its sole discretion, treat such termination as being effective on the first day after the written notice required under that clause by paying the Dentist an amount equal to three months average Base Compensation earned by him under Section 5 of this Agreement (the "Severance Payment"), such average to be based on the prior six-month period (or if the Dentist has been employed by the Company less than six months, then the period of the Dentist's employment).  The intent of the Severance Payment shall be to compensate the Dentist for the 90-day period during which the Dentist otherwise would have continued to perform Services and generate Collections.  The Severance Payment, in and of itself, shall have no effect on, and, at the Company's option, may be calculated without regard to, the Company's obligations described in Section 5(b)(ii), above.

The Company and the Dentist acknowledge and agree that, upon the termination by the Dentist of the Dentist's employment with the Company during the Initial Term or any Renewal Term, if any, other than because of the Dentist's death or Long-Term Disability, without the Dentist having given the notice required pursuant to Section 10(b), above (an "Early Termination"), the actual losses suffered by the Company will be difficult to ascertain, and that the liquidated damages set forth in this paragraph have been agreed upon by the Parties after good faith efforts as a reasonable estimate of such losses and not as a penalty.  The Company and the Dentist acknowledge that the Company would not have entered into this Agreement but for this liquidated damages covenant.  Therefore, in the event of an Early Termination, the Dentist shall pay to the Company liquidated damages in an amount equal to the result obtained when the Dentist's average monthly Base Compensation earned by him under Section 5 of this Agreement, such average to be based on the six-month period immediately preceding the Early Termination, is multiplied by the number of months, including partial months, by which the notice period required pursuant to Section 10(b), above, exceeds the actual period of prior written notice of termination given by the Dentist to the Company.

For purposes of this Agreement:

(A)    "Cause" shall mean any one or more of the following:

(1)    The revocation or suspension of the Dentist's license to practice dentistry in the State of Michigan;

(2)    The expulsion, suspension or disciplining of the Dentist as the final action of any professional, scientific, or similar organization having a primary purpose related to the practice of dentistry (a "Dental Organization");

C-6

(3)     The resignation of the Dentist from any Dental Organization while under threat of disciplinary action;

(4)     Any act constituting (i) a felony under the laws of the United States, the laws of any state, or any other applicable law, (ii)   fraud, embezzlement, misappropriation of assets, willful misfeasance or dishonesty, (iii) or other conduct which in any way materially and adversely affects the reputation, goodwill or business of the Company;

(5)     The inability of the Company to obtain or maintain professional liability insurance covering the Dentist at rates comparable to those at which it is able to insure other professional employees;

(6)     The failure of the Dentist to perform and observe all material obligations and conditions to be performed and observed by the Dentist under this Agreement or to perform the Services in accordance with the policies, programs, procedures and directions established from time to time by the Company or in a demonstrable spirit of cooperation and teamwork which accurately reflects the Company's work ethic and group practice philosophy (any such event, a "Performance Failure"), and to correct such Performance Failure promptly following notice from the Company to do so; or

(7)     Having corrected a Performance Failure, the occurrence of any subsequent Performance Failure.

(B)     "Long-Term Disability" shall mean that, because of physical or mental incapacity, it is more likely than not that the Dentist will be unable, within 180 days after such incapacity commenced, to engage actively in performing services and other business activities of the type which are substantially the same as the Services the Dentist was performing prior to such incapacity, with or without reasonable accommodation. In the event of any disagreement about whether or when the Dentist is under a Long-Term Disability, the question shall be determined: (1) by a physician selected by agreement between the Parties if such a physician is selected within the 10 days after either Party requests the other to so agree, or, if not, (2) by two physicians, the first of whom shall be selected by the Dentist and the second of whom shall be selected by the Company or, if the Dentist fails to make a selection within 10 days after being requested to do so by the Company, the second physician shall be selected by the first physician, and (3) if the two physicians fail to agree, by a third physician selected by the first two physicians. The Dentist shall submit to all reasonable examinations requested by any such physicians.

11.     Records and Files.  In the event of the termination of employment of the Dentist, possession of all records and files, including without limitation all patient records and files, shall be retained by the Company. However, if any patient requests a copy of that patient's records, the Company shall provide a copy of such records to the patient free of charge.

12.    Capacity.  The Dentist represents and warrants to the Company that he has the capacity and right to enter into this Agreement and perform all of his obligations under this Agreement without any restriction.

13.    Remedies.  Subject to the right of the Company and the Affiliated Companies to exercise the remedies described in the last paragraph of Section 10 of this Agreement in any court having jurisdiction, all disagreements and controversies arising with respect to this Agreement, or with respect to its application to circumstances not clearly set forth in this Agreement, shall be settled by binding arbitration to be held, and the award made, in the Detroit, Michigan, metropolitan area pursuant to the then-applicable Commercial Arbitration Rules of the American Arbitration Association. In any such arbitration, the arbitrators shall consist of a panel of three arbitrators, which shall act by majority vote and which shall consist of one arbitrator selected by the Party on one side of the issue subject to the arbitration, one arbitrator selected by the Party on the other side of the issue, and a third arbitrator selected by the two arbitrators so selected, who shall be either a certified public accountant or an attorney at law licensed to practice in the State of Michigan and who shall act as chairman of the arbitration panel; provided that if the Party on one side of the issue selects its arbitrator for the panel and the other Party fails so to select its arbitrator within 10 business days after being requested by the first Party to do so, then the sole arbitrator shall be the arbitrator selected by the first Party. A decision in any such arbitration shall apply both to the particular question submitted and to all similar questions arising thereafter and shall be binding and conclusive upon both Parties and shall be enforceable in any court having jurisdiction over the Party to be charged.

All costs and expenses of arbitration shall be borne by the Parties as determined by the arbitrator or arbitration panel, except that the fees and expenses of any arbitrator on an arbitration panel who is selected individually by a Party shall be borne separately by the Party appointing the arbitrator; provided that if one Party fails to select an arbitrator for a panel, and the sole arbitrator is the arbitrator selected by the other Party, then the fees of that arbitrator shall be borne by the Parties as determined by that arbitrator.

All rights and remedies of each Party under this Agreement are cumulative and in addition to all other rights and remedies which may be available to that Party from time to time, whether under any other agreement, at law, or in equity.

14.    Survival.  The termination of the Dentist's employment by the Company (for any reason) shall not relieve the Parties of any of their respective obligations to each other existing at, arising as a result of, or relating to acts or omissions occurring prior to, such termination. Without limiting the generality of the preceding sentence, in no event shall the termination of such employment modify or affect any obligations of the Dentist or rights of the Company or the Affiliated Companies under Sections 5, 6, 9, or 10 of this Agreement, all of which shall survive the termination of such employment.

15.    Notices.  All notices and other communications under this Agreement to either Party shall be in writing and shall be deemed given when (a) delivered personally to that Party, (b) telecopied (which is confirmed) to that Party at the telecopy number for that Party set forth at the end of this Agreement, (c) mailed by certified mail (return receipt requested) to that Party at the address for that Party set forth at the end of this Agreement, or (d) delivered to Federal

C-8

Express, UPS, or any similar express delivery service for delivery the next business day to that Party at that address. Either Party may change its address or telecopy number for notices under this Agreement by giving the other Party notice of such change.

16.     Severability. The intention of the Parties is to comply fully with all rules, laws, and public policies to the extent possible. If and to the extent that any court of competent jurisdiction is unable to so construe any provision of this Agreement and holds that provision to be invalid, such invalidity shall not affect the remaining provisions of this Agreement, which shall remain in full force and effect. With respect to any provision in this Agreement finally determined by such a court to be invalid or unenforceable, such court shall have jurisdiction to reform this Agreement to the extent necessary to make such provision valid and enforceable, and, as reformed, such provision shall be binding on the parties.

17.     Non-Waiver. No failure by either Party to insist upon strict compliance with any term of this Agreement, to exercise any option, to enforce any right, or to seek any remedy upon any default of the other Party shall affect, or constitute a waiver of, the other Party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default. No custom or practice of the Parties at variance with any provision of this Agreement shall affect or constitute a waiver of, either Party's right to demand strict compliance with all provisions of this Agreement.

18.     Complete Agreement. This Agreement contains the entire agreement between the Parties and supersedes all other agreements and understandings between the Parties with respect to the subject matter of this Agreement. This Agreement shall be of no force or effect unless and until executed and delivered by both the Dentist and a duly authorized representative of the Company. No alterations, additions, or other changes to this Agreement shall be made or be binding unless made in writing and signed by both Parties.

19.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

20.     Captions. The captions of the various sections of this Agreement are not part of the context of this Agreement, are only guides to assist in locating those sections, and shall be ignored in construing this Agreement.

21.     Genders and Numbers. Where permitted by the context, each pronoun used in this Agreement includes the same pronoun in other genders and numbers, and each noun used in this Agreement includes the same noun in other numbers.

22.     Successors. This Agreement shall be personal to the Dentist and no rights or obligations of the Dentist under this Agreement may be assigned or delegated by the Dentist to any person. Any assignment or attempted assignment by the Dentist in violation of the preceding sentence shall be null and void. Subject to the foregoing, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the heirs, personal representatives, successors, and assigns of each Party.

C-9

DENTIST:                          COMPANY:

                                  [_____]


_____           By:_____
[NAME OF DENTIST]                 Its:_____

Address:                          Address:

_____           _____
Telecopy No.: (___) ___-_____     Telecopy No.: (___) ___-_____


C:\Documents and Settings\wshearer\My Documents\68999\97034\Service Agr. (04-29-03).doc


C-10

November 15, 2010

*Sent Via E-Mail*

Michael Simons
Maria Melone
Robert Trettin, D.D.S.

Dear Mike, Maria and Bob:

I am writing to you as the ADP-appointed members of the Policy Board on behalf of Redwood Dental Group, P.C. and all of its shareholders. We need to raise with you a number of issues important to our practice and our patients which the Service Agreement requires to be timely addressed and resolved. Before addressing specific practice needs, we want to first articulate some basic principles regarding the relationship between Redwood Dental and American Dental Partners.

First, the relationship between the two companies is that of principal and agent – Redwood Dental is the principal and ADP is the agent. It often seems that this reality is turned on its head, with ADP expecting us to conform to ADP's culture and way of doing business as if Redwood Dental was the agent of ADP. Illustrative of this problem is a 9/14/10 email in which Greg Serrao chastised Mike Simon for recognizing that Redwood Dental and ADP are different organizations with differing interests, and suggested that the doctor group is part of "one ADPI," that is not true. Redwood Dental is an independent professional corporation. ADP is our service provider, with a fiduciary duty to act in the best interests of Redwood Dental. While ADP may wish this was not true and that Redwood Dental really is part of "one ADPI," that is simply not the case and never will be. We have great concerns about ADP's approach, particularly its singular focus on financial metrics and the constant attention to the financial bottom line with respect to virtually every decision that is made. While financial performance is not unimportant, the best interests of our patients and the professional satisfaction of the doctors and assistants who serve those patients in our practices are our chief concerns.

Second, the Service Agreement makes clear that notwithstanding any other provisions of the Agreement, the services to be provided under the Agreement by ADP are "solely for the purpose of providing non-dental administrative services." (Section 9.1.) ADP does not get to run our business or set policy for our practices. ADP works for us, not the other way around. We need ADP to recognize and re-affirm that fact so that we can have a meaningful and productive dialogue going forward.

Third, under the Service Agreement, it is Redwood Dental that is to have complete control and responsibility for dental care decisions. Among the relevant provisions of the Service Agreement addressing this fact are the following:

**EXHIBIT B**

November 15, 2010
Page 2

- Provider . . . shall be solely responsible for and shall have complete authority, responsibility, supervision, and control over the provision of Dental Care and that all Dental Care shall be provided and performed exclusively by or under the supervision of dentists as such dentists, in their sole discretion, deem appropriate . . . (Section 2.5)

- Service Company shall not have or exercise any control or supervision over the provision of Dental Care. (Section 2.5)

- Notwithstanding . . . any . . . provisions of this Agreement to the contrary, all Dental Decisions . . . will be made solely by the dentists members of the Policy Board. (Section 3.3)

- The rendition of Dental Care should be the sole responsibility of Provider . . . and Service Company shall not interfere in any manner or to any extent therewith. (Section 9.1)

Fourth, when Redwood Dental agreed to enter into an affiliation with ADP in 2003, we were promised that Redwood Dental would be the "platform group" in Michigan and that ADP would invest the capital necessary to grow our practice through, among other things, acquisition of other dental practices. We were told that ADP would help assure that Redwood Dental would continue to be the premier group in this area and that we would grow into the "Park Dental of Michigan." We are represented on ADP's website as "Michigan's Premier Dental Practice Group." Disappointingly, ADP has not lived up to its promises and commitments. As Mike Vaughan stated in November 2008: "Michigan is not a market that we [ADP] want to invest in." That attitude has had real consequences. The lack of investment has limited meaningful growth of our practices in recent years, and has hampered our ability to manage our practice and provide the kind of service to our patients that we want to provide and that they deserve.

ADP's unnecessary capital constraints, unrealistic administrative policies, and unresponsiveness to the needs of the doctors and our patients is wholly inconsistent with the commitment that Redwood Dental will remain the premier dental group practice in Michigan. We are greatly concerned that our facilities, personnel, and presentation to the public no longer support this description. We need updated and improved facilities, our personnel need raises, and the presentation of our offices need to be improved to retain the "wow" factor that, as a premier practice group, we spent many years to accomplish but which has been lost in recent years.

With these overarching principles in mind, following is a list of investments that ADP needs to promptly implement for us:

Troy office:

implant motor, hand piece and accessories
new solid surface flooring in all treatment rooms
office sign in front of building falling apart
new overhead lights in room 7 and 10
dental chair room 8 needs reupholster

November 15, 2010
Page 3

6 fiber optic hand pieces and units as needed
re-wallpaper main bathroom
repair or replace office sign in front of building

St. Clair Shores office:
3 fiber optic handpieces
1 fiber optic unit
Expasyl starter kit

Warren office:
new nitrous/oxygen units rooms 5,6,7,8,9,16
new dental units room 9 and 16 (including light)
counter top mini lab
reupholster chairs 5,6,7,8,15,16 (including assistant chair/doc)
cordless curing light
operatory light room 12
lab handpiece (Chris's lab)

Westland office:
one new complete operatory (light, chairs, etc.)
intraoral camera for hygiene
fiber optic units for 2 operatories
6 fiber optic handpieces

Madison Heights office:
reupholster waiting room seating
reupholster chair room 3
new patient chairs rooms 6 and 7
new unit lights rooms 2,4,5
new wallpaper in ops where there are multiple holes in the walls

Shelby office:
2 cordless curing lights
delivery cart for endodontic rotary system
new sand blasting unit
one cordless endodontic drill for Prosystem
new solid surface flooring in all ops
new wallpaper in treatment rooms

In addition to funding needs for these items, there are other important issues that need to be addressed. These include the following:

1.  Dental Lab.  We want the constant pressure by ADP to get Redwood Dental to use ADP's own dental lab, Voss Dental Lab to stop. The doctors have decided on the laboratory(ies) we will use to fabricate all of our crowns and bridges, and Voss will

November 15, 2010
Page 4

not be included. We are most comfortable with the local lab we have used for decades. It has a long history of providing high quality work and excellent service, and we intend to continue to use it as our primary lab. We are also concerned by the pressure from ADP to lower our lab costs by sending our crowns to China. The slightly lower cost does not override our need and desire for quality and service. ADP's bottom line approach of trying to force lab costs down to 4.2% of AGR without regard to quality and service is unacceptable to us because it impacts our patients and our ability to provide dental care in the manner we determine is appropriate. Therefore, we will be using Olsen Dental as our primary lab, and will not be using Voss Dental or sending work to China.

2.  Insurance. Redwood Dental would like a complete analysis of options for our professional liability and other insurance needs. It is not clear to us how or from whom ADP obtains professional liability insurance for Redwood Dental and its doctors. However, it appears that ADP and/or its wholly-owned insurance subsidiary are the beneficiaries of the money paid by Redwood Dental for this insurance. We are unaware of any efforts to do "comparison shopping" to make sure we are getting appropriate insurance for the lowest cost. Please obtain competing bids and provide us with options for our professional liability and other insurance needs.

3.  Staff Raises. We need to address the issue of compensation for our staff. The fact that staff has not seen a raise for the last two years, and ADP has included no raises in the Plan for 2011, is unacceptable. Our clinic staff members work hard and are critical to both the quality of dental care we provide our patients and the strong relationships we seek to maintain with our patients. Staff members are aware of fee increases and significant cost cutting that has gone on in recent years. At the same time, they see executive salaries at ADP at significant levels. Yet, year-after-year, our staff members get no raise. It is particularly ironic and inappropriate to withhold staff raises when ADP is suggesting fee increases for the hygiene staff. We simply cannot tolerate the morale problems created by the multi-year refusal to provide any staff raises. We think it is critical that staff receive raises of not less than 3% for 2011.

4.  Collection Policies. ADP's collection policies are overly aggressive and harmful to patients and patient relationships with Redwood Dental. In an effort to reduce days outstanding ("DSO") to 20 or below, ADP has changed collection guidelines. Most of Redwood Dental's longstanding patients who have made monthly payments on balances for many years are no longer allowed to do so. For years, we were successful in our collection practices, which were implemented with a human touch and focused on maintaining strong doctor/patient relationships. ADP has now changed that, engaging in much more aggressive collection actions, including sending accounts to collection with balances of $25 or less. This is due in part to the transfer of collections activities to an ADP facility in Minnesota where ADP employees are simply dialing for dollars without any knowledge or recognition of the human element. We are concerned that patients who are the subject of these

November 15, 2010
Page 5

efforts may forego needed dental care in the future or seek care from other providers who demonstrate more care and concern for them.

While patients may just represent dollar signs to ADP, they are much more to us. We should abandon the purely "bottom line" driven goal to get DSO to 20 days or below and re-implement the flexibility with which Redwood Dental has in the past been successful both in collecting its fees and maintaining the best possible doctor/patient relationship.

5.   Provider Bank Account.  We understand that on a daily or other periodic basis, ADP "sweeps" the provider account that is maintained for the purpose of receiving deposits of fees and other revenues and paying proper expenses of the practice. This is contrary to the best interests of Redwood Dental Group and the Service Agreement. Under Section 4.11 and 4.12 of the Service Agreement, ADP is to deposit all revenues into the provider account, and then issue checks or make withdrawals for payments specified in the Service Agreement or requested by Redwood Dental Group. There is no provision for sweeping the funds and placing both the control and benefit of those funds in the hands of ADP. Not only should the practice of sweeping the account end immediately, but as our service provider, we hereby request that ADP provide us with a monthly general ledger or comparable report that will show specifically the dates and amounts of each deposit into the provider account and the details of each and every payment out of the account and the purpose for which the payment is made. Finally, going forward, one or more of the officers of Redwood Dental will have signing authority for the account. Please provide us with the necessary paperwork to add signers to the account.

6.   Due To/From Affiliates.  The balance sheet for Redwood Dental Group has a line in the asset section called "Due to/from Affiliates." As of September 30, 2010, the amount of that line item was -$263,018.23. This number seems to change month-to-month and year-to-year, but it is always a negative number. Please provide a detailed explanation of what is contained in that "due to affiliate" entries and why it changes over time. In addition to that explanation, please provide us with a detailed report starting from the date on which there first was a "due to" or "due from" affiliates on our financial statement and shows all changes to that amount over time and the reasons for those changes. In addition, if Redwood Dental Group's balance sheet reflects any other liabilities besides ordinary trade payables incurred in the ordinary course of business, please identify those.

7.   Tax Return.  Redwood Dental Group's 2009 tax return reflects a deduction in line 26 for "Credit card fees/collection service fees" of $121,786, and "Subcontractor and temporary labor expense" of $318,878. Please provide a detailed description of what these entries reflect.

8.   The Service Agreement provides that Redwood Dental Group is to receive an amount equal to 15% of the Calculated Margin as its profit share. We do not see

November 15, 2010
Page 6

that calculation in the financial reports prepared by ADP. We do see profit share reflected as a percent of what is referred to as "gross contribution margin" but that percentage is in the 12-14% range. Please confirm that Redwood Dental has received and will continue to receive 15% of Calculated Margin as its profit share and provide documentation to confirm that calculation.

9.  Withholding Information From Doctors. It has come to our attention that ADP employees are apparently being directed not to provide important information to the doctors and/or are chastised when they have provided us certain information. A recent example was a complaint letter by a patient who had expressed concern that he was being sent to collections for a debt of approximately less than $25. Apart from the inappropriate and unproductive collection efforts reflected by that letter, it is absolutely critical that doctors be promptly provided with copies of any complaints or concerns of patients regardless of whether that relates to their experience at the clinic, payment and collections, or anything else. Yet, we learned that Brenda Golenbewski was chastised by Mike Simons for telling me of this patient complaint and that Pam Kaoma expressed similar comments that such information was not to be provided to doctors and that I was somehow being "sneaky" when I asked for a copy of the letter upon learning about it. ADP is hereby instructed as our agent and service provider to immediately bring to my attention, as well as any doctor who may be involved, any and all patient complaints received by ADP. Also, please confirm in writing that ADP has rescinded any contrary instructions that have ever been provided to any ADP staff.

10. New Patient Form. Please immediately discontinue use of the new patient form, and the policy that requires the form to be signed before care will be provided. This form was implemented by ADP without prior authorization or agreement by Redwood Dental Group. That is not the way in which we want to treat our patients, and it is the doctors, not ADP, who will determine when and the circumstances under which patients will be treated.

The above issues are very important to us, our practices, and our patient relationships. For that reason, and so that there will be no misunderstanding about ADP's plans to address these issues, please respond to each of the issues and requests outlined above in a written response to us. Also, a number of these issues will have an impact on the budgeting and planning process. We will be prepared to discuss the matters set forth in this letter at the Policy Board Meeting scheduled for this Wednesday. However, given the importance of these issues and the impact of them on the plan development, we will be happy to reschedule that Policy Board meeting if you would like some additional time to consider these issues and prepare a response. Just let me know whether or not you'd like to proceed with the meeting this Wednesday, as scheduled. Of course, there may be other issues and concerns that we will raise with you in the future, but wanted to get your response to the above important issues at this time.

Finally, because we do not want our communications on these issues to result in unnecessary concerns on the part of staff and want to avoid rumors within the practices, we direct ADP as our agent not to provide this letter or disclose its contents to anyone other than those

November 15, 2010
Page 7

within ADP management whose input will be needed to address these issues.  ADP should direct all of its communications on the above issues to me or in Policy Board meetings.  In addition ADP is instructed to not have any separate communications with any of the partners or associates of Redwood Dental Group about these matters.

Very truly yours,


Mark Bouchillon, D.D.S.

January 18, 2011

Michael Simon
Maria Melone
Robert Trettin, D.D.S.

I am writing to address some immediate needs for additional clinical staff in our practices. In the past, a number of RDG doctors have requested additional clinical assistants. In most cases, Mike Simon has resisted, indicating his concern that if we increase staffing costs "we will not make our numbers." This focus on the financial bottom line at the expense of patient care and our patient relationships must stop. Going forward, we must have the numbers and type of clinical staff that RDG doctors deem necessary.

Following are additional staff positions that need to be filled promptly:

1. Dr. Jack and Dr. Balhorn each need a new clinical assistant in the Troy office. They are understaffed and have made several requests to Mike Simon for additional assistants. With the exception of "borrowing" of clinical assistants from other offices (which has not met the need), Mike Simon has done nothing. Given the busy schedules of these doctors, they need additional assistants and they need them now.

2. Dr. Mahadaven needs an additional clinical assistant for the Westland office. He continues to share clinical assistants with our periodontist and orthodontist. This causes patients to be left unattended and patient care to be rushed--situations which are unacceptable. He has asked several times to have an additional assistant designated for him, but again nothing has been done. We need to add an assistant for Dr. Mahadaven.

3. Dr. White and Dr. Haynes at the Madison Heights office each need and have requested, to no avail, an additional clinical assistant. They are short staffed, and have also requested a person to handle the front desk. Filling these positions cannot be delayed any longer.

Please take steps to identify candidates for the above positions that can be interviewed and positions filled as soon as possible.

Very truly yours,


Mark Bouchillon, D.D.S.

cc:   Dr. Jack
      Dr. Balhorn
      Dr. Mahadaven
      Dr. White
      Dr. Haynes

**EXHIBIT C**

| STATE OF MICHIGAN<br>THIRD CIRCUIT COURT | | CASE NO. | 11-003213-CK |
|---|---|---|---|
|  | **SUMMONS AND<br>RETURN OF SERVICE** | | |

| COURT<br>ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT<br>TELEPHONE NO. (313) 224- |
|---|---|

| THIS CASE ASSIGNED TO JUDGE: | Jeanne Stempien | Bar Number: 31381 |
|---|---|---|

| PLAINTIFF | | DEFENDANT |
|---|---|---|
| DENTAL ASSOCIATES PC | VS | AMERICAN DENTAL PARTNERS INC |

PLAINTIFF'S ATTORNEY

Cornell, Ronald L.
(P-46860)
2000 Town Ctr Ste 1500
Southfield, MI 48075-1148
(248) 353-7620

| CASE FILING FEE | | JURY FEE | |
|---|---|---|---|
| Paid | | Paid | |
| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK | |
| 03/17/2011 | 06/16/2011 | Latonya Smith | |
| *This summons is invalid unless served on or before its expiration date. | | Cathy M. Garrett – Wayne County Clerk | |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | | Bar no. |
|---|---|---|---|
| | | | |

The action ☐ remains ☐ is no longer pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

3/25/11
Date          Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101     MC 01 (10/97)     **SUMMONS AND RETURN OF SERVICE**     MCR 2.102(7)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
REV. (3-96)

RETURN COPY-FILE IN ROOM 201 C.C.B.

For best results use a felt pen

## RETURN OF SERVICE

Case No.

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party [MCR 2.104(A)(2)], and that:  (notary not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:  (notary required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the Summons and Complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s): _____

☐ I have personally attempted to serve the summons and complaint, together with _____
Attachment

on _____
Name

at _____ and have been unable to complete service because
Address

the address was incorrect at the time of filing.

| Service fee $ | Miles traveled $ | Mileage fee $ | Total fee $ | Signature _____ |
|---|---|---|---|---|
| | | | | Title _____ |

Subscribed and sworn to before me on _____ County, Michigan.
Date

My commission expires: _____   Signature: _____
Date                                Deputy court clerk/Notary public

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

on   **3/25/11**
Day, date, time

on behalf of   *American Dental Partners, Inc.*

Signature



STATE OF MICHIGAN
THIRD CIRCUIT COURT

**SUMMONS AND
RETURN OF SERVICE**

CASE NO.   11-003213-CK

COURT
ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226

COURT
TELEPHONE NO. (313) 224-

THIS CASE ASSIGNED TO JUDGE:   **Jeanne Stempien**        **Bar Number: 31381**

| PLAINTIFF | DEFENDANT |
|---|---|
| **DENTAL ASSOCIATES PC** | **VS AMERICAN DENTAL PARTNERS OF MICHIGAN LLC** |

PLAINTIFF'S ATTORNEY

**Cornell, Ronald L.
(P-46860)
2000 Town Ctr Ste 1500
Southfield, MI 48075-1148
(248)  353-7620**

| CASE FILING FEE | JURY FEE |
|---|---|
| **Paid** | **Paid** |
| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
| **03/17/2011** | **06/16/2011** | **Latonya Smith** |
| | | Cathy M. Garrett – Wayne County Clerk |

*This summons is invalid unless served on or before its expiration date.

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

The action ☐ remains ☐ is no longer pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

3/25/11
Date

Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101   MC 01 (10/97)
REV. (3-96)        **SUMMONS AND RETURN OF SERVICE**   MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(A), (B), MCR 3.206 (A)

RETURN COPY-FILE IN ROOM 201-C.C.B.

For best results use a felt pen

## RETURN OF SERVICE

Case No.

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

☐ **OFFICER CERTIFICATE**    OR    ☐ **AFFIDAVIT OF PROCESS SERVER**

I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party [MCR 2.104(A)(2)], and that:    (notary not required)

Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:    (notary required)

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s): _____

_____

_____

☐ I have personally attempted to serve the summons and complaint, together with _____
                                                              Attachment

_____ on _____
                                                Name

_____ and have been unable to complete service because

at _____
   Address

the address was incorrect at the time of filing.

| Service fee | Miles traveled | Mileage fee | Total fee |
|---|---|---|---|
| $ | | $ | $ |

Signature _____

Title _____

Subscribed and sworn to before me on _____ _____ County, Michigan.
                                        Date

My commission expires: _____ Signature: _____
                    Date                                   Deputy court clerk/Notary public

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                            Attachments

on **3/25/11**
    Day, date, time

on behalf of _American Dental Partners of Michigan, LLC_

Signature _____

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DENTAL ASSOCIATES, P.C., d/b/a
REDWOOD DENTAL GROUP,

       Plaintiff,

v.

AMERICAN DENTAL PARTNERS
OF MICHIGAN, LLC and AMERICAN
DENTAL PARTNERS, INC.,

       Defendants.

Case No. 11-003213-CK
Hon. Jeanne Stempien

| | |
|---|---|
| Ronald L. Cornell, Jr. (P46860)<br>SEYBURN, KAHN, GINN, BESS &<br>SERLIN, P.C.<br>Attorneys for Plaintiff<br>200 Town Center, Suite 1500<br>Southfield, Michigan 48075<br>(248) 353-7620 | Robert M. Jackson (P40723)<br>Jason R. Abel (P70408)<br>HONIGMAN MILLER SCHWARTZ<br>AND COHN LLP<br>Attorneys for Defendants<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, Michigan 48226<br>(313) 465-7430 |

## STIPULATION AND ORDER FOR EXTENSION
## OF TIME FOR RESPONSE BY DEFENDANTS

Plaintiff Dental Associates, P.C., d/b/a Redwood Dental Group, and Defendants American Dental Partners of Michigan, LLC and American Dental Partners, Inc., by their undersigned attorneys, without waiving any potential claims or defenses, including any defense based on lack of personal jurisdiction, hereby stipulate to entry of the attached order extending until May 9, 2011 the time for Defendants to respond to Plaintiff's complaint.

8984216.2

SEYBURN, KAHN, GINN, BESS &
SERLIN, P.C.

*Ronald L. Cornell, Jr.* (with written authority by RMJ)
Ronald L. Cornell, Jr. (P46860)
Attorneys for Plaintiff
200 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 353-7620

HONIGMAN MILLER SCHWARTZ
AND COHN LLP

*Robert M. Jackson*
Robert M. Jackson (P40723)
Jason R. Abel (P70408)
Attorneys for Defendants
660 Woodward Avenue
Detroit, Michigan 48226
(313)-465-7430

Dated: April _11_, 2011

SEYBURN, KAHN, GINN, BESS &
SERLIN, P.C.

Ronald L. Cornell, Jr. (P46860)
Attorneys for Plaintiff
200 Town Center, Suite 1500
Southfield, Michigan 48075
(248) 353-7620

HONIGMAN MILLER SCHWARTZ
AND COHN LLP

Robert M. Jackson (P40723)
Jason R. Abel (P70408)
Attorneys for Defendants
660 Woodward Avenue
Detroit, Michigan 48226
(313)-465-7430

Dated: April _11_, 2011

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DENTAL ASSOCIATES, P.C., d/b/a
REDWOOD DENTAL GROUP,

      Plaintiff,

v.

AMERICAN DENTAL PARTNERS
OF MICHIGAN, LLC and AMERICAN
DENTAL PARTNERS, INC.,

      Defendants.

Case No. 11-003213-CK
Hon. Jeanne Stempien

| Ronald L. Cornell, Jr. (P46860) | Robert M. Jackson (P40723) |
|---|---|
| SEYBURN, KAHN, GINN, BESS & SERLIN, P.C. | Jason R. Abel (P70408) |
| Attorneys for Plaintiff | HONIGMAN MILLER SCHWARTZ AND COHN LLP |
| 200 Town Center, Suite 1500 | Attorneys for Defendants |
| Southfield, Michigan 48075 | 2290 First National Building |
| (248) 353-7620 | 660 Woodward Avenue |
| | Detroit, Michigan 48226 |
| | (313) 465-7430 |

## ORDER FOR EXTENSION OF TIME FOR
## RESPONSE BY DEFENDANTS

At a session of said Court
held in City of Detroit, Wayne County, Michigan
on _APR 1 3 2011_____, 2011

Upon filing and reading of the attached stipulation;

**IT IS HEREBY ORDERED** that Defendants American Dental Partners of Michigan,

LLC and American Dental Partners, Inc. shall, without waiving any potential claims or defenses,

be allowed until May 9, 2011 to respond to Plaintiff's Complaint.

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY _____
              DEPUTY CLERK

JEANNE STEMPIEN
_____
Hon. Jeanne Stempien

8984216.2

LAW OFFICES
# SEYBURN, KAHN, GINN, BESS AND SERLIN
PROFESSIONAL CORPORATION

2000 TOWN CENTER, SUITE 1500, SOUTHFIELD, MICHIGAN 48075-1195

TELEPHONE (248) 353-7620
FACSIMILE (248) 353-3727

RONALD L. CORNELL, JR.[1]
(248) 351-3593
rcornell@seyburn.com

[1]ALSO A MEMBER OF NORTH CAROLINA BAR

April 11, 2011

Clerk
Wayne County Circuit Court
2 Woodward Avenue
Detroit, Michigan 48226

RE:    Dental Associates, P.C. v American Dental Partners, et al.
Case No. 11-003213-CK

Dear Sir/Madam:

Enclosed is an original and one (1) copy of a Certification of Service with respect to the above-captioned matter. Please file the attached in your usual fashion and return a time-stamped copy in the enclosed, self-addressed, stamped envelope.

If you have any questions, please do not hesitate to contact me.

Sincerely,

SEYBURN, KAHN, GINN, BESS AND SERLIN, P.C.

Ronald L. Cornell, Jr.

RLC/klb
Enclosures

{00560961.DOC}

## STATE OF MICHIGAN

## WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

|                          |                          |
|--------------------------|--------------------------|
| Plaintiff,               | Case No. 11-003213-CK    |
|                          | Hon. Jeanne Stempien     |

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

DENTAL ASSOCIATES PC , et al. v A
Hon. Jeanne Stemplen        03/17/2011

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

11-003213-CK

Defendants.

_____/

| Ronald L. Cornell, Jr. (P46860) | Robert M. Jackson (P40723) |
|---|---|
| Seyburn, Kahn ,Ginn, Bess & Serlin, P.C. | Jason R. Abel (P70408) |
| Attorneys for Plaintiff | Honigman, Miller, Schwartz and |
| 2000 Town Center-Ste. 1500 | Cohn, LLP |
| Southfield, Michigan 48075 | Attorneys for Defendants |
| (248) 353-7620 | 2290 First National Bldg. |
| | 660 Woodward Avenue |
| | Detroit, Michigan 48226 |
| | (313) 465-7430 |

_____/

## <u>CERTIFICATION OF SERVICE</u>

Kathy Bilpo hereby certifies that on the 11th day of April, 2011, she did cause to be

served the following document(s) in the manner specified below:

<u>DOCUMENTS:</u>        Plaintiff's Motion for Temporary Admission of
Randy G. Gullickson, Plaintiff's Motion for
Temporary Admission of Joseph W. Anthony,
Notice of Hearings; Praecipes; and Certification of
Service

{00560964.DOC}

**PERSON(S) SERVED:**        Robert M. Jackson, Esq.
                            Honigman, Miller, Schwartz & Cohn, LLP
                            660 Woodward Avenue
                            2290 First National Bldg.
                            Detroit, MI 48226


**MANNER SERVED:**          First Class Mail


Kathy Bilpo

Legal Software, Inc
(800) 530-2255

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | REQUEST FOR HEARING ON A MOTION (PRAECIPE) ORDER / JUDGMENT | CASE NO. 11-003213-CK |
|---|---|---|

2 Woodward Avenue, Detroit, Michigan 48226

| Plaintiff name(s) Dental Associates, P.C., d/b/a Redwood Dental Group | | Defendant name(s) American Dental Partners of Michigan, LLC and American Dental Partners, Inc. |
|---|---|---|
| Plaintiff attorney, bar no., address, and telephone no. Ronald L. Cornell, Jr. (P46860) Seyburn, Kahn, Ginn, Bess & Serlin 2000 Town Center, Ste. 1500 Southfield, MI 48075        248-353-7620 | v | Defendant's attorney, bar no., address, and telephone no. |

List additional attorneys on other side

1. Motion Title: <u>Motion for Temporary Admission of Joseph W. Anthony</u>

2. Moving Party: <u>Plaintiff</u>          Telephone No.   <u>248-353-7620</u>

3. Please place on the motion calendar for:

| Judge Jeanne Stempien | Bar No P31381 | Date April 22, 2011 | Time 8:30 a.m. |
|---|---|---|---|

Adj. to: _____    Adj. to: _____    Adj. to: _____

4. I certify that I have made personal contact with   <u>n/a</u>

on _____ regarding concurrence in relief sought in this motion and that concurrence has been denied or that I have made reasonable and diligent attempts to contact counsel regarding concurrence with motion.

Date  <u>April 5, 2011</u>     Attorney _____     Bar No. P- <u>46860</u>
                             Ronald L. Cornell, Jr.

**ORDER / JUDGMENT**

DATED: _____

IT IS ORDERED THAT THIS MOTION IS:

☐ DENIED     ☐ GRANTED IN PART / DENIED IN PART     ☐ TAKEN UNDER ADVISEMENT     ☐ DISMISSED

☐ GRANTED AND IT IS FURTHER ORDERED AND ADJUDGED: _____

_____
CIRCUIT JUDGE

Approved as to form and substance by Counsel for:

Plaintiff _____

Defendant _____

Date _____

FILE EITHER IN PERSON OR BY MAIL WITH:
CATHY MARIE GARRETT
WAYNE COUNTY CLERK
201 CITY-COUNTY BUILDING
DETROIT, MI 48226

{00557190.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

                Plaintiff,          Case No. 11-003213-CK
                                    Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

                Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

### NOTICE OF HEARING

TO:    Counsel of Record

       **PLEASE TAKE NOTICE** that Plaintiff's Motion For Temporary Admission

{00551039.DOC}

of Joseph W. Anthony will be brought on for hearing before the Honorable Jeanne Stempien on

April 22, 2011 at 8:30 a.m. or as soon thereafter as counsel may be heard.

Respectfully submitted,

**SEYBURN, KAHN, GINN,
BESS AND SERLIN, P.C.**

By: _____
　　　Ronald L. Cornell, Jr. (P46860)
　　　Attorneys for Plaintiff
　　　2000 Town Center, Suite 1500
　　　Southfield, MI 48075-1195
　　　(248) 353-7620

Date: April 5, 2011

{00551039.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

              Plaintiff,             Case No. 11-003213-CK
                                          Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

              Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

## PLAINTIFF'S MOTION FOR TEMPORARY ADMISSION OF JOSEPH W. ANTHONY

      Plaintiff, Dental Associates, P.C., d/b/a Redwood Dental Group ("RDG"), through its counsel, Seyburn, Kahn, Ginn, Bess and Serlin, P.C., states for its Motion for Temporary Admission of Joseph W. Anthony to the State Bar, pursuant to MCR 8.126 as follows:

      1.    RDG, through its undersigned Ronald L. Cornell, Jr., seeks the temporary admission of Joseph W. Anthony to serve as co-counsel in this case. Mr. Anthony is one of the founders of the law firm of Anthony Ostlund Baer & Louwagie, P.A., and is duly licensed to practice law in the State of Minnesota. Attached as **Exhibit A** is a copy of Mr. Anthony's

Affidavit.   Mr. Anthony will be associated with the undersigned in the Trial and all other proceedings related to this case.

2.    The undersigned made a reasonable inquiry concerning the statements in Mr. Anthony's Affidavit, believes that they are true, and agrees to ensure that the procedures of MCR 8.126 are followed.  The addresses of both the undersigned and Mr. Anthony are stated below.

3.    The undersigned has sent a copy of this Motion, including Mr. Anthony's Affidavit, to the Attorney Grievance Commission as of the date of the filing of this Motion.

WHEREFORE, Fifth Third requests that this Court enter an Order in the form attached as **Exhibit B** granting Mr. Anthony temporary admission to the Bar in the above-captioned case to serve as co-counsel with the undersigned.

Respectfully submitted,

**SEYBURN, KAHN, GINN,**
**BESS AND SERLIN, P.C.**

By:  _____
Ronald L. Cornell, Jr. (P46860)
Attorneys for Plaintiff
2000 Town Center, Suite 1500
Southfield, MI 48075-1195
(248) 353-7620

**ANTHONY OSTLUND BAER**
**& LOUWAGIE P.A.**

Joseph W. Anthony #2872
3600 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402
(612) 349-6969

Dated:  April 5, 2011

006255\017991\{00551039.DOC}

2

# EXHIBIT A

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

           Plaintiff,                  Case No. 11-003213-CK
                                        Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

           Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

## AFFIDAVIT OF JOSEPH W. ANTHONY

STATE OF MINNESOTA    )
                            ) SS.
COUNTY OF HENNEPIN   )

      Joseph W. Anthony, being first sworn, states:

      1.    I am a duly licensed attorney to practice law in the State of Minnesota and I am

one of the founders of the law firm of Anthony Ostlund, Baer & Louwagie, P.A., 3600 Wells

Fargo Building, 90 South Seventh Street, Minneapolis, Minnesota 55402.

      2.    I am not disbarred and have not been suspended from the practice of law in any

jurisdiction and that I am licensed to practice.   Also, I am not the subject of any pending

disciplinary action and my license to practice law in the State of Minnesota is in good standing. A copy of the certificate of good standing is attached.

3.    I am familiar with the Michigan Rules of Professional Conduct, the Michigan Court Rules and the Michigan Rules of Evidence.

4.    Based upon the foregoing, I respectfully request temporary admission for the purposes of serving as co-counsel for Redwood Dental Group in this matter, in association with the law firm of Seyburn, Kahn Ginn, Bess & Serlin, P.C.

Joseph W. Anthony
Minnesota Bar #2872

Subscribed and sworn to before me
this March 23rd, 2011.

Notary Public
Hennepin County, Minnesota
(acting in Hennepin County, Minnesota)
My Commission Expires:  January 31, 2015

LAURA WILHELM
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

2



# STATE OF MINNESOTA
# IN SUPREME COURT

*Certificate of Good Standing*

This is to certify that the following lawyer is in good standing.

JOSEPH W ANTHONY

was duly admitted to practice as a lawyer and counselor at law in all the courts of this state on

September 16, 1974

Given under my hand and seal of this court on

March 24, 2011

*Frederick K. Grittner*

Frederick K. Grittner
Clerk of Appellate Courts

# EXHIBIT B

Legal Software, Inc
(800) 530-2255

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | REQUEST FOR HEARING ON A MOTION (PRAECIPE) ORDER / JUDGMENT | CASE NO. 11-003213-CK |
|---|---|---|

2 Woodward Avenue, Detroit, Michigan 48226

**Plaintiff name(s)**
Dental Associates, P.C., d/b/a Redwood Dental Group

**Plaintiff attorney, bar no., address, and telephone no.**
Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn, Ginn, Bess & Serlin
2000 Town Center, Ste. 1500
Southfield, MI 48075        248-353-7620

v

**Defendant name(s)**
American Dental Partners of Michigan, LLC and American Dental Partners, Inc.

**Defendant's attorney, bar no., address, and telephone no.**

List additional attorneys on other side

1. Motion Title: Motion for Temporary Admission of Randy G. Gullickson

2. Moving Party: Plaintiff _____        Telephone No.    248-353-7620

3. Please place on the motion calendar for:

| Judge Jeanne Stempien | Bar No P31381 | Date April 22, 2011 | Time 8:30 a.m. |
|---|---|---|---|

Adj. to: _____        Adj. to: _____        Adj. to: _____

4. I certify that I have made personal contact with    n/a _____
   on _____ regarding concurrence in relief sought in this motion and that concurrence has been
   denied or that I have made reasonable and diligent attempts to contact counsel regarding concurrence with
   motion.

Date    April 5, 2011        Attorney _____        Bar No. P- 46860
                                    Ronald L. Cornell, Jr.

**ORDER / JUDGMENT**

DATED: _____

IT IS ORDERED THAT THIS MOTION IS:

☐ DENIED    ☐ GRANTED IN PART / DENIED IN PART    ☐ TAKEN UNDER ADVISEMENT    ☐ DISMISSED

☐ GRANTED AND IT IS FURTHER ORDERED AND ADJUDGED: _____

_____
CIRCUIT JUDGE

Approved as to form and substance by Counsel for:

Plaintiff _____

Defendant _____

Date _____

FILE EITHER IN PERSON OR BY MAIL WITH:
CATHY MARIE GARRETT
WAYNE COUNTY CLERK
201 CITY-COUNTY BUILDING
DETROIT, MI 48226

{00557189.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

                    Plaintiff,                Case No. 11-003213-CK
                                            Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

                    Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

**NOTICE OF HEARING**

TO:   Counsel of Record

       **PLEASE TAKE NOTICE** that Plaintiff's Motion For Temporary Admission

{00551006.DOC}

of Randy G. Gullickson will be brought on for hearing before the Honorable Jeanne Stempien on

April 22, 2011 at 8:30 a.m. or as soon thereafter as counsel may be heard.

Respectfully submitted,

**SEYBURN, KAHN, GINN,
BESS AND SERLIN, P.C.**

By: _____
    Ronald L. Cornell, Jr. (P46860)
    Attorneys for Plaintiff
    2000 Town Center, Suite 1500
    Southfield, MI 48075-1195
    (248) 353-7620

Date: April 5, 2011

{00551006.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

               Plaintiff,             Case No. 11-003213-CK
                                           Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

               Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

### PLAINTIFF'S MOTION FOR TEMPORARY ADMISSION OF RANDY G. GULLICKSON

      Plaintiff, Dental Associates, P.C., d/b/a Redwood Dental Group ("RDG"), through its counsel, Seyburn, Kahn, Ginn, Bess and Serlin, P.C., states for its Motion for Temporary Admission of Randy G. Gullickson to the State Bar, pursuant to MCR 8.126 as follows:

      1.    RDG, through its undersigned Ronald L. Cornell, Jr., seeks the temporary admission of Randy G. Gullickson to serve as co-counsel in this case. Mr. Gullickson is a shareholder of the law firm of Anthony Ostlund Baer & Louwagie, P.A., and is duly licensed to practice law in the State of Minnesota. Attached as **Exhibit A** is a copy of Mr. Gullickson's

Affidavit. Mr. Gullickson will be associated with the undersigned in the Trial and all other proceedings related to this case.

2.      The undersigned made a reasonable inquiry concerning the statements in Mr. Gullickson's Affidavit, believes that they are true, and agrees to ensure that the procedures of MCR 8.126 are followed. The addresses of both the undersigned and Mr. Gullickson are stated below.

3.      The undersigned has sent a copy of this Motion, including Mr. Gullickson's Affidavit, to the Attorney Grievance Commission as of the date of the filing of this Motion.

WHEREFORE, Fifth Third requests that this Court enter an Order in the form attached as **Exhibit B** granting Mr. Gullickson temporary admission to the Bar in the above-captioned case to serve as co-counsel with the undersigned.

Respectfully submitted,

**SEYBURN, KAHN, GINN, BESS AND SERLIN, P.C.**

By: _____
Ronald L. Cornell, Jr. (P46860)
Attorneys for Plaintiff
2000 Town Center, Suite 1500
Southfield, MI 48075-1195
(248) 353-7620

**ANTHONY OSTLUND BAER & LOUWAGIE P.A.**

Randy G. Gullickson, #185607
3600 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 349-6969

Dated: April 5, 2011

006255\017991\{00551006.DOC}

2

# EXHIBIT A

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

                  Plaintiff,                Case No. 11-003213-CK
                                            Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

                  Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

## AFFIDAVIT OF RANDY G. GULLICKSON

STATE OF MINNESOTA    )
                           ) SS.
COUNTY OF HENNEPIN   )

Randy G. Gullickson, being first sworn, states:

1.     I am a duly licensed attorney to practice law in the State of Minnesota and I am a

shareholder of the law firm of Anthony Ostlund, Baer & Louwagie, P.A., 3600 Wells Fargo

Building, 90 South Seventh Street, Minneapolis, Minnesota 55402.

2.     I am not disbarred and have not been suspended from the practice of law in any

jurisdiction and that I am licensed to practice.   Also, I am not the subject of any pending

disciplinary action and my license to practice law in the State of Minnesota is in good standing.

A copy of the certificate of good standing is attached.

3.    I am familiar with the Michigan Rules of Professional Conduct, the Michigan Court Rules and the Michigan Rules of Evidence.

4.    Based upon the foregoing, I respectfully request temporary admission for the purposes of serving as co-counsel for Dental Associates, P.D., d/b/a Redwood Dental Group in this matter, in association with the law firm of Seyburn, Kahn Ginn, Bess & Serlin, P.C.

Randy G. Gullickson
Minnesota Bar #185607

Subscribed and sworn to before me
this March 2?  , 2011.



Notary Public
Hennepin County, Minnesota
(acting in Hennepin County, Minnesota)
My Commission Expires: January 31, 2015

BARBARA K. BECKER
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

2



# STATE OF MINNESOTA
## IN SUPREME COURT

*Certificate of Good Standing*

This is to certify that the following lawyer is in good standing.

**RANDY G GULLICKSON**

was duly admitted to practice as a lawyer and counselor at law in all the courts of this state on

October 16, 1987

Given under my hand and seal of this court on

March 24, 2011

*Frederick K. Grittner*

Frederick K. Grittner
Clerk of Appellate Courts

# EXHIBIT B

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

               Plaintiff,              Case No. 11-003213-CK
                                               Hon. Jeanne Stempien

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

               Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

## ORDER FOR TEMPORARY ADMISSION OF RANDY G. GULLICKSON

At a session of said Court, held in the City County
Bldg., City of Detroit, Wayne County, Michigan,
dated:_____

PRESENT: Hon._____
                           Circuit Court Judge

Plaintiff having filed a Motion for Temporary Admission of Randy G. Gullickson to

appear *pro hac vice* as co-counsel for Plaintiff, and the Court being fully advised in the premises;

{00551044.DOC}

**IT IS HEREBY ORDERED** that Randy G. Gullickson is admitted to appear *pro hac vice* as counsel for Plaintiff in the above-captioned case, only; and

**IT IS FURTHER ORDERED** that in conjunction with Mr. Gullickson's admission and to matters arising or pertaining to the above-entitled case, Mr. Gullickson shall be subject to the full disciplinary process of this Court to the same extent as if he were fully admitted to practice in this Court and the State of Michigan.

_____
Circuit Court Judge

.{00551044.DOC}

LAW OFFICES
# SEYBURN, KAHN, GINN,
## BESS  AND  SERLIN
PROFESSIONAL CORPORATION

2000 TOWN CENTER, SUITE 1500, SOUTHFIELD, MICHIGAN 48075-1195

TELEPHONE (248) 353-7620
FACSIMILE  (248)  353-3727

**RONALD L. CORNELL, JR.**[1]
(248) 351-3593
rcornell@seyburn.com

[1]ALSO A MEMBER OF NORTH CAROLINA BAR

April 14, 2011

Clerk
Wayne County Circuit Court
2 Woodward Avenue
Detroit, Michigan 48226

RE:    Dental Associates, P.C. v American Dental Partners, et al.
Case No. 11-003213-CK

Dear Sir/Madam:

Enclosed is an original and one (1) copy of a Certification of Service with respect to the above-captioned matter.  Please file the attached in your usual fashion and return a time-stamped copy in the enclosed, self-addressed, stamped envelope.

If you have any questions, please do not hesitate to contact me.

Sincerely,

**SEYBURN, KAHN, GINN,
BESS AND SERLIN, P.C.**

Ronald L. Cornell, Jr.

RLC/klb
Enclosures
cc:    Robert M. Jackson, Esq.
Randy G. Gullickson, Esq.
Joseph W. Anthony, Esq. (all w/enc.)

{00560961.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

               Plaintiff,

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

             Defendants.

Case No. 11-003213-CK
Hon. Jeanne Stempien

DENTAL ASSOCIATES PC , et al. v A
Hon. Jeanne Stempien          03/17/2011

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
11-003213-CK

/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

Robert M. Jackson (P40723)
Jason R. Abel (P70408)
Honigman, Miller, Schwartz and Cohn,
LLP
Attorneys for Defendants
2290 First National Bldg.
660 Woodward Avenue
Detroit, Michigan 48226
(313) 465-7430

Randy G. Gullickson
Joseph W. Anthony
Attorneys for Plaintiff
3600 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 349-6969

                                           /

## <u>CERTIFICATION OF SERVICE</u>

    Kathy Bilpo hereby certifies that on the 14th day of April, 2011, she did cause to be

served the following document(s) in the manner specified below:

{00561517.DOC}

**DOCUMENTS:**            Orders for Temporary Admission of Randy G. Gullickson and Joseph W. Anthony and Certification of Service

**PERSON(S) SERVED:**      Robert M. Jackson, Esq.
Honigman, Miller, Schwartz & Cohn, LLP
660 Woodward Avenue
2290 First National Bldg.
Detroit, MI 48226

**MANNER SERVED:**      First Class Mail

Kathy Bilbo

{00561517.DOC}

STATE OF MICHIGAN

WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

                Plaintiff,

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

                Defendants.

Case No. 11-003213-CK
Hon. Jeanne Stempien

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

### ORDER FOR TEMPORARY
### ADMISSION OF JOSEPH W. ANTHONY

At a session of said Court, held in the City County
Bldg., City of Detroit, Wayne County, Michigan,
dated: **APR 13 2011**_____

PRESENT: Hon._**JEANNE STEMPIEN**_____
                     Circuit Court Judge

Plaintiff having filed a Motion for Temporary Admission of Joseph W. Anthony to

appear *pro hac vice* as co-counsel for Plaintiff, and the Court being fully advised in the premises;

{00551045.DOC}

**IT IS HEREBY ORDERED** that Joseph W. Anthony is admitted to appear *pro hac vice* as counsel for Plaintiff in the above-captioned case, only; and

**IT IS FURTHER ORDERED** that in conjunction with Mr. Anthony's admission and to matters arising or pertaining to the above-entitled case, Mr. Anthony shall be subject to the full disciplinary process of this Court to the same extent as if he were fully admitted to practice in this Court and the State of Michigan.

JEANNE STEMPIEN

_____

Circuit Court Judge

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY _____ DEPUTY CLERK

# STATE OF MICHIGAN

# WAYNE COUNTY CIRCUIT COURT

Dental Associates, P.C., d/b/a
Redwood Dental Group,

|   |   |
|---|---|
| Plaintiff, | Case No. 11-003213-CK |
|  | Hon. Jeanne Stempien |

vs.

American Dental Partners of Michigan,
LLC and American Dental Partners,
Inc.,

Defendants.

_____/

Ronald L. Cornell, Jr. (P46860)
Seyburn, Kahn ,Ginn, Bess & Serlin, P.C.
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, Michigan 48075
(248) 353-7620

_____/

## ORDER FOR TEMPORARY
## ADMISSION OF RANDY G. GULLICKSON

At a session of said Court, held in the City County
Bldg., City of Detroit, Wayne County, Michigan,
dated: **APR 13 2011**

PRESENT: Hon. _JEANNE STEMPIEN_____
Circuit Court Judge

Plaintiff having filed a Motion for Temporary Admission of Randy G. Gullickson to

appear *pro hac vice* as co-counsel for Plaintiff, and the Court being fully advised in the premises;

{00551044.DOC}

**IT IS HEREBY ORDERED** that Randy G. Gullickson is admitted to appear *pro hac vice* as counsel for Plaintiff in the above-captioned case, only; and

**IT IS FURTHER ORDERED** that in conjunction with Mr. Gullickson's admission and to matters arising or pertaining to the above-entitled case, Mr. Gullickson shall be subject to the full disciplinary process of this Court to the same extent as if he were fully admitted to practice in this Court and the State of Michigan.

JEANNE STEMPIEN

_____

Circuit Court Judge

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY_____
DEPUTY CLERK

{00551044.DOC}