UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Dental Associates, P.C., d/b/a<br>Redwood Dental Group,<br><br>    Plaintiff,<br><br>vs.<br><br>American Dental Partners of Michigan,<br>LLC and American Dental Partners,<br>Inc.,<br><br>    Defendants. | Case No. 2:11-CV-11624-DPH-MJH<br>Hon. Denise Page Hood<br>Magistrate Judge Michael J. Hluchaniuk<br><br><br>**AMENDED COMPLAINT** |

For its Complaint against Defendants American Dental Partners of Michigan, LLC and American Dental Partners, Inc., Plaintiff Dental Associates, P.C., states and alleges as follows:

## PARTIES

1. Plaintiff Dental Associates, P.C. d/b/a Redwood Dental Group ("RDG") is a Michigan professional corporation with its registered office located in Warren, Michigan. RDG is owned by a number of dentists, each of whom is licensed to practice dentistry in the state of Michigan. RDG, which employs approximately 20 licensed dentists and provides dental services to the general public at six clinics located in the following Detroit-area communities: Madison Heights, Shelby Township, St. Clair Shores, Troy, Warren, and Westland.

2. Upon information and belief, Defendant American Dental Partners of Michigan, LLC ("ADP of Michigan") is a Delaware limited liability company with its registered office located in Bingham Farms, Michigan. The principal business of ADP of Michigan is providing administrative services to RDG in connection with the operation of RDG's dental clinics in the Detroit metropolitan area, including Wayne County.

#449326

3.     Upon information and belief, ADP of Michigan is a wholly-owned subsidiary of defendant American Dental Partners, Inc. ("ADPI").  ADPI is a Delaware corporation with its headquarters located in Wakefield, Massachusetts.  ADPI, through ADP of Michigan and other wholly-owned subsidiaries, is in the business of providing administrative services to group dental practices throughout the United States.  Until approximately February 2012, ADPI was publicly traded on NASDAQ.  At that time, the stock of ADPI was acquired by one or more entities affiliated with a private equity firm called JLL Partners.

4.     In describing the business of ADP of Michigan and other ADPI subsidiaries, ADPI represents on its website and/or in filings with the Securities and Exchange Commission that it is the leading "business partner" to group dental practices like RDG.  ADPI states that its model for affiliating with group dental practices centers around "a partnership in management" designed to insure sharing of operating governance and financial risk and reward with each dental practice and that the relationship that ADPI and its subsidiaries structure with affiliated dentists "has the critical elements of any business partnership."  ADPI touts its resources that it deploys "to enhance the growth and success of our affiliated dental group practices."

5.     As a former publicly traded business corporation, and now under the ownership of a private equity firm, ADPI, along with its subsidiaries, including ADP of Michigan, are focused heavily on financial performance through increasing revenue, controlling expenses, and meeting certain financial metrics in its affiliated dental practices.  They seek to maximize the financial return to ADPI's public and/or private shareholders and investors.

6.     Through overlapping officers and directors and as the parent company of ADPI of Michigan, ADPI, upon information and belief, controls the business activities of ADPI of Michigan and its other subsidiaries and affiliates.  For example, although it is technically ADPI's

2

subsidiaries that enter into contractual agreements with group dental practices, ADPI's Form

10-K filed with the SEC states that "we have entered into a service agreement with each

affiliated practice "and that "[p]ursuant to the service agreement, we are responsible" for the

various services to be provided to the dental practices.  ADPI further states that under its

contractual arrangements with dental groups, the affiliated dental practices "reimburse us" for

certain expenses and "pay fees to us" for certain services.  In short, with respect to their

relationships with group dental practices, ADPI and its subsidiaries like ADP of Michigan make

no operational distinctions between ADPI and the subsidiaries.

## JURISDICTION AND VENUE

7.     This dispute involves equitable claims and an amount in controversy in excess of

$75,000, exclusive of costs, interest and attorneys' fees and is therefore within this Court's venue

and jurisdiction.

## FACTUAL BACKGROUND

8.     RDG was formed in approximately 1980.  At that time RDG had 4 dentists

practicing in one location.

9.     Over the next several decades, RDG grew and expanded so that by the early

2000's, RDG employed approximately 17 dentists working at five locations.  During this period

RDG built a culture and reputation of placing the interests of patients ahead of profit motive or

other financial metrics.  RDG accomplished this by providing high qualify dental care at well

equipped and well furnished clinics, by assuring that licensed dentists were responsible for all

decisions impacting dental care, and by placing great emphasis on maintaining strong doctor-

patient relationships.

3

10.     In approximately 1999-2000, RDG was introduced to executives of ADPI.  ADPI proposed to RDG that RDG enter into an affiliation agreement with ADPI whereby ADPI (or its subsidiary) would purchase certain assets of RDG and would provide administrative services to RDG in return for payment of fees.

11.     ADPI subsequently proposed that RDG and ADPI (or its subsidiary) enter into a Service Agreement that would describe the services to be provided by ADPI and the fees to be paid by RDG.  ADPI indicated that the proposed Service Agreement was similar to one that ADPI (or its subsidiaries) had previously entered into with other dental groups, including Park Dental, a large (approximately 100 dentists) and very successful group dental practice located in the Minneapolis, Minnesota metropolitan area.

12.     In discussing a possible affiliation of RDG with ADPI, RDG expressed to ADPI that RDG and its doctors were not interested in a relationship with ADPI if it would mean a change in the long-standing culture of RDG or changes in the way doctors provided dental care, interacted with their patients, and operated the clinics.  RDG was repeatedly assured by high level ADPI executives, including ADPI Chief Executive officer and Board Chairman Greg Serrao, that no such changes would occur.  To the contrary ADPI and its executives assured RDG that entering into a Service Agreement with ADP of Michigan would serve RDG's interests, both from a professional and financial standpoint.

13.     Mr. Serrao told RDG and its doctors on multiple occasions that nothing about the way RDG and its doctors practiced dentistry and exercised control over dental care and patient issues would change.  What would change, according to Serrao, is that ADPI would provide the sufficient capital and resources to make RDG "the premier dental group in Michigan" and "the next Park Dental."  Serrao told RDG that RDG would become the Michigan "platform group"

4

and that ADPI would invest the capital necessary to substantially grow the RDG practices

through acquisitions of other dental practices or otherwise adding doctors and locations.

14.     To back up these commitments, Serrao encouraged RDG President Mark

Bouchillon to meet with Dr. Greg Swenson. Dr. Swenson was a member of the Board of

Directors of ADPI and a senior executive of ADPI's affiliate in Minnesota (Park Dental).

Dr. Bouchillon met in person with Dr. Swenson and spoke with him on the phone on other

occasions.

15.     Dr. Swenson told Dr. Bouchillon that RDG would benefit financially and

professionally from an affiliation with ADPI and that an affiliation would allow RDG to grow

and open new state-of-the-art offices as Park Dental had done in Minnesota. On the critical issue

of doctor independence and avoiding changes in the RDG culture and dental practices,

Dr. Swenson assured Dr. Bouchillon and RDG that such changes would not occur. He said that

under Park Dental's relationships with ADPI, the doctors continued to be completely

autonomous and in charge of their practices, and the same would be true for RDG if it affiliated

with ADPI.

16.     Prior to its affiliation with Park Dental, ADPI made similar commitments to the

Park Dental doctor group, telling Park Dental that affiliation with ADPI would not result in

changes in the culture of the practice, and that the doctor group would maintain autonomous

decision-making and control over dental care and doctor-patient relationships.

17.     ADPI (and its Minnesota subsidiary) did not honor those representations,

promises, and assurances to the Park Dental doctor group. Ultimately, the Park Dental doctor

group sued ADPI and its Minnesota subsidiary and terminated its Service Agreement with the

ADPI subsidiary. The conduct by ADPI and its subsidiary resulted in a December 2007 jury

verdict against ADPI and its Minnesota subsidiary for approximately $88 million in compensatory damages and over $40 million in punitive damages.  Defendants have also failed to honor their similar assurances and contractual obligations to RDG.

18.     Based upon the representations, promises and assurances by ADPI, on or about May 1, 2003, RDG and ADP of Michigan entered into a Service Agreement, a copy of which is attached hereto as Exhibit A and incorporated herein.

19.     Among the essential purposes of the affiliation of RDG with ADPI was for Defendants to provide capital and other support so that RDG could grow its practices in Michigan while the licensed doctors of RDG would remain autonomous in the operations of their practices and would continue to make all decisions relating to the manner in which dental care is provided.

20.     The representations, promises, and assurances of Defendants, including those made by Greg Serrao and Dr. Greg Swenson, to induce RDG to enter into the Service Agreement have not been honored.  Instead, Defendants have exercised greater and greater control over both the financial expenditures and operational issues at the RDG dental practices and have interfered with RDG's ability to make or direct decisions regarding dental care and their doctor-patient relationships in the manner they believe is appropriate to fulfill their professional obligations to their patients and the state of Michigan, which licenses them to practice dentistry.

21.     Rather than maintaining the culture of RDG's practices, as promised, ADPI has aggressively sought to sublimate RDG's culture and to advance a culture of what Mr. Serrao calls "One ADPI," whereby all ADPI affiliates through the U.S. are part of a top-down, one-size-fits all culture focused first and foremost on meeting financial metrics to increase the bottom line and the return to ADPI's investors.  This conduct violated not only the parties' agreement but

also has allowed Defendants to exercise control over dental care in a manner that is directly

contrary to the public policy that licensed dentists, and not non-professional business

corporations, be responsible for decisions affecting dental care and doctor-patient relationships.

22.     Defendants have failed to provide capital necessary for significant growth of

RDG's practices.  Instead of honoring the commitment to make RDG the platform group in

Michigan that would become the next Park Dental, Defendants have made the decision that they

do not want to invest significant capital in Michigan.  As a result, Defendants have not provided

the capital and other assistance needed for meaningful growth of RDG's practices through

acquisition or otherwise.

23.     Under RDG's Service Agreement with ADP of Michigan, RDG hired ADP of

Michigan as its agent to perform certain services outlined in the Agreement.  According to the

express terms of the Service Agreement, it was the "sole intention" of the parties that the

services to be provided to RDG by ADP of Michigan "are solely for the purpose of providing

non-dental administrative services to [RDG]."  (Exhibit A, § 9.1.)

24.     ADP of Michigan is the employer of the non-professional staff that provide

administrative and business services to RDG.  RDG employs all of the professional staff,

including the dentists as well as the dental hygienists and dental assistants that provide care to

patients.

25.     The critical overarching principle governing the contractual relationship between

ADP of Michigan and RDG is that RDG and its licensed dentists, and not ADP of Michigan (the

non-professional business corporation hired to provide administrative services) is to be solely

responsible for all decisions relating to dental care.

7

26.  For example, Section 2.5 of the Service Agreement provides that:

The Parties acknowledge and agree that:  (a) Service Company is not authorized or qualified to engage in any activity that may be construed or deemed to constitute the practice of dentistry, and (b) notwithstanding anything in this Agreement to the contrary:  (i) Provider, through its dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants, shall be solely responsible for and shall have complete authority, responsibility, supervision, and control over the provision of all Dental Care and that all Dental Care shall be provided and performed exclusively by or under the supervision of dentists as such dentists, in their sole discretion, deem appropriate, consistent with applicable law; (ii) Service Company shall not have or exercise any control or supervision over the provision of Dental Care. . . .

27.  Similarly, Section 3.3 of the Service Agreement provides:

<u>Dental Decisions</u>.  Notwithstanding the preceding section or any other provisions of this Agreement to the contrary, all Dental Decisions (defined below) will be made solely by the dentist members of the Policy Board; provided that non-dentist members of the Policy Board may participate in the analysis and discussion process.  For purposes of this Agreement, "Dental Decisions" shall mean decisions relating directly to:  (a) types and levels of Dental Care to be provided; (b) recruitment of dentists, dental hygienists, and other licensed dental personnel and unlicensed dental assistants for Provider, including the evaluation of the background, experience, qualification, specialties, and other credentials of such recruited individuals; (c) fee schedules for Provider's services, including without limitation Provider's usual and customary fee schedule; (d) to the extent required by applicable law, third party payor contracting; and (e) any other Dental Care related functions or decisions agreed upon by the Parties.

28.  In short, consistent with the discussions prior to entering into the Service Agreement, RDG and its dentists are to be solely responsible for all dental care related decisions and it is the responsibility of ADP of Minnesota as RDG's administrative service provider to implement those decisions.

29.  Despite this relationship of RDG as the principal and ADP of Michigan  as the agent, Defendants have attempted to turn this relationship on its head, effectively making RDG and its doctors agents of ADPI and part of the "One ADPI" envisioned by ADPI CEO Greg

8

Serrao. Contrary to the terms of the Service Agreement and public policy, Defendants have not allowed RDG and its doctors to make all decisions affecting dental care at RDG's practices and have refused to implement directives from RDG with respect to dental care issues. Defendants have exercised control over these issues through, among other things, their control over RDG's purse strings.

30.     Under the Service Agreement, ADP of Michigan was appointed as the "sole and exclusive agent" of RDG. (Exhibit A, § 2.1.) In addition, ADP of Michigan was granted an "exclusive special power of attorney" and was appointed RDG's "attorney-in-fact" with respect to the handling of RDG's bank account and funds and the use and distribution of revenues generated by RDG's dental practices. (Exhibit A, § 4.12.) In addition, ADP of Michigan was granted a "special power of attorney" and was appointed as RDG's attorney-in-fact with respect to matters involving patient billing, insurance reimbursement, collection of accounts receivable, depositing funds in RDG's bank account, and making payments of RDG's funds out of the bank account. (Exhibit A, § 4.11.) As such, ADP of Michigan has a fiduciary duty to RDG to act in RDG's best interests, to not utilize its authority to its own benefit to the detriment and/or without the consent of RDG, and to deal fairly with RDG in all transactions between ADP of Michigan and RDG and in the use of RDG's funds.

31.     Despite the fact that ADP of Michigan is RDG's agent with fiduciary duties to RDG and the fact that the services to be provided by ADP of Michigan to RDG are supposed to be solely for the purpose of providing non-dental administrative services, ADP of Michigan and ADPI have exercised control over important aspects of RDG's dental practices in ways that affect the dental care provided by RDG, that are inconsistent with the Service Agreement and the role of ADP of Michigan as RDG's agent and fiduciary, and that are inconsistent with

9

commitments made by Defendants prior to and after the execution and effective date of the Service Agreement.

32.     As a former publicly-traded business corporation, with its shares trading on NASDAQ and now as a corporation owned by a private equity firm, ADPI (along with ADP of Michigan) is intensely focused on the financial performance and results.  Given this intense focus on financial results, Defendants have exercised control over expenditures by RDG in a manner that has affected the dental care provided by RDG and its doctors.  Examples of expenditures directed by RDG doctors in order for them to provide dental care in the manner they deem to be appropriate, but that Defendants refused to undertake, are:  replacement of defective nitrous/oxygen systems; purchase of needed dental hand pieces, tools and other important clinical equipment; new lighting systems and other furnishings needed in a number of clinic operatories.  When requests for these and other necessities have been made by RDG doctors, the response from Defendants has generally been, in words or substance "we cannot spend the money or we will not meet our [budget] numbers."

33.     Defendants' focus on the financial bottom line has also resulted in the failure to maintain appropriate staffing levels at RDG clinics.  Hiring of appropriate staff and keeping them motivated and satisfied in their job is critical to RDG's standards of professional quality as well as financial performance.  RDG doctors have requested additional clinical assistants necessary to provide the dental care they believe to be necessary and appropriate.  Due to Defendants' excessive focus on the financial results, Defendants have refused to provide for sufficient staffing of RDG's clinics.  Defendants have also refused to provide for any staff raises for an extended period of time, thereby undermining staff morale and resulting in staff turnover.

34.     Defendants have taken other steps contrary to the directions of RDG.  For example, RDG had always worked with its patients to provide them with needed care, even if the patients could not pay for the services or needed to be extended credit so they could pay a bill over time.  RDG views this financial flexibility to be an important service because without it, some patients will simply not get dental care or will not see a dentist with the frequency necessary for appropriate care.  ADPI as part of its bill collection efforts has implemented policies that take away this flexibility, that result in refusal of dental services to patients, and that result in threatening bill collection communications to patients.

35.     On or about November 15, 2010, RDG provided Defendants as its agent and fiduciary with written directions as to a number of necessary expenditures (many of which had been previously requested) and other actions needed for ADP of Michigan to comply with its obligations under the Service Agreement.  A copy of that letter is attached hereto as Exhibit B and is incorporated herein.  Defendants provided no response within 30 days and took no steps within that period to even begin implementing the directions it had received from RDG.  Defendants' failure to respond and correct the problems is a breach of the Service Agreement.

36.     In a January 18, 2011 letter to representatives of ADP of Michigan and ADPI, RDG identified specific staffing needs for its practices and directed its agent to immediately take steps to fill three positions.  A copy of that letter is attached hereto as Exhibit C and incorporated herein.  Defendants have failed to take any timely or sufficient steps to implement this directive from RDG.  Defendants' actions are a breach of the Service Agreement.

37.     In its November 15, 2010 letter (Exhibit B), RDG addressed the issue of staff raises, directing that "it is critical that staff receive raises of not less than 3% for 2011."  For several months, Defendants took no steps to implement such staff compensation increases.

11

Then, after several months had passed, Defendants unilaterally implemented certain minimal staff raises that had never been approved by RDG and directly contrary to what RDG had directed. Defendants' actions are a breach of the Service Agreement.

38.     Moreover, under its "One ADPI Compensation Philosophy," ADPI has set a financial metric that dental assistants cannot be paid more than a specific maximum hourly wage. Because several of RDG's dental assistants have been working for RDG for many years, and are valuable and critical team members in the dental care provided to patients, already are paid at or above ADPI's unilateral metric, Defendants have dictated that these staff members (who are not even employees of Defendants) will get no raises at all.

39.     As RDG's agent and fiduciary, ADP of Michigan collects all revenues generated by RDG's practices and deposits the funds into a "Provider Account," a bank account in the name of RDG. Rather than leaving the funds in RDG's bank account so that the funds can be used to pay RDG's expenses, including fees payable to ADP of Michigan under the Service Agreement, ADP of Michigan instead "sweeps" the funds from the account on a daily or other periodic basis. The funds are then transferred into one or more accounts used and/or controlled by ADPI, such that Defendants have control over all of RDG's funds and control what payments are made from RDG's funds. By taking possession and control of RDG's funds, ADPI takes on the same fiduciary duty as the duty owed by ADP of Michigan to RDG.

40.     Through their sweep and control over the funds deposited into RDG's bank account, Defendants benefit because among other things, ADPI is able to reduce the amount by which it must draw on its own credit facility. The same conduct harms RDG by depriving it of the investment income that could otherwise be earned on the funds.

41.     In its November 15, 2010 letter (Exhibit B), RDG directed that the "sweep" of its bank account be discontinued, and requested its agent to provide RDG with a monthly general ledger or comparable report of payments out of RDG's account and provide RDG with necessary paperwork to give officers of RDG signing authority for RDG's own account. Defendants have ignored this direction and request, and failed to take any of the steps that RDG directed or requested that they take. Defendants continue to sweep RDG's account and exercise complete control over RDG's funds. Moreover, in exercising this unilateral control over RDG's account and funds, RDG has acted in a manner contrary to the best interests of RDG, contrary to the direction from RDG, and in a manner that interferes with RDG's ability to make or direct dental care decisions regarding dental care and their doctor-patient relationships in the manner they believe is appropriate.

42.     Under the Service Agreement, RDG is to maintain professional and comprehensive general liability insurance coverage covering RDG and its dentists. Such insurance is to be obtained and maintained with commercial carriers or through self insurance by RDG. Upon information and belief, ADPI and ADP of Michigan have in recent years arranged for professional liability coverage for RDG that results in payment to ADPI and/or ADPI's wholly owned captive insurance subsidiary, Edgewater Indemnity Company. Upon information and belief, ADPI and ADP of Michigan have not attempted to obtain or provide to RDG competitive bids or otherwise obtain the best insurance at the least cost, but rather have implemented an "insurance program" for RDG to provide financial benefit to ADPI and/or its affiliated insurance company.

43.     As a result of the conduct of Defendants, which has been part of the "One ADPI" philosophy they have attempted to force on RDG, ADP has breached its obligations to RDG and

13

has interfered with RDG's ability to make or direct decisions regarding dental care or otherwise operate their practices and deal with their patients in the way they believe in their professional opinions to be appropriate.

44.     As a result of Defendants' actions and inactions, ADP of Michigan is in breach of the Service Agreement and in breach of their fiduciary duty to RDG, and RDG is entitled to terminate the Service Agreement.  Notwithstanding these breaches, Defendants have refused to allow RDG to end the Service Agreement or move their dental practices to locations other than the clinics controlled by Defendants.

45.     Defendants' improper efforts to control the practice of dentistry, dental care, and doctor-patient relationships are also reflected by their improper insistence on enforcing non-compete agreements RDG has with its dentists.  Employment agreements between RDG and its doctors prevent the doctors for a period of time from competing with RDG within a 10-mile radius of their current clinic locations.  ADP of Michigan asserts that it is a third-party beneficiary of these non-compete agreements between RDG and its doctors, even though Defendants, as non-professional business corporations, are legally prohibited from engaging in the practice of dentistry and therefore as a matter of law cannot compete with a professional dental practice.  Defendants have no cognizable interest that would justify them from enforcing non-compete agreements against doctors, but nonetheless have indicated an intent that, regardless of whether RDG enforces the non-competes, ADP of Michigan can enforce the non-competes and thereby control the practice of dentistry in violation of law and public policy.

46.     Defendants have through their conduct continued to violate their contractual and fiduciary duties to RDG since the filing of the original Complaint.  Such conduct, includes, but is not limited to the following:

14

a.  failing to meet staffing, equipment and other needs of RDG's practices, as identified in an RDG letter to defendants on or about May 27, 2011;

b.  failing to correct RDG's cash application process and vendor account policies, as described in RDG's letter to defendants on or about August 16, 2011;

c.  failing to meet needs with respect to facilities repairs and replacements as identified to ADPI's Joint Policy Board members and discussed in RDG's letter to defendants on or about May 10, 2012;

d.  failing to implement compensation policies, as described in RDG's letter to defendants on or about July 2, 2012;

e.  failing to properly address mold issues in RDG clinics and refusal to pay for mold evaluation and remediation work, as discussed in RDG's letter to defendants on or about July 13, 2012

f.  failing to replace dental equipment, as discussed in RDG's letter to defendants on or about March 5, 2013;

g.  failing to pay compensation and benefits for a staff member, as discussed in RDG's letter to defendants on or about May 8, 2013;

h.  failing to meet needs for patient recall staffing and process, as discussed in RDG's letter to defendants on or about May 29, 2013;

i.  failing to provide appropriate clinic cleaning services, as discussed in RDG's letters to defendants on or about October 5, 2012 and June 11, 2013; and

j.  failing to deposit RDG revenue in RDG's bank account (the Provider Account) or change the handling of payments by patients and insurers, as described in RDG's letter to defendants on or about July 3, 2013; and

k.  failing to approve budgets without RDG's agreement to defendants' demands that the budgets provide funding levels that are inadequate for the needs of RDG and its patients.

## COUNT I
## BREACH OF FIDUCIARY DUTY

47.    RDG incorporates by references paragraphs 1 through 46 above.

48.    As the result of its status and duties to RDG under the Service Agreement,
specifically including the power of attorney granted by RDG to ADP of Michigan and ADP of
Michigan's appointment as RDG's exclusive agent and attorney-in-fact, ADP of Michigan owes
a fiduciary duty to RDG.

49.    As a result of ADPI's control over ADP of Michigan and in light of the fact that
ADPI asserts control over RDG's funds once they are swept on a daily or other period basis from
RDG's bank account, ADPI owes a fiduciary duty to RDG.

50.    By their above described actions and omissions, ADP of Michigan and ADPI
have breached their fiduciary duty, including multiple actions and omissions by which
Defendants have failed to act in the best interests of RDG and have acted in the self interest of
ADP of Michigan and ADPI, and often in a manner that is contrary to the direction of RDG
and/or at the expense or to the detriment of RDG.

51.    RDG has been damaged as a direct and proximate result of the breaches of
fiduciary duty by ADP of Michigan and ADPI in an amount in excess of $75,000, exclusive of
interest and costs.

## COUNT II
## BREACH OF CONTRACT

52.    RDG incorporates by references paragraphs 1 through 51 above.

53.    By its above described actions and omissions, ADP of Michigan has materially
breached its contractual obligations, specifically including the Service Agreement and the
implied covenant of good faith and fair dealing.

54.    As a direct and proximate result of said breaches of contract, RDG has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

**COUNT III**
**DECLARATORY AND/OR INJUNCTIVE RELIEF**

55.    RDG incorporates by references paragraphs 1 through 54 above.

56.    Upon a judicial determination that ADP of Michigan has materially breached a fiduciary duty to RDG, RDG is entitled to terminate the Service Agreement.  RDG is also entitled to terminate the Service Agreement due to ADP of Michigan's failure to comply with or perform material duties or obligations under the Service Agreement.  RDG is and/or will be entitled to terminate the Service Agreement.

57.    ADP of Michigan, as lessee, controls all of the clinics utilized by RDG, and owns all of the assets, including all dental furniture and equipment and other furnishings, used in RDG's practices.  ADP of Michigan also is the employer of many of the non-professional staff performing services for RDG.

58.    The Service Agreement does not provide a defined process or timetable to be followed to separate RDG and its practices from Defendants upon a termination of the Service Agreement.  The Service Agreement does provide that upon termination by RDG under the relevant sections of the Service Agreement, RDG has an option to purchase assets and assume liabilities of ADP of Michigan, but the closing on this purchase may take up to 180 days from the notice of termination.  If RDG does not exercise this option, the Agreement does not articulate how and when RDG will transition its current practice locations.

59.    Upon termination of the Service Agreement by RDG, if RDG does not exercise its purchase option, RDG will need time to locate and purchase (or rent) space for new clinics to design and build-out the spaces as needed for dental clinics, to purchase and install all

17

equipment, materials and supplies needed to operate the practices, and to hire all needed personnel. Even if RDG does exercise the option, Defendants will continue to own and/or control the clinic locations and other assets, but the closing on the purchase of the assets may take up to 180 days.

60.     Because Defendants own the assets and control the clinic locations, this would allow Defendants to attempt to force RDG out of the existing clinics before RDG is prepared to begin operations at new clinics or has purchased the assets of the existing clinics. Without locations to serve its patients, the business of RDG would be destroyed or significantly impaired within a short period of time, and RDG's patients would be prevented from obtaining needed dental services from their RDG dentists and thereby irreparably harmed.

61.     Upon information and belief, ADPI and its Minnesota subsidiary used just such tactic of attempting to force the Park Dental doctors out of their clinics before they could establish new practice locations after the Park Dental doctor group in Minnesota notified ADPI of the termination of a similar Service Agreement. The Park Dental Doctor Group introduced evidence at trial of its lawsuit against ADPI (and its Minnesota subsidiary) that this and other conduct by defendant would destroy Park Dental's business and interfere with Park Dental's ability to serve its patients. At the conclusion of trial and based in large part due to such conduct, the jury entered a verdict against ADPI and its Minnesota subsidiary of approximately $88 million in compensatory damages and over $40 million in punitive damages. Given this history, RDG reasonably believes that Defendants will employ a similar strategy upon any termination of the Service Agreement by RDG.

62.     It would be a violation of Defendants' contractual obligations, including the implied covenant of good faith and fair dealing, and their fiduciary duty to RDG to engage in such conduct upon the termination of the Service Agreement by RDG.

63.     To avoid the potential for massive irreparable harm to RDG and its patients and in light of the absence of any provision in the Service Agreement for implementation of a responsible and well-defined process following termination of the Service Agreement, the Court should oversee and direct the transition process through entry of appropriate injunctive and/or declaratory relief.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT AND/OR**
**PROSPECTIVE ECONOMIC ADVANTAGE**

64.     RDG incorporates by references paragraphs 1 through 63 above.

65.     RDG has contractual relationships with its patients and prospective patients that requires RDG and its doctors to provide dental care in the manner they believe to be appropriate and in the best interests of the patients without interference or limitation by Defendants or other non-dentists.

66.     RDG has relationships with its employees, including dental assistants and hygienists who are critical team members in the care provided to patients and for whom RDG directed staff raises of at least 3% for 2011.

67.     RDG has a relationship with the State of Michigan, which licenses RDG's dentists, that expressly and/or impliedly requires RDG and its doctors to provide dental care in the manner they believe to be appropriate and in the best interests of its patients without interferences, or limitations by Defendants or other non-dentists.

19

68.      Defendants have knowledge of said contracts, relationships, and prospective relationships and/or business expectancy.

69.      Defendants have intentionally and without justification interfered with and/or caused the breach of said contracts, relationships, and/or relationships and/or business expectancy.

70.      As a result, RDG has incurred and will continue to incur substantial damages in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

71.      RDG incorporates by references paragraphs 1 through 70 above.

72.      As a result of Defendants' above-referenced conduct, Defendants' have received a benefit from RDG.

73.      It would be inequitable to allow Defendants to retain that benefit.

74.      As a result, RDG is entitled to an award against Defendants in an amount to be determined at trial.

## COUNT VI
## CONSTRUCTIVE TRUST AND ACCOUNTING

75.      RDG incorporates by references paragraphs 1 through 74 above.

76.      RDG is entitled to a constructive trust with respect to any and all funds swept from its bank account and/or otherwise owned by RDG that Defendants have caused to be improperly paid to or retained by or for the benefit of Defendants or any affiliates of Defendants.

77.      RDG is entitled to a detailed audit and accounting with respect to any and all revenues generated by RDG and the payment of said funds to or for the benefit of Defendants.

### PRAYER FOR RELIEF

WHEREFORE, RDG prays that the Court enter relief, including the following:

1.    Award damages in favor of RDG and against Defendants, in an amount in excess of $25,000;

2.    Entry of such declaratory and/or injunctive relief as requested herein, including but not limited to imposing a reasonable transition that will allow RDG to end its relationship with Defendants and establish clinics without jeopardizing RDG's patient's ability to obtain continuity of care for their medical needs;

3.    Order a constructive trust and accounting as requested in Count VI;

4.    Award RDG its costs, disbursements, and attorneys' fees herein; and

5.    Entry of such other equitable and just relief as the Court finds appropriate.

### JURY TRIAL DEMAND

This action was commenced in Wayne County Circuit Court for the State of Michigan, and subsequently removed to this Court.  In the state court action, RDG filed a demand for jury trial on all issues triable by jury.  Pursuant to Fed. R. Civ. P. 81(c), RDG continues to demand a jury trial on all issues triable by jury.

Respectfully submitted:

**Seyburn, Kahn, Ginn, Bess & Serlin, P.C.**

By: _____
     Ronald L. Cornell, Jr. (P46860)
Attorneys for Plaintiff
2000 Town Center-Ste. 1500
Southfield, MI  48075 (248) 353-7620

and

**Anthony Ostlund Baer & Louwagie P.A.**
     Joseph W. Anthony (MN Atty. #2872)
     Randy G. Gullickson (MN Atty. #185607)
Co-Counsel for Plaintiff
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402  (612) 349-6969

Dated: ___8·12___, 2013

## CERTIFICATE OF SERVICE

This is to certify that on August 12, 2013, I electronically filed the foregoing paper using the ECF system which will send notification of such filing to all those participating in same.

/s/ Ronald L. Cornell, Jr. (P46860)
Ronald L. Cornell, Jr.  (P46860)
Attorneys for Plaintiff
2000 Town Center, Suite 1500
Southfield, MI 48075-1195
Telephone:  (248) 353-7620
rcornell@seyburn.com

{00831379.DOC}